EXHIBIT A

# MORRIS, NICHOLS, ARSHT & TUNNELL

1201 NORTH MARKET STREET
P.O. BOX 1347
WILMINGTON, DELAWARE 19899-1347

302 658 9200
302 658 3989 FAX

December 13, 2005

JACK B. BLUMENFELD
302 575 7291
302 425 3012 Fax
jblumenfeld@mnat.com

**BY ELECTRONIC FILING**
The Honorable Kent A. Jordan
United States District Court
844 King Street
Wilmington, DE 19801

Re:    _Intel Corp. v. AmberWave Systems Corp.,_ C.A. No. 05-301 (KAJ)

Dear Judge Jordan:

We write on behalf of AmberWave in connection with the telephonic hearing scheduled for 3:30 p.m. on December 15, 2005. There are two principal discovery issues that AmberWave would like to address at the hearing.

### A.    Intel's Refusal To Provide Discovery Relating To The Use of Its Strained Silicon Process In All Products

Strained silicon enhances the performance of microprocessors. AmberWave's '292 patent teaches a method of avoiding the presence of impurities in strained silicon. Intel uses this technology as part of its method of creating strain in its microprocessors. ("Intel's Strained Silicon Process.")

Every few years Intel introduces a new group of features in its products—a "technology node." Intel is currently selling products using its 90 nm node. Intel reports that its 65 nm node products will ship by the end of this month, and that its 45 nm products will be available in 2007 (Ex. A).

AmberWave maintains that Intel's Strained Silicon Process infringes the '292 patent, and therefore seeks discovery on all uses of this process in Intel's 90 nm, 65 nm, and 45 nm nodes. Intel has limited all of its discovery responses to commercially-available 90 nm products, and has refused to produce any documents or provide any interrogatory answers regarding the use of that process in its 65 nm and 45 nm nodes (_See, e.g.,_ Ex. B at 47).

Making, using, offering to sell, and selling are separate acts of infringement. 35 U.S.C. § 271(a). "It is beyond argument that performance of only _one_ of the three enumerated acts [making, using, selling] is patent infringement." _Roche Prods., Inc. v. Bolar Pharm. Co., Inc.,_ 733 F.2d 858, 861 (Fed. Cir. 1984). Intel's use of its Strained Silicon Process is an act of

The Honorable Kent A. Jordan
December 13, 2005
Page 2

infringement, regardless of whether the devices produced are currently on the market. Indeed, courts consistently recognize that pre-commercial manufacture or use is an act of infringement. *See id.* (allowing infringement claim based on research and noting that "patentee does not need to have *any* evidence of damages or lost sales to bring an infringement action"); *Embrex, Inc. v. Service Eng'g Corp.*, 216 F.3d 1343, 1349 (Fed. Cir. 2000) (precommercial use of patented method is infringement); *Ballard Med. Prods. v. Concord Labs., Inc.*, 700 F. Supp. 796, 799 (D. Del. 1988) ("The manufacture of the prototype...constitutes an alleged 'making' thus arguably infringing plaintiff's patent ....").

Discovery regarding Intel's 65 nm and 45 nm products is directly relevant to claims brought by both AmberWave and Intel. AmberWave's interrogatory responses confirm that Intel's 90, 65, and 45 nm products produced using Intel's Strained Silicon Process are all accused of infringement (Ex. C at 6-7). In addition, Intel's Supplemental Complaint does not make any distinction between commercial and pre-commercial products in the relief requested in its declaratory judgment claim (D.I. 62 at ¶¶ 13-16). Finally, evidence that Intel is using the '292 patent in future products establishes the technology's value, which is relevant to damages.

AmberWave is an engineering firm that generates revenue by providing design and technical consulting services related to the development of strained silicon technology. As a result, Intel's pre-commercial development activities that infringe the '292 patent are just as relevant to AmberWave's business as the commercial use of the invention.

**B.    Intel's Failure to Provide Meaningful Responses to Contention Interrogatories**

The Court's Scheduling Order encourages the early use of contention interrogatories (D.I. 25 at ¶ 3(d)). AmberWave's contention interrogatories to Intel fall into two categories: (1) facts that support Intel's affirmative defenses of invalidity, unclean hands, and estoppel (Interrogatory Nos. 1-3); and (2) facts that support Intel's claim that it does not infringe the '292 patent (Interrogatory Nos. 4-7). Although Intel filed its complaint against AmberWave almost seven months ago, and the parties are now three and a half months into discovery, Intel has not provided meaningful answers to these interrogatories.[1]

Invalidity Contentions: Interrogatory No. 1 asks Intel to identify the facts that support its affirmative defenses that the '292 patent is invalid (*See* Intel Reply to Counterclaim, D.I. 14 at 3-4, Third-Fifth Defenses). Intel responded by reciting the legal definitions of invalidity based on anticipation, obviousness, non-enablement, and indefiniteness. The only "facts" that Intel provides to support its contentions are a list of 333 prior art references. Intel's response fails to: (1) identify which disclosures in its 333 cited references support Intel's contentions of anticipation and obviousness, and what other facts support these contentions; (2) provide any explanation for its non-enablement and indefiniteness defenses; and (3) provide any information

---

[1]    Intel also failed to provide any meaningful identification of the documents that support its contentions, and persons with knowledge of the contentions, as requested.

The Honorable Kent A. Jordan
December 13, 2005
Page 3

to support its affirmative defenses based on double patenting and improper naming of inventors (*See* D.I. 14 at 4, Fourth and Fifth Defenses).

Non-Infringement:  Interrogatory No. 6 asks Intel to identify the facts that support its contention that it does not infringe any claim of the '292 patent.  Intel's response simply copied sixteen phrases from the four independent claims of the '292 patent, and states that "the accused infringing products do not meet at least one or more" of the sixteen phrases (Ex. B at 50-51). Intel must provide a meaningful explanation of why the products and processes at issue in this case do not infringe these limitations.

Additionally, in Interrogatory No. 4, AmberWave asked Intel to provide its construction of the terms in the '292 patent that Intel cites as a basis for its non-infringement position.[2]  Intel has refused to do so, despite the fact that it must have formed a contention on the meaning of these terms in order to maintain that it does not infringe them.

Estoppel:  Intel's Seventh Affirmative Defense states that AmberWave's infringement claim "is barred in whole or part under principles of equity, including laches, prosecution laches, waiver and/or estoppel" (D.I. 14 at 4).  AmberWave's Interrogatory No. 3 asks Intel to identify the facts that support this defense.  Intel responded that it "cannot properly respond to this interrogatory until discovery has proceeded further" (Ex. B at 44).  Intel should either disclose facts that support its defense, or withdraw it.

Unclean Hands: Intel's Sixth Affirmative Defense states that AmberWave's infringement claim is barred based on unclean hands (D.I. 14 at 4).  Interrogatory No. 2 asked Intel to identify the facts that support this defense.  Intel's response states only that unidentified '292 patent inventors failed to disclose unspecified prior art to the Patent Office (Ex. B at 43).  If Intel seeks to maintain this defense, it should be required to provide a meaningful explanation of its basis.

We thank Your Honor for hearing the parties on these issues.

Respectfully,

*/s/ Jack B. Blumenfeld*

Jack B. Blumenfeld

Attachments

cc:    Peter T. Dalleo, Clerk (By Hand)
       Josy W. Ingersoll, Esquire (By Hand)
       George M. Newcombe, Esquire (By Fax)

---

[2]    Interrogatory No. 4 originally requested that Intel provide a definition of all claim terms in the '292 patent because Intel's complaint sought a declaration of non-infringement on all claims.  AmberWave subsequently made a written offer to limit the interrogatory to the terms Intel uses as a basis for its non-infringement position.

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

INTEL CORPORATION,                  )
                                    )
            Plaintiff,              )
                                    )
      v.                            )      Civil Action No. 05-301-KAJ
                                    )
AMBERWAVE SYSTEMS CORPORATION,      )
                                    )
            Defendant.              )
_____)
                                    )
AMBERWAVE SYSTEMS CORPORATION,      )
                                    )
            Counterclaimant,        )
                                    )
      v.                            )
                                    )
INTEL CORPORATION,                  )
                                    )
            Counterdefendant.       )

## INTEL'S RESPONSES AND OBJECTIONS TO AMBERWAVE'S SECOND SET OF INTERROGATORIES

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff and Counterdefendant Intel Corporation ("Intel") through its lead counsel Simpson Thacher & Bartlett LLP, hereby objects and responds to AmberWave's Second Set of Interrogatories ("Interrogatories"), propounded on December 16, 2005 by Defendant and Counterplaintiff AmberWave Systems Corporation ("AmberWave") as follows:

Intel's responses are based solely on the documents, facts and contentions known and available to Intel at this time. Intel has not completed its investigation of the facts and documents relating to this action and is only in the initial phases of discovery in this action. Because Intel's investigation, research and analysis are ongoing in this case, it is very likely that additional documents, facts or contentions will be disclosed that will add meaning to already

5

16.    Intel objects to the instructions regarding requiring Intel to provide information in the possession of its "predecessors and/or successor" as well as its "officers, directors, agents, employees, servants, representatives and attorneys." The terms "predecessors," "successor," "officers," "directors," "agents," "employees," "servants," "representatives" and "attorneys" are vague, ambiguous, overbroad, unduly burdensome and seek information that is not reasonably calculated to lead to the discovery of information relevant to the claims or defenses of any party. Intel further objects to the term "attorneys" to the extent it calls for information that is privileged by virtue of the attorney-client privilege, the work-product doctrine and/or other judicially recognized protections or privileges.

17.    Intel objects to the Interrogatories to the extent they seek improperly to aggregate several separate and discrete interrogatories and exceed the limit of fifty interrogatories as agreed to by the parties and allowed by the Court.

## SPECIFIC OBJECTIONS AND ANSWERS

Subject to and without in any way waiving the foregoing objections, each of which is expressly incorporated into each of the individual answers below, Intel further responds to the Interrogatories as follows:

## INTERROGATORY NO. 8:

Identify all facts (including all DOCUMENTS) that support or contradict, and identify all persons with knowledge of, INTEL's contention that it has not infringed and is not infringing the '371 PATENT, either directly, by the doctrine of equivalents, by inducement, or by contribution.

## RESPONSE TO INTERROGATORY NO. 8:

In addition to the General Objections, which are incorporated fully by reference herein, Intel objects to this interrogatory as vague, ambiguous, overbroad, unduly burdensome and compound. Intel additionally objects to the terms "all," "identify" and "persons with

knowledge" because the terms are vague, ambiguous, overbroad, unduly burdensome, and seek information that is not reasonably calculated to lead to the discovery of information relevant to the claims or defenses of any party. Intel further objects to the terms "infringed," "infringing," "doctrine of equivalents," "inducement" and "contribution" because the terms are vague, ambiguous, overbroad, unduly burdensome and call for a legal conclusion that is privileged under the attorney-client privilege, the work-product doctrine and/or other judicially recognized protections or privileges. Intel additionally objects to the terms "infringed," "infringing," "doctrine of equivalents," "inducement" and "contribution" to the extent they seek to elicit an admission from Intel, by virtue of Intel's response to this request as to the meaning of the terms. Intel also objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege, the work-product doctrine and/or other judicially recognized protections or privileges. Intel further objects to the interrogatory because it requires Intel to speculate as to what the '371 Patent purports to have invented. Intel additionally objects to this interrogatory to the extent it seeks documents relating to Intel products that AmberWave has not accused of infringing the '371 Patent. Intel further objects to this interrogatory to the extent that it seeks the disclosure of information that reflects or discloses trade secrets, other confidential, financial or proprietary information of Intel or personal information that is protected by constitutional, statutory, common law or privacy rights. Intel additionally objects to this interrogatory to the extent it seeks a third party's confidential, trade secret or proprietary information. Intel will not provide such information without the third party's consent. Intel further objects because the interrogatory improperly seeks to aggregate numerous separate and distinct interrogatories in violation of Federal Rule of Civil Procedure 33(a). The '371 Patent is comprised of thirty-five (35) separate claims, each claim for which AmberWave seeks a determination of no direct infringement, no infringement under the doctrine of equivalents, no inducement and no contribution and each comprises a "subpart" under Federal Rule of Civil Procedure 33(a). Intel states that each of these discrete subparts counts as a separate interrogatory toward AmberWave's total limit of interrogatories. Intel reserves its right to seek a protective order if

and when AmberWave propounds interrogatories in excess of the amount allowed by this Court. Intel further objects to the interrogatory because Intel does not know which of the thirty-five (35) claims AmberWave contends are infringed by Intel's products. Intel further objects to the interrogatory because it calls for Intel to establish that its products do not infringe the '371 Patent and therefore improperly seeks to shift from AmberWave the burden of proving its affirmative claim of patent infringement.

Intel will limit its response to this interrogatory to the independent claim in the '371 Patent – claim 1 – because failure to satisfy the independent claim of the '371 Patent is a full defense to infringement of all thirty-five (35) claims of the patent. To the extent AmberWave argues that any Intel product infringes any of the dependent claims of the '371 Patent, Intel reserves the right to amend its response to this interrogatory. Intel will respond to the interrogatory as of the date of this response and expressly preserves its right to supplement and/or amend its response as additional facts become known.

Subject to the above objections, <u>Intel states that the accused infringing products do not meet at least one or more of the following limitations,</u> which are found in claim 1 of the '371 Patent: (1) "in situ doping the epitaxial layer at a first predetermined level to substantially suppress facet formation"; (2) "forming a substantially facetless semiconductor region." The relevant documents to the above determination include the '371 Patent and other intrinsic and extrinsic evidence relating to the terms in the above referenced claim elements. <u>Other relevant documents also include various technical documents and testimony relating to the design and fabrication of the accused infringing products.</u> These materials will be defined with greater specificity at the end of fact discovery and during expert reports. Intel believes anyone of ordinary skill in the art with access to the above information would have knowledge that Intel does not infringe the claims of the '371 Patent.

depositions responsive to this interrogatory under the schedule established by the Court;
AmberWave cannot force Intel to accelerate those disclosures by serving interrogatories.

## INTERROGATORY NO. 11:

Identify all facts (including all DOCUMENTS) that support or contradict, and
identify all persons with knowledge of, INTEL's contention, including but not limited to the
contention in its ANSWER, that the '371 PATENT is invalid.

## RESPONSE TO INTERROGATORY NO. 11:

In addition to the General Objections, which are incorporated fully by reference
herein, Intel objects to this interrogatory as vague, ambiguous, overbroad, unduly burdensome
and compound. Intel also objects to the terms "all," "identify" and "persons with knowledge"
because the terms are vague, ambiguous, overbroad, unduly burdensome and/or seek information
that is not reasonably calculated to lead to the discovery of information relevant to the claims or
defenses of any party. Intel further objects to the term "invalid" because the term is vague,
ambiguous, overbroad, unduly burdensome and calls for a legal conclusion that is privileged
under the attorney-client privilege, the work-product doctrine and/or other judicially recognized
protections or privileges. Intel additionally objects to the term "invalid" to the extent it seeks to
elicit an admission from Intel, by virtue of Intel's response to this request, as to the meaning of
the term. Intel also objects to this interrogatory to the extent that it seeks information already in
AmberWave's possession, custody, or control or that AmberWave could ascertain or derive from
documents and other discovery that will be provided in connection with AmberWave's own
disclosures or in AmberWave's responses to Intel's document requests. Intel also objects to this
interrogatory to the extent it seeks information protected by the attorney-client privilege, the
work-product doctrine and/or other judicially recognized protections or privileges. Intel notes
that 35 U.S.C. § 282 does not require the disclosure of prior art until "at least thirty days before
trial." Through this interrogatory, AmberWave seeks the disclosure of prior art more than a year
before trial and before AmberWave has given any indication in this litigation as to how it intends
to read the claims of the '371 Patent. Accordingly, the interrogatory is premature. Intel further

12

objects to this interrogatory because Intel will provide expert disclosures and depositions responsive to this interrogatory under the schedule established by the Court. AmberWave cannot force Intel to accelerate those disclosures by serving interrogatories. Intel further objects to this interrogatory because it includes no temporal limitation. Intel will respond to the interrogatory as of the date of this response and expressly reserves its right to supplement and/or amend its response as additional facts become known.

Subject to and without waiving the foregoing objections, Intel states that the '371 patent is invalid pursuant to 35 U.S.C. §102 because the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before any device or method purported to be described in the patent was invented by any applicant for the '371 Patent. Furthermore, any invention purported to be described by the '371 Patent was anticipated by one or more of the prior art references cited below. Moreover, the invention is invalid pursuant to 35 U.S.C. §103 because the differences between the subject matter of the '371 Patent and one or more pieces of prior art identified below are such that the subject matter of the '371 Patent would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter of the '371 Patent pertains. In addition, the '371 Patent is invalid because one skilled in the art could not make or use any invention purported to be described by the '371 Patent without undue experimentation. Moreover, the '371 Patent is invalid because one skilled in the art would not understand what is claimed when the patent is read in light of its specification. The documents that support the foregoing include, but are not limited to, the documents cited below. Intel's investigation of materials that support the invalidity arguments described in this response is ongoing and Intel explicitly reserves the right to supplement and amend its response to this interrogatory at the time of, or prior to, the completion of its investigation. The "persons with knowledge" for the purposes of this response include, but are not limited to, the named inventors in the patents and/or the authors of the publications cited below.

13

1.     D. L. Harame et al., *A High-Performance Epitaxial SiGe-Base ECL BiCMOS Technology,* 1992 Int'l Electron Devices Meeting Tech. Dig. 19.

2.     D. C. Ahlgren et al., *A SiGe HBT BICMOS Technology for Mixed-Signal RF Applications,* 1997 IEEE Bipolar/BiCMOS Circuits and Tech. Meeting 195.

3.     B. S. Meyerson, *Low-Temperature Silicon Epitaxy by Ultrahigh Vacuum/Chemical Vapor Disposition,* 48 Applied Physics Letters 797 (1986).

4.     John D. Cressler, *SiGe HBT Technology: A New Contender for Si-Based RF and Microwave Circuit Applications,* 46 IEEE Transactions on Microwave Theory and Tech. 572 (1998).

5.     K. J. van Oostrum et al., *Characterization of Epitaxial Layers by the Depth Dependence of Boron Diffusivity,* 61 Applied Physics Letters 1513 (1992).

6.     J. R. Pfiester & P. B. Griffin, *Anomalous Co-Diffusion Effects of Germanium on Group III and V Dopants in Silicon,* 52 Applied Physics Letters 471 (1988).

7.     E. J. Prinz et al., *The Effects of Base Dopant Outdiffusion and Undoped $Si_{1-x}Ge_x$ Junction Spacer Layers in $Si/Si_{1-x}Ge_x/Si$ Heterojunction Bipolar Transistors,* 12 IEEE Electron Device Letters 42 (1991).

8.     M. R. Mirabedini et al., *Submicrometre Elevated Source and Drain MOSFET Technology Using E-Beam Evaporated Silicon,* 33 Electronics Letters 1183 (1997).

9.     Jie J. Sun & Carlton Osburn, *Impact of Epi Facets on Deep Submicron Elevated Source/Drain MOSFET Characteristics,* 45 IEEE Transactions on Electron Devices 1377 (1998).

10.     Mark Rodder & D. Yeakley, *Raised Source/Drain MOSFET with Dual Sidewall Spacers,* 12 IEEE Electron Device Letters 89 (1991).

11.     Richard B. Fair, *Boron Diffusion in Silicon-Concentration and Orientation*

14

*Dependence, Background Effects and Profile Estimation*, 122 J. Electrochemical Soc'y 800 (1975).

12.    E. J. Prinz et al., *The Effect of Base-Emitter Spacers and Strain Dependent Densities of States in Si/Si$_{1-x}$Ge$_x$/Si Heterojunction Bipolar Transistors*, 1989 Int'l Electron Devices Meeting Tech. Dig. 639.

13.    Isolation Structure Configurations for Modifying Stresses in Semiconductor Devices, U.S. Patent No. 6,876,053 (filed Aug. 13, 1999) (issued Apr. 5, 2005).

14.    C. S. Fuller & J. A. Ditzenberger, *Diffusion of Donor and Acceptor Elements in Silicon*, 27 J. Applied Physics 544 (1956).

15.    Raj Kumar Jain & Roger J. van Overstraeten, *Theoretical Calculations of the Fermi Level and of Other Parameters in Phosphorus Doped Silicon at Diffusion Temperatures*, 21 IEEE Transactions on Electron Devices 155 (1974).

16.    Mehran Mehregany & Stephen D. Senturia, *Anisotropic Etching of Silicon in Hydrazine*, 13 Sensors and Actuators 375 (1988).

17.    Fariborz Maseeh & Stephen D. Senturia, *Plastic Deformation of Highly Doped Silicon*, A21-A23 Sensors & Actuators 861 (1990).

18.    W. Czaja, *Conditions for the Generation of Slip by Diffusion of Phosphorus into Silicon*, 37 J. Applied Physics 3441 (1966).

19.    Joseph Stach & Alfred Turley, *Anomalous Boron Diffusion in Silicon from Planar Boron Nitride Sources*, 121 J. Electrochemical Soc'y 722 (1974).

20.    Shoichi Mizuo & Hisayuki Higuchi, *Anomalous Diffusion of B and P in Si Directly Masked with Si$_3$N$_4$*, 21 Japanese J. Applied Physics 281 (1982).

21.    S. T. Ahn et al., *Film Stress-Related Vacancy Supersaturation in Silicon Under*

*Low-Pressure Chemical Vapor Deposited Silicon Nitride Films,* 64 J. Applied Physics 4914 (1988).

22.     Heinrich Daembkes et al., *The N-Channel SiGe/Si Modulation-Doped Field-Effect Transistor,* 33 IEEE Transactions on Electron Devices 633 (1986).

23.     K. Rim et al., *Characteristics and Device Design of Sub-100 nm Strained Si N- and PMOSFETs,* 2002 Symp. on VLSI Tech. Digest Tech. Papers 98.

24.     Minjoo Lee et al., *Strained Ge Channel P-Type Metal-Oxide-Semiconductor Field-Effect Transistors Grown on $Si_{1-x}Ge_x/Si$ Virtual Substrates,* 79 Applied Physics Letters 3344 (2001).

25.     P. Gaworzewski et al., *Electrical Properties of Lightly Doped P-Type Silicon-Germanium Single Crystals,* 83 J. Applied Physics 5258 (1998).

26.     Timothy K. Carns et al., *Hole Mobility Measurements in Heavily Doped $Si_{1-x}Ge_x$ Strained Layers,* 41 IEEE Transactions on Electron Devices 1273 (1994).

27.     A. J. Walker et al., *Shallow Boron Junctions and Preamorphization for Deep Submicron Silicon Technology,* 73 J. Applied Physics 4048 (1993).

28.     Juri Kato, *The Annealing Time and Temperature Dependence of Electrical Dopant Activation in High-Dose $BF_2$ Ion Implanted Silicon,* 141 J. Electrochemical Soc'y 3158 (1994).

29.     K. Rim et al., *Strained Si NMOSFETs for High Performance CMOS Technology,* 2001 Symp. on VLSI Tech. Digest Tech. Papers 59.

30.     Jung-Suk Goo et al., *Scalability of Strained-Si nMOSFETs Down to 25 nm Gate Length,* 24 IEEE Electron Device Letters 351 (2003).

31.     P. Kuo et al., *Effects of Strain on Boron Diffusion in Si and $Si_{1-x}Ge_x$,* 66 Applied

Physics Letters 580 (1995).

32.    T. A. Langdo et al., *Preparation of Novel SiGe-Free Strained Si on Insulator Substrates*, 2002 IEEE Intl. SOI Conf. Proc. 211.

33.    N. Moriya et al., *Boron Diffusion in Strained $Si_{1-x}Ge_x$ Epitaxial Layers*, 71 Physical Review Letters 883 (1993).

34.    G. H. Loechelt et al., *Measurement and Modeling of Boron Diffusion in Si and Strained $Si_{1-x}Ge_x$ Epitaxial Layers During Rapid Thermal Annealing*, 74 J. Applied Physics 5520 (1993).

35.    A. Antonelli & J. Bernholc, *Pressure and Strain Effects on Diffusion*, 163 Materials Res. Soc'y Symp. Proc. 523 (1989).

36.    Technique to Obtain Increased Channel Mobilities in NMOS Transistors by Gate Electrode Engineering, U.S. Patent No. 6,281,532 (filed June 28, 1999) (issued Aug. 28, 2001).

37.    N. E. B. Cowern et al., *Diffusion in Strained Si(Ge)*, 72 Physical Review Letters 2585 (1994).

38.    P. M. Fahey et al., *Point Defects and Dopant Diffusion in Silicon*, 61 Reviews of Modern Physics 289 (1989).

39.    K. Rim et al., *Low Field Mobility Characteristics of Sub-100 nm Unstrained and Strained Si MOSFETs*, 2002 Int'l Electron Devices Meeting Tech. Dig. 43.

40.    Anthony Lochtefeld & Dimitri A. Antoniadis, *Investigating the Relationship Between Electron Mobility and Velocity in Deeply Scaled NMOS via Mechanical Stress*, 22 IEEE Electron Device Letters 591 (2001).

41.    M. T. Currie et al., *Carrier Mobilities and Process Stability of Strained Si N- and P- MOSFETS on SiGe Virtual Substrates*, 19 J. Vacuum Sci. & Tech. 2268 (2001).

42.    H. S. P. Wong, *Beyond the Conventional Transistor*, 46 IBM J. Res. & Dev. 133 (2002).

43.    Semiconductor Transistor Having a Stressed Channel, U.S. Patent No. 6,621,131 (filed Nov. 1, 2001) (issued Sept. 16, 2003).

44.    M. Y. Tsai & B. G. Streetman, *Recrystallization of Implanted Amorphous Silicon Layers. I. Electrical Properties of Silicon Implanted with $BF^+_2$ or $Si^+ + B^{+a)}$*, 50 J. Applied Physics 183 (1979).

45.    Semiconductor Device Having Deposited Silicon Regions and a Method of Fabrication, U.S. Patent No. 6,235,568 (filed Jan. 22, 1999) (issued May 22, 2001).

46.    R. A. Powell, *Activation of Shallow, High-Dose $BF_2^+$ Implants into Silicon by Rapid Thermal Processing*, 56 J. Applied Physics 2837 (1984).

47.    M. E. Lunnon & J. T. Chen, *Furnace and Rapid Thermal Annealing of $P^+/n$ Junctions in $BF_2^+$-Implanted Silicon*, 132 J. Electrochemical Soc'y 2473 (1985).

48.    M. Simard-Normandin, *Electrical Characteristics and Contact Resistance of $B^+$- and $BF_2^+$-Implanted Silicon Diodes with Furnace and Rapid Thermal Annealing*, 32 IEEE Transactions on Electron Devices 1354 (1985).

49.    L. C. Hopkins et al., *Enhanced Diffusion in Boron Implanted Silicon*, 132 Journal of the Electrochemical Society 2035 (1985).

50.    Masayasu Miyake & Shinji Aoyama, *Transient Enhanced Diffusion of Ion-Implanted Boron in Si During Rapid Thermal Annealing*, 63 J. Applied Physics 1754 (1988).

51.    C. Carter et al., *Residual Defects Following Rapid Thermal Annealing of Shallow Boron and Boron Fluoride Implants into Preamorphized Silicon*, 44 Applied Physics Letters 459 (1984).

18

52.    S. Solmi et al., *High-Concentration Boron Diffusion in Silicon: Simulation of the Precipitation Phenomena*, 68 J. Applied Physics 3250 (1990).

53.    H. Ryssel et al., *High Concentration Effects of Ion Implanted Boron in Silicon*, 22 Applied Physics 35 (1980).

54.    Gary L. Patton et al., *Silicon-Germanium-Base Heterojunction Bipolar Transistors by Molecular Beam Epitaxy*, 9 IEEE Electron Device Letters 165 (1988).

55.    C. A. King et al., *Si/Si$_{1-x}$Ge$_x$ Heterojunction Bipolar Transistors Produced by Limited Reaction Processing*, 10 IEEE Electron Device Letters 52 (1989).

56.    A. Rodriguez et al., *Strain Compensation by Heavy Boron Doping in Si$_{1-x}$Ge$_x$ Layers Grown by Solid Phase Epitaxy*, 12 J. Materials Res. 1698 (1997).

57.    K. Rim et al., *Enhanced Hole Mobilities in Surface-Channel Strained-Si P-MOSFETs*, 1995 Int'l Electron Devices Meeting Tech. Dig. 517.

58.    Takashi Uchino et al., *MOSFETs with Ultrashallow Junction and Minimum Drain Area Formed By Using Solid-Phase Diffusion from SiGe*, 48 IEEE Transactions on Electron Devices 1406 (2001).

59.    Junichi Murota et al., *CVD Si$_{1-x}$Ge$_x$ Epitaxial Growth and Its Doping Control*, 27 J. Japanese Ass'n for Crystal Growth 171 (2000).

60.    Takaaki Noda et al., *Doping and Electrical Characteristics of In-Situ Heavily B-Doped Si$_{1-x-y}$Ge$_x$C$_y$ Films Epitaxially Grown Using Ultraclean LPCVD*, 380 Thin Solid Films 57 (2000).

61.    Atsushi Moriya et al., *Doping and Electrical Characteristics of In Situ Heavily B-Doped Si$_{1-x}$Ge$_x$ Films Epitaxially Grown Using Ultraclean LPCVD*, 343-344 Thin Solid Films 541 (1999).

62.     Jintae Noh et al., *Contact Resistivity Between Tungsten and Impurity (P and B)-doped $Si_{1-x-y}Ge_xC_y$ Epitaxial Layer*, 212-213 Applied Surface Sci. 679 (2003).

63.     Jie J. Sun et al., *Elevated $n^+/p$ Junctions by Implant into $CoSi_2$ Formed on Selective Epitaxy for Deep Submicron MOSFET's*, 45 IEEE Transactions on Electron Devices 1946 (1998).

64.     Emmanuel Augendre et al., *Elevated Source/Drain by Sacrificial Selective Epitaxy for High Performance Deep Submicron CMOS: Process Window Versus Complexity*, 47 IEEE Transactions on Electron Devices 1484 (2000).

65.     Jie J. Sun et al., *The Effect of the Elevated Source/Drain Doping Profile on Performance and Reliability of Deep Submicron MOSFET's*, 44 IEEE Transactions on Electron Devices 1491 (1997).

66.     S. S. Wong et al., *Elevated Source/Drain MOSFET*, 1984 Int'l Electron Devices Meeting Tech. Dig. 634.

67.     Hideki Shibata et al., *High Performance Half-Micron PMOSFETs with 0.1 μm Shallow $P^+N$ Junction Utilizing Selective Silicon Growth and Rapid Thermal Annealing*, 1987 Int'l Electron Devices Meeting Tech. Dig. 590.

68.     James R. Pfiester et al., *A Self-aligned Elevated Source/Drain MOSFET*, 11 IEEE Electron Device Letters 365 (1990).

69.     Akihiko Ishitani et al., *Facet Formation in Selective Silicon Epitaxial Growth*, 24 Japanese J. Applied Physics 1267 (1985).

70.     Hang Hu et al., *Channel and Source/Drain Engineering in High-Performance Sub-0.1 μm NMOSFETs Using X-Ray Lithography*, 1994 Symp. on VLSI Tech. Dig. Tech. Papers 17.

71.     Low Damage Doping Technique for Self-Aligned Source and Drain Regions, U.S. Patent No. 5,976,939 (filed July 3, 1995) (issued Nov. 2, 1999).

72.     Carlos Mazuré et al., *Facet Engineered Elevated Source/Drain by Selective Si Epitaxy for 0.35 Micron MOSFETS*, 1992 Int'l Electron Devices Meeting Tech. Dig. 853.

73.     Y. Nakahara et al., *Ultra-Shallow In-Situ-Doped Raised Source/Drain Structure for Sub-Tenth Micron CMOS*, 1996 Symp. on VLSI Tech. Dig. Tech. Papers 174.

74.     Maarten J. van Dort et al., *Influence of High Substrate Doping Levels on the Threshold Voltage and the Mobility of Deep-Submicrometer MOSFET's*, 39 IEEE Transactions on Electron Devices 932 (1992).

75.     Chih Hsin Wang, *Identification and Measurement of Scaling-Dependent Parasitic Capacitances of Small-Geometry MOSFET's*, 43 IEEE Transactions on Electron Devices 965 (1996).

76.     Kiyotaka Miyano et al., *Facet-Free Si Selective Epitaxial Growth Adaptable to Elevated Source/Drain MOSFETs With Narrow Shallow Trench Isolation*, 38 Japanese J. Applied Physics 2419 (1999).

77.     R. Gwoziecki et al., *Suitability of Elevated Source/Drain for Deep Submicron CMOS*, 1999 Proc. 29th European Solid-State Device Res. Conf. 384.

78.     H. van Meer et al., *High Performance Raised Gate/Source/Drain Transistors for Sub-0.15 µm CMOS Technologies*, 1999 Proc. 29th European Solid-State Device Res. Conf. 388.

79.     D. Schumann et al., *Impact of Elevated Source/Drain on the Reverse Short Channel Effect*, 1999 Proc. 29th European Solid-State Device Res. Conf. 572.

80.     Satoshi Yamakawa et al., *Drivability Improvement on Deep-Submicron MOSFET's by Elevation of Source/Drain Regions*, 20 IEEE Electron Device Letters 366 (1999).

81.    A. Waite et al., *A Novel Deep Submicron Elevated Source/Drain MOSFET*, 1998 Proc. 28th European Solid-State Device Res. Conf. 885.

82.    Gonçal Badenes et al., *A High Performance 0.18 μm CMOS Technology Designed for Manufacturability*, 1997 Proc. 27th European Solid-State Device Res. Conf. 404.

83.    Takashi Uchino et al., *A Raised Source/Drain Technology Using In-Situ P-Doped SiGe and B-doped Si for 0.1 μm CMOS ULSIs*, 1997 Int'l Electron Devices Meeting Tech. Dig. 479.

84.    G. Badenes et al., *Optimization of Critical Parameters in a Low Cost, High Performance Deep Submicron CMOS Technology*, 1999 Proc. 29th European Solid-State Device Res. Conf. 628.

85.    S. Suzuki & T. Itoh, *Effects of Si-Ge Buffer Layer for Low-temperature Si Epitaxial Growth on Si Substrate by RF Plasma Chemical Vapor Deposition*, 54 J. Applied Physics 1466 (1983).

86.    Mehrdad M. Moleshi et al., *Single-Wafer Integrated Semiconductor Device Processing*, 39 IEEE Transactions on Electron Devices 4 (1992).

87.    N. Endo et al., *Novel Device Isolation Technology with Selective Epitaxial Growth*, 1982 Int'l Electron Devices Meeting Tech. Dig. 241.

88.    Kohetsu Tanno et al., *Selective Silicon Epitaxy Using Reduced Pressure Technique*, 21 Japanese J. Applied Physics L564 (1982).

89.    Akihiko Ishitani et al., *Local Loading Effect in Selective Silicon Epitaxy*, 23 Japanese J. Applied Physics L391 (1984).

90.    Hiroshi Kitajima et al., *Crystalline Defects in Selectively Epitaxial Silicon Layers*, 22 Japanese J. Applied Physics L783 (1983).

91.    J. Sun et al., *Parasitic Resistance Considerations of Using Elevated Source/Drain Technology for Deep Submicron Metal Oxide Semiconductor Field Effect Transistors*, 145 J. Electrochemical Soc'y 2131 (1998).

92.    K. Weldon et al., *Raised Source-Drains Using Selective Silicon Deposition for Sub-Half Micron CMOS Devices*, 94-2 Extended Abstracts Fall Meeting Electrochemical Soc'y 756 (1994).

93.    S. K. Lee et al., *High Quality Thin Epitaxial Silicon Layers Deposited Selectively by Rapid Thermal Processing*, 1989 Proc. Second Int'l Symp' on Ultra Large Scale Integration Sci. Tech. 233.

94.    Keunhyung Park et al., *Analysis of Ion-Implanted Amorphous and Polycrystalline Silicon Films as Diffusion Sources for Ultrashallow Junctions*, 70 J. Applied Physics 1397 (1991).

95.    S. Song et al., *Facet Formation in Selectively Overgrown Silicon by Reduced Pressure Chemical Vapor Deposition*, 1998 Dig. Papers Microprocesses and Nanotechnology '98 240.

96.    Transistor with Ultra Shallow Tip and Method of Fabrication, U.S. Patent No. 5,710,450 (filed Dec. 23, 1994) (issued Jan. 20, 1997).

97.    Akihiko Ishitani et al., *Facet Formation in Selective Silicon Epitaxial Growth*, 24 Japanese J. Applied Physics 1267 (1985).

98.    C. I. Drowley et al., *Model for Facet and Sidewall Defect Formation During Selective Epitaxial Growth of (001) Silicon*, 52 Applied Physics Letters 546 (1988).

99.    S. T. Kim & Y. J. Lee, *Properties of C-Axis-Oriented Freestanding GaN Substrates Prepared on Fused Silica Glass by Hydride Vapor Phase Epitaxy*, 33 J. Korean

Physical Soc'y L1 (1998).

100.    Nobuhiro Endo et al., *Scaled CMOS Technology Using SEG Isolation and Buried Well Process*, 33 IEEE Transactions on Electron Devices 1659 (1986).

101.    John Ogawa Borland, *Novel Device Structures by Selective Epitaxial Growth (SEG)*, 1987 Int'l Electron Devices Meeting Tech. Dig. 12.

102.    U.S. Patent No. 6,555,880 (filed June 7, 2001).

103.    Akihiro Miyauchi et al., *Low-Temperature (850°C) Silicon Selective Epitaxial Growth on HF-Treated Si (100) Subtrates Using $SiH_4$-$HCl$-$H_2$ Systems*, 138 J. Electrochemical Soc'y 3480 (1991).

104.    P. L. Huang et al., *N-Channel MOS Transistors Below 0.5µm with Ultra-Shallow Channels Formed by Low Temperature Selective Silicon Epitaxy*, 387 Materials Res. Soc'y Symp. Proc. 347 (1995).

105.    J. T. Fitch, *Selectivity Mechanisms in Low Pressure Selective Epitaxial Silicon Growth*, 141 J. Electrochemical Soc'y 1046 (1994).

106.    Alan R. Stivers & Chiu H. Ting, *Growth Condition Dependence of SEG Planarity and Electrical Characteristics*, 1987 Proc. Tenth Int'l Conf. on Chemical Vapor Deposition 389.

107.    John O. Borland et al., *Low Temperature Low Pressure Silicon Epitaxial Growth and Its Application to Advanced Dielectric Isolation Technology*, 1986 Extended Abstracts 18th (1986 Int'l) Conf. on Solid State Devices and Materials 53.

108.    B. Gallas et al., *Influence of Doping on Facet Formation at the $SiO_2$/Si Interface*, 440 Surface Science 41 (1999).

109.    Yang-Kyu Choi et al., *30 nm Ultra-Thin-Body SOI MOSFET with Selectively Deposited Ge Raised S/D*, 58th Device Res. Conf. Dig. 23 (2000).

110.    M. C. Arst et al., *Surface Planarity and Microstructure of Low Temperature Silicon SEG and ELO*, 6 J. Materials Res. 784 (1991).

111.    Min Cao et al., *0.18-μm Fully-Depleted Silicon-on-Insulator MOSFET's*, 18 IEEE Electron Device Letters 251 (1997).

112.    D. J. Eaglesham et al., *Growth Morphology and the Equilibrium Shape: The Role of "Surfactants" in the Ge/Si Island Formation*, 70 Physical Review Letters 966 (1993).

113.    Hsiang-Jen Huang et al., *Electrical and Compositional Properties of Co-Silicided Shallow $P^+$-n Junction Using Si-Capped/Boron-Doped $Si_{1-x}Ge_x$ Layer Deposited by UHVCME*, 148 J. Electrochemical Soc'y G126 (2001).

114.    T. I. Kamins et al., *Kinetics of Selective Epitaxial Deposition of $Si_{1-x}Ge_x$*, 61 Applied Physics Letters 669 (1992).

115.    Daniel Kendel & Efthimios Kaxiras, *Surfactant Mediated Crystal Growth of Semiconductors*, 75 Physical Review Letters 2742 (1995).

116.    Ivo J. Raaijmakers et al., *Enabling Technologies for Forming and Contacting Shallow Junctions in Si: HF-Vapor Cleaning and Selective Epitaxial Growth of Si and SiGe*, 17 J. Vacuum Sci. & Tech. 2311 (1999).

117.    Xiaowei Ren et al., *A Novel Implantation Free Raised Source/Drain MOSFET Process Using Selective Rapid Thermal Chemical Vapor Deposition of In-Situ Boron Doped $Si_xGe_{1-x}$*, 303 Materials Ress Soc'y Symp. Proc. 37 (1993).

118.    High Tensile Nitride Layer, U.S. Patent No. 5,633,202 (filed June 6, 1996) (issued May 27, 1997).

119.    S. B. Samavedam et al., *Elevated Source Drain Devices Using Silicon Selective Epitaxial Growth*, 18 J. Vacuum Sci. & Tech. 1244 (2000).

120.    T. O. Sedgwick et al., *Growth of Facet-Free Selective Silicon Epitaxy at Low Temperature and Atmospheric Pressure*, 138 J. Electrochemical Soc'y 3042 (1991).

121.    Katherine E. Violette et al., *Facet-Free Selective Silicon Epitaxy by Reduced-Pressure Chemical Vapor Deposition: Process Evaluation and Impact on Shallow Trench Isolation*, 146 J. Electrochemical Soc'y 1895 (1999).

122.    M. Okada et al., *Epitaxial Growth of Heavily B-Doped SiGe Films and Interfacial Reaction of Ti/B-Doped SiGe Bilayer Structure Using Rapid Thermal Processing*, 369 Thin Solid Films 130 (2000).

123.    Youri V. Ponomarev et al., *High-Performance Deep SubMicron CMOS Technologies with Polycrystalline-SiGe Gates*, 47 IEEE Transactions on Electron Devices 848 (2000).

124.    D. W. Greve & M. Racanelli, *Growth Rate of Doped and Undoped Silicon by Ultra-High Vacuum Chemical Vapor Deposition*, 138 J. Electrochemical Soc'y 1744 (1991).

125.    Qi Xiang et al., *Interfacet Mass Transport and Facet Evolution in Selective Epitaxial Growth of Si by Gas Source Molecular Beam Epitaxy*, 14 J. Vacuum Sci. & Tech. 2381 (1996).

126.    T. I. Kamins et al., *Kinetics of Selective Epitaxial Deposition of $Si_{1-x}-Ge_x$*, 61 Applied Physics Letters 669 (1992).

127.    M. R. Goulding, *The Selective Epitaxial Growth Of Silicon*, B17 Materials Sci. and Engineering 47 (1993).

128.    V. Ilderem & R. Reif, *Very Low Pressure Chemical Vapor Deposition Process for Selective Titanium Silicide Films*, 53 Applied Physics Letters 687 (1988).

129.    Syun-Ming Jang et al., *Phosphorus Doping of Epitaxial Si and $Si_{1-x}Ge_x$ at Very*

*Low Pressure*, 63 Applied Physics Letters 1675 (1993).

130.    T. V. Savina et al., *Faceting of a Growing Crystal Surface by Surface Diffusion*, 67 Physical Review E 1 (2003).

131.    M. Okada et al., *Epitaxial Growth of Heavily B-Doped SiGe Films and Interfacial Reaction of Ti/B-Doped SiGe Bilayer Structure Using Rapid Thermal Processing*, 369 Thin Solid Films 130 (2000).

132.    K. Ota et al., *Novel Locally Strained Channel Technique for High Performance 55nm CMOS*, 2002 Int'l Electron Devices Meeting Tech. Dig. 27.

133.    A. Shimizu et al., *Local Mechanical Stress Control (LMC): A New Technique for CMOS-Performance Enhancement*, 2001 Int'l Electron Devices Meeting Tech. Dig. 433.

134.    Sandip Tiwari et al., *Hole Mobility Improvement in Silicon-on-Insulator and Bulk Silicon Transistors Using Local Strain*, 1997 Int'l Electron Devices Meeting Tech. Dig. 939.

135.    M. R. Mirabedini et al., *Submicrometre Elevated Source and Drain MOSFET Technology Using E-Beam Evaporated Silicon*, 33 Electronics Letters 1183 (1997).

**INTERROGATORY NO. 12:**

Identify all facts (including all DOCUMENTS) that support or contradict, and identify all persons with knowledge of, INTEL's contention, including but not limited to the contention in its ANSWER, that AMBERWAVE has unclean hands and therefore should be barred from recovering any relief based in the '371 PATENT.

**RESPONSE TO INTERROGATORY NO. 12:**

In addition to the General Objections, which are incorporated fully by reference herein, Intel objects to this interrogatory as vague, ambiguous, overbroad, unduly burdensome and compound.  Intel also objects to the terms "all," "identify," "persons with knowledge" and "relief" because the terms are vague, ambiguous, overbroad, unduly burdensome, and seek

information that is not reasonably calculated to lead to the discovery of information relevant to the claims or defenses of any party. Intel further objects to the terms "unclean hands" and "barred" because the terms are vague, ambiguous, overbroad, unduly burdensome and call for a legal conclusion that is privileged under the attorney-client privilege, the work-product doctrine and/or other judicially recognized protections or privileges. Intel additionally objects to the terms "unclean hands" and "barred" to the extent they seek to elicit an admission from Intel, by virtue of Intel's response to this request, as to the meanings of the terms. Intel further objects that information to support a defense based on the legal and/or equitable principle of "unclean hands" is in the possession of AmberWave. Intel also objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege, the work-product doctrine and/or other judicially recognized protections or privileges. Intel further objects to this interrogatory as premature and improper because Intel cannot properly respond to this interrogatory until discovery has proceeded further. Intel will respond to the interrogatory as of the date of this response and expressly preserves its right to supplement and/or amend its response as additional facts become known.

Subject to and without waiving the foregoing objections, Intel intends to develop during discovery facts sufficient to support an assertion of the affirmative defense of unclean hands and reserves the right to amend its response if discovery reveals facts that support such a defense.

**INTERROGATORY NO. 13:**

Identify all facts (including all DOCUMENTS) that support or contradict, and identify all persons with knowledge of, INTEL's contention, including but not limited to the contention in its ANSWER, that AMBERWAVE should be barred in whole or in part from recovering based on the '371 PATENT under principles of equity, including laches, prosecution laches, waiver, and/or estoppel.

Dated: February 3, 2006

As to the Objections:

By: _____

George M. Newcombe (admitted *pro hac vice*)
Patrick E. King
SIMPSON THACHER & BARTLETT LLP
3330 Hillview Avenue
Palo Alto, CA 94304
(650) 251-5000

Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
YOUNG CONWAY STARGATT &
TAYLOR LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
jingersoll@ycst.com

Attorneys for Plaintiff and Counterdefendant
Intel Corporation

EXHIBIT C

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMBERWAVE SYSTEMS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-837-KAJ |
| | ) | |
| INTEL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## INTEL'S AMENDED RESPONSES AND OBJECTIONS TO AMBERWAVE'S FIRST
## SET OF INTERROGATORIES

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff and
Counterdefendant Intel Corporation ("Intel") through its lead counsel Simpson Thacher &
Bartlett LLP, hereby objects and responds to AmberWave's First Set of Interrogatories
("Interrogatories"), propounded on December 16, 2005 by Defendant and Counterplaintiff
AmberWave Systems Corporation ("AmberWave") as follows:

Intel's responses are based solely on the documents, facts and contentions known
and available to Intel at this time.  Intel has not completed its investigation of the facts and
documents relating to this action and is only in the initial phases of discovery in this action.
Because Intel's investigation, research and analysis are ongoing in this case, it is very likely that
additional documents, facts or contentions will be disclosed that will add meaning to already
known documents, facts or contentions, and/or possibly lead to additions, deletions or changes to
these responses.  Intel reserves its right to amend, modify or supplement the objections and
answers stated herein.  Intel further reserves its right to rely on any facts, documents or other
evidence which may develop or come to Intel's attention at a later date.  Intel also reserves the
right to rely on expert testimony.

## SPECIFIC OBJECTIONS AND ANSWERS

Subject to and without in any way waiving the foregoing objections, each of which is expressly incorporated into each of the individual answers below, Intel further responds to the Interrogatories as follows:

## INTERROGATORY NO. 1:

Identify all facts (including all DOCUMENTS) that support or contradict, and identify all persons with knowledge of, INTEL's contention that it has not infringed and is not infringing the '632 PATENT, either directly, by the doctrine of equivalents, by inducement, or by contribution.

## RESPONSE TO INTERROGATORY NO. 1:

In addition to the General Objections, which are incorporated fully by reference herein, Intel objects to this interrogatory as vague, ambiguous, overbroad, unduly burdensome and compound. Intel additionally objects to the terms "all," "identify" and "persons with knowledge" because the terms are vague, ambiguous, overbroad, unduly burdensome, and seek information that is not reasonably calculated to lead to the discovery of information relevant to the claims or defenses of any party. Intel further objects to the terms "infringed," "infringing," "doctrine of equivalents," "inducement" and "contribution" because the terms are vague, ambiguous, overbroad, unduly burdensome and call for a legal conclusion that is privileged under the attorney-client privilege, the work-product doctrine and/or other judicially recognized protections or privileges. Intel additionally objects to the terms "infringed," "infringing," "doctrine of equivalents," "inducement" and "contribution" to the extent they seek to elicit an admission from Intel, by virtue of Intel's response to this request as to the meaning of the terms. Intel also objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege, the work-product doctrine and/or other judicially recognized protections or privileges. Intel further objects to the interrogatory because it requires Intel to speculate as to what the '632 Patent purports to have invented. Intel additionally objects to this interrogatory to the extent it seeks documents relating to Intel products that AmberWave has not accused of

infringing the '632 Patent. Intel further objects to this interrogatory to the extent that it seeks the disclosure of information that reflects or discloses trade secrets, other confidential, financial or proprietary information of Intel or personal information that is protected by constitutional, statutory, common law or privacy rights. Intel additionally objects to this interrogatory to the extent it seeks a third party's confidential, trade secret or proprietary information. Intel will not provide such information without the third party's consent. Intel further objects because the interrogatory improperly seeks to aggregate numerous separate and distinct interrogatories in violation of Federal Rule of Civil Procedure 33(a). The '632 Patent is comprised of sixteen (16) separate claims, each claim for which AmberWave seeks a determination of no direct infringement, no infringement under the doctrine of equivalents, no inducement and no contribution and each comprises a "subpart" under Federal Rule of Civil Procedure 33(a). Intel states that each of these discrete subparts counts as a separate interrogatory toward AmberWave's total limit of interrogatories. Intel reserves its right to seek a protective order if and when AmberWave propounds interrogatories in excess of the amount allowed by this Court. Intel further objects to the interrogatory because Intel does not know which of the sixteen (16) claims AmberWave contends are infringed by Intel's products. Intel further objects to the interrogatory because it calls for Intel to establish that its products do not infringe the '632 Patent and therefore improperly seeks to shift from AmberWave the burden of proving its affirmative claim of patent infringement.

Intel will limit its response to this interrogatory to the independent claims in the '632 Patent – claims 1 and 5 – because failure to satisfy the independent claims of the '632 Patent is a full defense to infringement of all sixteen (16) claims of the patent. To the extent AmberWave argues that any Intel product infringes any of the dependent claims of the '632 Patent, Intel reserves the right to amend its response to this interrogatory. Intel will respond to the interrogatory as of the date of this response and expressly preserves its right to supplement and/or amend its response as additional facts become known.

Subject to the above objections, Intel states that <u>the accused infringing products</u>

do not meet at least one or more of the following limitations, as used in claims 1 and 5 of the '632 Patent: (1) a "heterostructure"; (2) "heterostructure having a Si substrate"; (3) "heterostructure having a Si substrate and a strained layer thereover"; (4) a "strained layer"; (5) a "strained layer on the $Si_{1-x}Ge_x$ layer"; (6) "an interface, located between the strained layer and the Si substrate"; (7) "an interface, located between the strained layer and the Si substrate, that exhibits a roughness less than 1 nm"; (8) "integrating a pMOSFET and an nMOSFET in the heterostructure"; (9) "wherein a channel of the pMOSFET and a channel of the nMOSFET are formed in the strained surface layer;" (10) "a Si substrate and a strained layer thereover"; (11) "heterostructure having a Si substrate and a strained layer thereover, the strained layer exhibiting a surface roughness less than 1 nm"; (12) "forming a p transistor and a n transistor in the heterostructure"; and (13) "a channel of the pMOSFET and a channel of the nMOSFET are formed in the strained surface layer."  The relevant documents to the above determination include the '632 Patent and other intrinsic and extrinsic evidence relating to the above terms. Other relevant documents also include various technical documents and testimony relating to the design and fabrication of the accused infringing products.  These materials will be defined with greater specificity at the end of fact discovery and during expert reports.  Intel believes anyone of ordinary skill in the art with access to the above information would have knowledge that Intel does not infringe the claims of the '632 Patent.

**INTERROGATORY NO. 2:**

        Identify all facts (including all DOCUMENTS and opinions of counsel) that Intel will rely on to establish that it has not willfully infringed and is not willfully infringing the '632 PATENT either directly, by the doctrine of equivalents, by inducement, or by contribution.

**RESPONSE TO INTERROGATORY NO. 2:**

        In addition to the General Objections, which are incorporated fully by reference herein, Intel objects to this interrogatory as vague, ambiguous, overbroad, unduly burdensome and compound.  Intel further objects to the use of the terms "all," "identify" and "persons with knowledge" because the terms are vague, ambiguous, overbroad, unduly burdensome, and seek

constructions of such terms and/or phrases. The scheduling order also will provide the date on which the parties are obligated to make disclosures of expert testimony under Federal Rule of Civil Procedure 26(a)(2). Thus, this interrogatory is premature and improper. Intel further objects to the interrogatory because Intel does not know which of the sixteen (16) claims AmberWave contends are infringed by Intel's products. AmberWave interrogatory seeks a construction by Intel of innumerable potential claim terms in sixteen (16) separate claims and is thus unduly burdensome, oppressive, vexatious and can only be intended to harass. Intel further objects because the interrogatory improperly seeks to aggregate numerous separate and distinct interrogatories in violation of Federal Rule of Civil Procedure 33(a). The '632 Patent is comprised of sixteen (16) separate claims and innumerable words or phrases that may be subject to claims construction in this proceeding. Each term for which AmberWave seeks a construction by the interrogatory comprises a "subpart" under Federal Rule of Civil Procedure 33(a). Intel states that each of these discrete subparts counts as a separate interrogatory toward AmberWave's total limit of interrogatories. Intel reserves its right to seek a protective order if and when AmberWave propounds interrogatories in excess of the amount allowed by this Court. Intel further objects to this interrogatory because Intel will provide expert disclosures and depositions responsive to this interrogatory under the schedule established by the Court. AmberWave cannot force Intel to accelerate those disclosures by serving interrogatories.

**INTERROGATORY NO. 4:**

Identify all facts (including all DOCUMENTS) that support or contradict, and identify all persons with knowledge of, INTEL's contention that the '632 PATENT is invalid.

**RESPONSE TO INTERROGATORY NO. 4:**

In addition to the General Objections, which are incorporated fully by reference herein, Intel objects to this interrogatory as vague, ambiguous, overbroad, unduly burdensome and compound. Intel also objects to the terms "all," "identify" and "persons with knowledge" because the terms are vague, ambiguous, overbroad, unduly burdensome and/or seek information that is not reasonably calculated to lead to the discovery of information relevant to the claims or

defenses of any party. Intel further objects to the term "invalid" because the term is vague, ambiguous, overbroad, unduly burdensome and calls for a legal conclusion that is privileged under the attorney-client privilege, the work-product doctrine and/or other judicially recognized protections or privileges. Intel additionally objects to the term "invalid" to the extent it seeks to elicit an admission from Intel, by virtue of Intel's response to this request, as to the meaning of the term. Intel also objects to this interrogatory to the extent that it seeks information already in AmberWave's possession, custody, or control or that AmberWave could ascertain or derive from documents and other discovery that will be provided in connection with AmberWave's own disclosures or in AmberWave's responses to Intel's document requests. Intel also objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege, the work-product doctrine and/or other judicially recognized protections or privileges. Intel notes that 35 U.S.C. § 282 does not require the disclosure of prior art until "at least thirty days before trial." Through this interrogatory, AmberWave seeks the disclosure of prior art more than a year before trial and before AmberWave has given any indication in this litigation as to how it intends to read the claims of the '632 Patent. Accordingly, the interrogatory is premature. Intel further objects to this interrogatory because Intel will provide expert disclosures and depositions responsive to this interrogatory under the schedule established by the Court. AmberWave cannot force Intel to accelerate those disclosures by serving interrogatories. Intel further objects to this interrogatory because it includes no temporal limitation. Intel will respond to the interrogatory as of the date of this response and expressly reserves its right to supplement and/or amend its response as additional facts become known.

Subject to and without waiving the foregoing objections, Intel states that the '632 patent is invalid pursuant to 35 U.S.C. §102 because the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before any device or method purported to be described in the patent was invented by any applicant for the '632 Patent. Furthermore, any invention purported to be described by the '632 Patent was anticipated by one or more of the prior art references cited below. Moreover, the

invention is invalid pursuant to 35 U.S.C. §103 because the differences between the subject matter of the '632 Patent and one or more pieces of prior art identified below are such that the subject matter of the '632 Patent would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter of the '632 Patent pertains. In addition, the '632 Patent is invalid because one skilled in the art could not make or use any invention purported to be described by the '632 Patent without undue experimentation. Moreover, the '632 Patent is invalid because one skilled in the art would not understand what is claimed when the patent is read in light of its specification. The documents that support the foregoing include, but are not limited to, the documents cited below. Intel's investigation of materials that support the invalidity arguments described in this response is ongoing and Intel explicitly reserves the right to supplement and amend its response to this interrogatory at the time of, or prior to, the completion of its investigation. The "persons with knowledge" for the purposes of this response include, but are not limited to, the named inventors in the patents and/or the authors of the publications cited below.

1.     Zhi-Yuan Cheng et al., *Electron Mobility Enhancement in Strained-Si N-MOSFETs Fabricated on SiGe-on-Insulator (SGOI) Substrates*, 22 IEEE Electron Device Letters 321 (2001).

2.     M. Bruel, *Silicon on Insulator Material Technology*, 31 Electronics Letters 1201 (1995).

3.     A. J. Auberton-Hervé et al., *Smart-Cut®: The Basic Fabrication Process for Unibond® SOI Wafers*, E80-C IEICE Transactions on Electronics 358 (1997).

4.     Isolation Structure Configurations for Modifying Stresses in Semiconductor Devices, U.S. Patent No. 6,876,053 (filed Aug. 13, 1999) (issued Apr. 5, 2005).

5.     L. J. Huang et al., *SiGe-on-Insulator Prepared by Wafer Bonding and Layer Transfer for High-Performance Field-Effect Transistors*, 78 Applied Physics Letters 1267

(2001).

6.    Zhiyuan Cheng et al., *Relaxed Silicon-Germanium on Insulator Substrate by Layer Transfer*, 30 J. Electronic Materials (Special Issue) L37 (2001).

7.    D. Godbey et al., *A $Si_{0.7}Ge_{0.3}$ Strained Layer Etch Stop for the Generation of Bond and Etch Back SOI*, 1989 IEEE SOS/SOI Tech. Conf. Proc. 143.

8.    Gianni Taraschi et al., *Strained-Si-on-Insulator (SSOI) and SiGe-on-Insulator (SGOI): Fabrication Obstacles and Solutions*, 745 Materials Res. Soc'y Symp. on Novel Materials and Processes for Advanced CMOS 105 (2003).

9.    K. D. Hobart et al., *Ultra-Cut: A Simple Technique for the Fabrication of SOI Substrates with Ultra-Thin (<5 nm) Silicon Films*, 1998 IEEE Int'l SOI Conf. 145.

10.    Gianni Taraschi et al., *Relaxed SiGe-on-Insulator Fabricated Via Wafer Bonding and Etch Back*, 20 J. Vacuum Sci. Tech. 725 (2002).

11.    M. T. Currie et al., *Controlling Threading Dislocation Densities in Ge on Si Using Graded SiGe Layers and Chemical-Mechanical Polishing*, 72 Applied Physics Letters 1718 (1998).

12.    P. Eichinger et al., *Characterization of MBE Grown SiGe Superlattices with SIMS and RBS*, 85-7 Proc. First Int'l Symp. on Silicon Molecular Beam Epitaxy 367 (1985).

13.    R. Hull et al., *Structural Studies of GeSi/Si Heterostructures*, 85-7 Proc. First Int'l Symp. on Silicon Molecular Beam Epitaxy 367 (1985).

14.    Semiconductor Transistor Having a Stressed Channel, U.S. Patent No. 6,621,131 (filed Nov. 1, 2001) (issued Sept. 16, 2003).

15.    C. Maleville et al., *Physical Phenomena Involved in the Smart-Cut® Process*, 96-3 Proc. Seventh Int'l Symp. on Silicon-on-Insulator Tech. and Devices, 34 (1996).

14

16.      Richard B. Fair, *Concentration Profiles of Diffused Dopants in Silicon, in Impurity Doping* 317 (F. F. Y. Wang ed. 1981).

17.      E. Kasper, *Growth and Properties of Si/SiGe Superlattices*, 174 Surface Sci. 630 (1986).

18.      C. M. Gronet et al., *Growth of GeSi/Si Strained-Layer Superlattices Using Limited Reaction Processing*, 61 J. Applied Physics 2407 (1987).

19.      D. Fathy et al., *Formation of Epitaxial Layers of Ge on Si Substrates by Ge Implantation and Oxidation*, 51 Applied Physics Letters 1337 (1987).

20.      Bernard S. Meyerson et al., *Cooperative Growth Phenomena in Silicon/Germanium Low-Temperature Epitaxy*, 53 Applied Physics Letters 2555 (1988).

21.      Transistor with Ultra Shallow Tip and Method of Fabrication, U.S. Patent No. 5,710,450 (filed Dec. 23, 1994) (issued Jan. 20, 1997).

22.      G. Abstreiter et al., *Silicon/Germanium Strained Layer Superlattices*, 95 J. Crystal Growth 431 (1989).

23.      B. Holländer et al., *Reduction of Dislocation Density of MBE-Grown $Si_{1-x}Ge_x$ Layers on (100) Si by Rapid Thermal Annealing*, 183 Thin Solid Films 157 (1989).

24.      F. Schäffler et al., Letter to the Editor, *High-Eelectron-Mobility Si/SiGe Heterostructures: Influence of the Relaxed SiGe Buffer Layer*, 7 Semiconductor Sci. Tech. 260 (1992).

25.      U. S. Patent No. 5,091,767 (filed Mar. 18, 1991).

26.      E. A. Fitzgerald et al., *Relaxed $Ge_xSi_{1-x}$ Structures for III-V Integration with Si and High Mobility Two-Dimensional Electron Gases in Si*, 10 J. Vacuum Sci. Tech. 1807 (1992).

27.      Don Monroe et al., *Comparison of Mobility-Limiting Mechanisms in High-*

15

*Mobility Si₁₋ₓGeₓ Heterostructures*, 11 J. Vacuum Sci. Tech. 1731 (1993).

28.    K. Ismail et al., *Identification of a Mobility-Limiting Scattering Mechanism in Modulation-Doped Si/SiGe Heterostructures*, 73 Physical Rev. Letters 3447 (1994).

29.    K. Ismail et al., *Gated Hall Effect Measurements in High-Mobility N-Type Si/SiGe Modulation-Doped Heterostructures*, 66 Applied Physics Letters 842 (1995).

30.    K. Ismail et al., *Extremely High Electron Mobility in Si/SiGe Modulation-Doped Heterostructures*, 66 Applied Physics Letters 1077 (1995).

31.    M. Bruel et al., ®*"Smart Cut": A Promising New SOI Material Technology*, 1995 IEEE Int'l SOI Conf. Proc. 178.

32.    U. S. Patent No. 5,571,373 (filed May 18, 1994).

33.    Technique to Obtain Increased Channel Mobilities in NMOS Transistors by Gate Electrode Engineering, U.S. Patent No. 6,281,532 (filed June 28, 1999) (issued Aug. 28, 2001).

34.    N. Sugiyama et al., *Formation of Strained-Silicon Layer on Thin Relaxed-SiGe/SiO₂/Si Structure Using SIMOX Technology*, 369 Thin Solid Films 199 (2000).

35.    Low Damage Doping Technique for Self-Aligned Source and Drain Regions, U.S. Patent No. 5,976,939 (filed July 3, 1995) (issued Nov. 2, 1999).

36.    T. Mizuno et al., *Electron and Hole Mobility Enhancement in Strained-Si MOSFET's on SiGe-on-Insulator Substrates Fabricated by SIMOX Technology*, 21 IEEE Electron Device Letters 230 (2000).

37.    Gianni Taraschi et al., *Relaxed SiGe on Insulator Fabricated via Wafer Bonding and Layer Transfer: Etch-Back and Smart-Cut Alternatives*, 2001-3 Silicon-on-Insulator Technology and Devices X Proc. Tenth Int'l Symp. 27 (2001).

38.    Zhiyuan Cheng et al., *Relaxed Silicon-Germanium on Insulator Substrate by*

*Layer Transfer*, 30 J. Electronic Materials L37 (2001).

39.    S. Subbanna et al., *How SiGe Evolved into a Manufacturable Semiconductor Production Process*, 4 IEEE Int'l Solid-State Circuits Conf. 66 (1999).

40.    High Tensile Nitride Layer, U.S. Patent No. 5,633,202 (filed June 6, 1996) (issued May 27, 1997).

41.    Min Cao et al., *0.18-$\mu$m Fully-Depleted Silicon-on-Insulator MOSFET's*, 18 IEEE Electron Device Letters 251 (1997).

42.    M. T. Currie et al., *Carrier Mobilities and Process Stability of Strained Si N-and P-MOSFETs on SiGe Virtual Substrates*, 19 J. Vacuum Sci. Tech. 2268 (2001).

43.    J. F. Gibbons et al., *Limited Reaction Processing: Silicon Epitaxy*, 47 Applied Physics Letters 721 (1985).

44.    T. Ghani et al., *Effect of Oxygen on Minority-Carrier Lifetime and Recombination Currents in $Si_{1-x}Ge_x$ Heterostructure Devices*, 58 Applied Physics Letters 1317 (1991).

45.    D. B. Noble et al., *Reduction in Misfit Dislocation Density by the Selective Growth of $Si_{1-x}Ge_x/Si$ in Small Areas*, 56 Applied Physics Letters 51 (1990).

**INTERROGATORY NO. 5:**

Identify all facts (including all DOCUMENTS) that support or contradict, and identify all persons with knowledge of, INTEL's contention that AMBERWAVE has unclean hands and therefore should be barred from recovering any relief sought in its COMPLAINT or any relief whatsoever against INTEL.

**RESPONSE TO INTERROGATORY NO. 5:**

In addition to the General Objections, which are incorporated fully by reference herein, Intel objects to this interrogatory as vague, ambiguous, overbroad, unduly burdensome and compound. Intel also objects to the terms "all," "identify," "persons with knowledge" and

"relief" because the terms are vague, ambiguous, overbroad, unduly burdensome, and seek information that is not reasonably calculated to lead to the discovery of information relevant to the claims or defenses of any party. Intel further objects to the terms "unclean hands" and "barred" because the terms are vague, ambiguous, overbroad, unduly burdensome and call for a legal conclusion that is privileged under the attorney-client privilege, the work-product doctrine and/or other judicially recognized protections or privileges. Intel additionally objects to the terms "unclean hands" and "barred" to the extent they seek to elicit an admission from Intel, by virtue of Intel's response to this request, as to the meanings of the terms. Intel further objects that information to support a defense based on the legal and/or equitable principle of "unclean hands" is in the possession of AmberWave. Intel also objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege, the work-product doctrine and/or other judicially recognized protections or privileges. Intel further objects to this interrogatory as premature and improper because Intel cannot properly respond to this interrogatory until discovery has proceeded further. Intel will respond to the interrogatory as of the date of this response and expressly preserves its right to supplement and/or amend its response as additional facts become known.

Subject to and without waiving the foregoing objections, Intel states on information and belief that one or more of the inventors named in the '632 Patent were aware at the time they prosecuted the application that issued as the '632 Patent of prior art that anticipates or renders obvious the '632 Patent and failed to disclose this prior art to the Patent and Trademark Office during the pendency of the application process.

conjunction with subjecting such materials to changes in pressure and temperature during the manufacturing process, the use of various materials in the source and drain, and by other factors that in some way may be characterized as stressing or straining the materials in the transistor. Many of these processes and mechanisms are explained in greater detail in Intel patents, including without limitation U.S. Patent Nos. 5,633,202; 6,281,532; 6,621,131; 6,861,318; and 6,876,053. In addition, various mechanisms and processes that can be characterized as inducing "stress" or "strain" in semiconductor materials and/or transistors have been known for decades. Moreover, depending on how AmberWave interprets the phrase "channel region" the surface roughness of the "channel region" in these devices may or may not be less than 1 nm. Until AmberWave explains what it means by the objectionably vague words, terms and expressions, cited in the preceding paragraph, Intel cannot fully respond to the interrogatory.

Dated: February 3, 2006

As to the Objections:

By: _____

George M. Newcombe (admitted *pro hac vice*)
Patrick E. King
SIMPSON THACHER & BARTLETT LLP
3330 Hillview Avenue
Palo Alto, CA 94304
(650) 251-5000

Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
YOUNG CONWAY STARGATT &
TAYLOR LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
jingersoll@ycst.com

*Attorneys for Defendant Intel Corporation*