# EXHIBIT A

US005158907A

# United States Patent [19]

## Fitzgerald, Jr.

[11] Patent Number: 5,158,907

[45] Date of Patent: Oct. 27, 1992

[54] **METHOD FOR MAKING SEMICONDUCTOR DEVICES WITH LOW DISLOCATION DEFECTS**

[75] Inventor: Eugene A. Fitzgerald, Jr., Bridgewater, N.J.

[73] Assignee: AT&T Bell Laboratories, Murray Hill, N.J.

[21] Appl. No.: 561,744

[22] Filed: Aug. 2, 1990

[51] Int. Cl.5 .............................................. H01L 21/20
[52] U.S. Cl. ..................................... 437/126; 437/110;
437/132; 437/133; 148/DIG. 42
[58] Field of Search .............. 437/110, 126, 132, 133;
148/DIG. 42

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,962,716 | 6/1976 | Pétroff et al. | 437/130 |
| 4,088,515 | 5/1978 | Blakeslee et al. | 437/128 |
| 4,370,510 | 1/1983 | Stirn | 136/262 |
| 4,632,712 | 12/1986 | Fan et al. | 437/132 |
| 4,769,341 | 9/1988 | Luryi | 437/132 |
| 4,826,784 | 5/1989 | Salerno et al. | 437/126 |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 62-087490 | 4/1987 | Japan . |
| 1-223718 | 9/1989 | Japan . |
| 2215514 | 9/1989 | United Kingdom . |

### OTHER PUBLICATIONS

Choi, et al., "Monolithic Integration of GaAs/AlGaAs Double–Heterostructure LED's and Si MOSFET's" *IEEE Electron Device Letters*, vol. EDL-7, No. 9, Sep. 1986.

Shichijo et al, "Co–Integration of GaAs MESFET and Si CMOS Circuits", *IEEE Electron Device Letters*, vol. 9, No. 9, Sep. 1988.

Choi et al, "Monolithic Integration of GaAs/AlGaAs LED and Si Driver Circuit", *IEEE Electron Device Letters*, vol. 9, No. 10, Oct. 1988 (p. 513).

Smith, et al, "A New Infrared Detector Using Electron Emission From Multiple Quantum Wells," *J. Vac. Sci. Technol. B.*, vol. 1, No. 2, Apr.–Jun. 1983.

Levine, et al, "New 10 Micron Infrared Detector Using

Intersubband absorption in resonant tunneling GaAlAs superlattices," *Applied Physics Letters*, vol. 50, No. 16, Apr. 20, 1987.

Windhorn et al, "Al GaAs/GaAs Laser Diodes on Si", *Applied Physics Letters*, vol. 47, p. 1031 (1985).

Ettenburg, "Continuous Low Threshold AlGaAs/-GaAs Laser", *Applied Physics Letters*, vol. 27, p. 652 (1975).

Fitzgerald, E. A., "In Search of Low-Dislocation-Density Hetero-Epitaxial Structures", *Journal of Metals*, vol. 41, pp. 20–24 (1989).

Fitzgerald, et al, "Nucleation Mechanisms and the Elimination of Misfit Dislocations at Mismatched Interfaces by Reduction in Growth Area", *Journal of Appl. Phys.*, vol. 65, No. 6, Mar. 1989.

Matthews, et al, "Accommodation of Misfit Across the Interface Between Crystals of Semiconducting Elements or Compounds", *Journal of Appl. Phys.*, vol. 41, No. 9, (1970).

C. H. Henry, "Recent Advances in Integrated Optics on Silicon", the Eighth Annual European Fibre Optic Communications and Local Area Networks Conference, Jun. 1990, pp. 11–14.

(List continued on next page.)

Primary Examiner—Brian E. Hearn
Assistant Examiner—Laura M. Holtzman
Attorney, Agent, or Firm—G. E. Books

[57] **ABSTRACT**

Semiconductor devices having a low density of dislocation defects can be formed of epitaxial layers grown on defective or misfit substrates by making the thickness of the epitaxial layer sufficiently large in comparison to the maximum lateral dimension, threading dislocations arising from the interface will exit the sides of the epitaxial structure and not reach the upper surface. Using this approach, one can fabricate integral gallium arsenide on silicon optoelectronic devices and parallel processing circuits. One can also improve the yield of lasers and photodetectors.

**10 Claims, 3 Drawing Sheets**



**5,158,907**

Page 2

### OTHER PUBLICATIONS

D. V. Lang, "Defects and Future Semiconductor Devices", *Materials Science Forum*, vols. 38–41, (1989) pp. 13–24.

J. Narayan et al., "Critical Phenomenon and Segregation Behavior at Interfaces and Subgrain Boundaries", *Journal de Physique*, vol. 49, No. C–5, pp. 731–767, Oct. 1988.

H. L. Tsai et al, "Generation of Misfit Dislocations in GaAs grown on Si", *Applied Physics Letters*, vol. 55, No. 3, Jul. 17, 1989, pp. 265–267.

E. A. Fitzgerald, "The Effect of Substrate Growth Area on Misfit and Threading Dislocation . . . " *J. Vac. Sci. Tech. B*, vol. 7, No. 4, Jul./Aug. 1989, pp. 782–788.

E. A. Fitzgerald et al., "Elimination of Interface Defects in Mismatched Epilayers by a Reduction in Growth Area," *Applied Physics Letters*, vol. 52, No./8, May 2, 1988, pp. 149–158.

H. K. Choi et al., "Monolithic Integrated Circuits of Si MOSFET's and GaAs MESFET's" *IEEE Electron Device Letters*, vol. EDL–7, No. 4, Apr. 1986, pp. 241–243.

**U.S. Patent**          Oct. 27, 1992          Sheet 1 of 3          5,158,907

FIG. 1



FIG. 2



FIG. 3



*FIG. 4*



*FIG. 5*

*FIG. 6*



*FIG. 7*



5,158,907

1

## METHOD FOR MAKING SEMICONDUCTOR DEVICES WITH LOW DISLOCATION DEFECTS

### FIELD OF THE INVENTION

This invention relates to semiconductor devices having a low density of dislocation defects and, in particular, to semiconductor devices comprising limited area epitaxial regions grown on either misfit substrates or substrates having a high density of dislocation defects. It further concerns methods for making and using such devices.

### BACKGROUND OF THE INVENTION

A low level of dislocation defects is important in a wide variety of semiconductor devices and processes. Dislocation defects partition an otherwise monolithic crystal structure and introduce unwanted and abrupt changes in electrical and optical properties. Dislocation defects can arise in efforts to epitaxially grow one kind of crystalline material on a substrate of a different kind of material (heterostructures) due to different crystalline lattice sizes of the two materials. Misfit dislocations form at the mismatched interface to relieve the misfit strain. Many misfit dislocations have vertical components, termed threading segments, which terminate at the surface. These threading segments continue through all subsequent layers added. Dislocation defects can also arise in the epitaxial growth of the same material as the substrate (homostructures) where the substrate itself contains dislocations. Some of the dislocations replicate as threading dislocations in the epitaxially grown material. Such dislocations in the active regions of semiconductor devices such as diodes, lasers and transistors, seriously degrade performance.

To avoid dislocation problems, most semiconductor heterostructure devices have been limited to semiconductor layers that have very closely lattice-matched crystal structures. Typically the lattice mismatch is within 0.1%. In such devices a thin layer is epitaxially grown on a mildly lattice mismatched substrate. So long as the thickness of the epitaxial layer is kept below a critical thickness for defect formation, the substrate acts as a template for growth of the epitaxial layer which elastically conforms to the substrate template. While lattice matching and near matching eliminates dislocations in a number of structures, there are relatively few lattice-matched systems with large energy band offsets, limiting the design options for new devices.

There is considerable interest in heterostructure devices involving greater epitaxial layer thickness and greater lattice misfit than present technology will allow. For example, it has long been recognized that gallium arsenide grown on silicon substrates would permit a variety of new optoelectronic devices marrying the electronic processing technology of silicon VLSI circuits with the optical component technology available in gallium arsenide. See, for example, Choi et al, "Monolithic Integration of Si MOSFET's and GaAs MESFET's", *IEEE Electron Device Letters*, Vol. EDL-7, No. 4, April 1986. Highly advantageous results of such a marriage include high speed gallium arsenide circuits combined with complex silicon VLSI circuits and gallium arsenide optoelectronic interface units to replace wire interconnects between silicon VLSI circuits. Progress has been made in integrating gallium arsenide and silicon devices. See, for example, Choi et al, "Monolithic Integration of GaAs/AlGaAs Double-

2

Heterostructure LED's and Si MOSFET's" *IEEE Electron Device Letters*, Vol. EDL-7, No. 9, September 1986; Shichijo et al, "Co-Integration of GaAs MESFET and Si CMOS Circuits", *IEEE Electron Device Letters*, Vol. 9, No. 9, September 1988. However, despite the widely recognized potential advantages of such combined structures and substantial efforts to develop them, their practical utility has been limited by high defect densities in gallium arsenide layers grown on silicon substrates. See, for example, Choi et al, "Monolithic Integration of GaAs/AlGaAs LED and Si Driver Circuit", *IEEE Electron Device Letters*, Vol. 9, No. 10, Oct. 1988 (p. 513). Thus while basic techniques are known for integrating gallium arsenide and silicon devices, there exists a need for producing gallium arsenide layers having a low density of dislocation defects.

There is also considerable interest in growing low defect density gallium arsenide surfaces irrespective of the type of substrate. Gallium arsenide is prone to dislocation defects; and, as a consequence, devices grown on gallium arsenide substrates have a notoriously low yield.

### SUMMARY OF THE INVENTION

In contrast with the prior art approach of minimizing dislocation defects by limiting misfit epitaxial layers to less than a critical thickness for elastic conformation to the substrate, the present invention utilizes greater thickness and limited lateral areas to produce limited area regions having upper surfaces exhausted of threading dislocations. Since threading dislocations propagate with a lateral as well as a vertical component, making the thickness sufficiently large in comparison to the lateral dimension permits the threading dislocations to exit the sides of the epitaxial structure. The upper surface is thus left substantially free of defects. As a result, one can fabricate monolithic heterostructure devices, such as gallium arsenide on silicon optoelectronic devices, long sought in the art but heretofore impractical due to dislocation defects. As another embodiment, one can fabricate a monolithic structure using gallium arsenide circuitry to perform high speed processing tasks and silicon VLSI circuitry to perform complex, lower speed tasks. In yet another embodiment, one can fabricate arrays of low defect density devices on a high defect density substrate, substantially improving the yield.

### BRIEF DESCRIPTION OF THE DRAWINGS

The advantages, nature and various additional features of the invention will appear more fully upon consideration of the illustrative embodiments now to be described in detail. In the drawings:

FIG. 1 is a schematic cross section illustrating the problem of threading dislocations addressed by the present invention.

FIG. 2 is a schematic cross section of a first embodiment of a semiconductor workpiece provided with limited area regions of low defect density in accordance with the invention.

FIG. 3 is a schematic cross section of a second embodiment of a semiconductor workpiece in accordance with the invention.

FIG. 4 is a schematic cross section of a third embodiment of the invention;

FIG. 5 schematically illustrates the use of the invention to provide optical input, optical interconnections

5,158,907

3

and/or optical output to integrated circuits in the substrate.

FIG. 6 schematically illustrates the use of the invention to provide a supplementary high speed circuit to an integrated circuit in the substrate; and

FIG. 7 schematically illustrates the use of the invention to provide arrays of low defect density regions on a high defect density substrate.

It is to be understood that these drawings are for purposes of illustrating the concepts of the invention and are not to scale. Similar structural elements are denoted by the same reference numerals throughout the drawing.

## DETAILED DESCRIPTION

Referring to the drawings, FIG. 1 is a schematic cross section illustrating the problem of threading dislocations resulting from efforts to epitaxially grow a blanket layer 10 of crystalline material on a crystalline substrate 11. As illustrated, dislocation defects 12 form at the interface 13 between layers 10 and 11. Many of these defects 12 have not only horizontal portions 14, termed misfit segments, but also portions with vertical components 15, termed threading segments. Such threading segments can also arise as continuations of pre-existing threading segments 16 in the substrate 11.

FIG. 2 is a schematic cross section of a first embodiment of a semiconductor workpiece provided with limited area regions of low defect density in accordance with the invention. The workpiece comprises a monolithic semiconductor substrate 20 having a major surface 21 covered with an insulating layer 22. The insulating layer includes one or more openings 23, and grown within the openings on substrate 20, one or more limited area epitaxial regions 24 of low defect density semiconductor. The substrate 20 and the low defect region 24 can be different crystalline semiconductors having lattice mismatch in excess of 0.2%.

Because of dislocations or pre-existing threading segments at the interface between substrate 20 and grown regions 24, threading segments 15 and 16 arise from the interface. However each epitaxial region 24 has a thickness t sufficiently large as compared with its maximum lateral extent L that the threading segments exit the sides of regions 24 rather than reaching the upper surfaces 27. The ratio of t/L required to insure exit of threading segments arising from the interface depends on the crystalline orientation of the substrate. A (100) substrate requires a ratio of 1; a (111) substrate requires a ratio of $\sqrt{2}$, and a (110) substrate requires $\sqrt{3}/3$. Ratios of 50% of these values provide a useful level of defect elimination.

In a preferred embodiment, the substrate 20 is (100) monocrystalline silicon, the insulating layer 22 is silicon oxide, and the limited area regions 24 are gallium arsenide. The limited area regions are approximately circular in the lateral surface and preferably have a transverse thickness t at least as great as their maximum lateral dimension L.

This preferred embodiment can be fabricated by growing on a conventional (100) silicon IC wafer 20 a layer of silicon oxide 22 having a thickness preferably in the range from 5 to 100 microns. Conventional photolithography can be used with HF etchant to open windows 23, and gallium arsenide having a thickness greater than or approximately equal to the maximum lateral dimension is deposited on the exposed silicon by MBE with a substrate temperature of 570° C. Preferably

4

the thickness of the silicon oxide and the gallium arsenide are equal in order to produce a co-planar structure as shown in FIG. 2.

FIG. 3 is a schematic cross section of a second embodiment of a semiconductor workpiece provided with limited area regions of low defect density. The embodiment is similar to that shown in FIG. 2 except that the substrate 20 is provided with one or more limited area mesa regions 30 upon which the limited area regions 24 of low defect density semiconductor are grown. The mesas are substantially surrounded by trenches 31.

This embodiment can be fabricated by forming on a silicon substrate an aluminum mask which selectively exposes trench regions 31. The masked substrate is then subjected to reactive ion etching to produce trenches 31. The aluminum is removed over the mesas, and a silicon oxide layer is deposited. The silicon oxide over the mesas is selectively removed, and the gallium arsenide region 24, having a thickness preferably in excess of its maximum lateral dimension, is deposited by CVD at a temperature of about 600°–700° C. or by MBE at about 550°–650° C. Any GaAs deposited on the oxide covered areas can be removed by dissolving the underlying silicon oxide in HF. Finally a planarized insulating layer 22, such as silicon oxide can be applied to the non-mesa areas, resulting in the structure shown in FIG. 3.

FIG. 4 is a schematic cross section of a third embodiment of the invention wherein a semiconductor substrate 20 is provided with limited area regions 24 of low defect density by providing a plurality of relaxed, misfitted buffer layers 42 and 43 between the substrate and the low defect layer.

In essence the preferred form of the FIG. 4 embodiment is similar to the preferred form of the FIG. 3 embodiment except that disposed between the upper surface of silicon mesa 30 and limited area gallium arsenide region 24 is a limited area region 42 of germanium silicon alloy $Ge_x Si_{1-x}$ having an upper surface 43 of substantially pure germanium upon which gallium arsenide region 24 is grown. The $Ge_x Si_{1-x}$ region is grown as a limited area region having an area in the range between 25 and 10,000 square microns. The $Ge_x Si_{1-x}$ region 42 has a gradient of increasing Ge concentration as the region extends from the mesa 30 to the gallium arsenide layer 24. The advantage of growing this structure in limited area is that a high proportion of threading segments from the interface with substrate 20 can glide out to the sides of the structure. Thus the Germanium surface 43 presents the gallium arsenide layer 24 with a very low defect substrate. If desired, highly effective further filtering can be provided by growing layer 24 in sufficient thickness t in relation to maximum lateral dimension L that threading segments exit the sides.

The workpiece of FIG. 4 can be prepared by etching trenches 31 to define mesas 30, and depositing $Ge_x Si_{1-x}$ onto the mesas by the MBE or CVD processes. The Ge concentration increased linearly with thickness or step graded at a rate in the range between 5% and 0.1% per one thousand angstroms until the concentration of germanium is substantially 100%. The temperature of growth should be greater than about 600° C. For the CVD process the temperature is preferably about 900° C. and for the MBE process, preferably 650°–750° C.

Once the pure germanium concentration is reached, either the GaAs layer can be grown immediately or a

5,158,907

5

Ge buffer layer 43 of about 1000 angstroms can be grown before the GaAs deposition.

Semiconductor workpieces as shown in FIGS. 2, 3 and 4 are highly advantageous in that they present upper surfaces of epitaxial regions 24 that are substantially free of dislocation defects. While the low defect surfaces are limited in area, they present areas of 25 to 10,000 square microns that are large enough to permit fabrication of useful optoelectronic devices and high speed integrated circuits. Primary uses include 1) provision of optical input, optical output and optical interconnections to integrated circuits in the substrate; 2) provision of high speed supplementary circuitry in support of integrated circuits in the substrate; and 3) provision of high yield areas in low yield substrates.

FIG. 5 schematically illustrates the use of the invention to provide optical input, optical interconnections and optical output to integrated circuits in the substrate. Specifically, the substrate 20 is preferably a monolithic silicon substrate containing one or more integrated circuits 50A and 50B and one or more limited area, low defect gallium arsenide regions 24A, 24B, 24C and 24D.

Integrated circuit 50A is provided with optical input, as from optical fiber 51A, by forming a photodetector 52A on limited area gallium arsenide region 24A. The optical signal coupled to the photodetector produces an electrical signal coupled to circuit 50A by conformal metal leads 53.

Integrated circuit 50A is provided with optical output, as to optical waveguide 54, by forming a light emitter 55A, such as a LED or laser, on limited area gallium arsenide region 24B. An electrical signal from circuit 50A is coupled to light emitter 55A by metal leads 56. The light emitter, in turn, produces a modulated optical output signal coupled by waveguide 54 to a second photodetector 52B formed on limited area region 24C. The electrical output of 52B is coupled to a second integrated circuit 50B by metal leads 57. Thus integrated circuits 50A and 50B are provided with optical interconnections.

As illustrated, the system can similarly be provided with an optical output as by a second light emitter 55B' formed on limited area region 24D. An electrical output signal from circuit 50B over leads 53 causes emitter 55B to produce an optical output signal coupled into optical fiber 51B.

The integrated circuits 50A and 50B can be any of a large number of known silicon VLSI circuits useful, for example, in processing serial digital signals. The structure and fabrication of such circuits is well known in the art.

Limited area gallium arsenide regions 24A, 24B, 24C, and 24D can be fabricated on substrate 20 after formation of integrated circuits 50A and 50B without significantly deteriorating the underlying integrated circuits. MBE at 550°–650° C. is particularly advantageous because of the low deposition temperatures. Photodetectors 52A and 52B can be formed on regions 24A and 24C in accordance with one of a variety of known methods of forming photodetectors on gallium arsenide substrates. See, for example, the photodetectors disclosed in Smith et al, "A New Infrared Detector Using Electron Emission From Multiple Quantum Wells," *J. Vac. Sci. Technol. B*, Vol. 1, No. 2, April-June 1983 and Levine et al, "New 10 Micron Infrared Detector Using Intersubband Absorption In Resonant Tunneling GaAlAs Superlattices," *Applied Physics Letters*, Vol. 50, No. 16, Apr. 20, 1987. Similarly light emitters 55A and

6

55B can be formed on regions 24B and 24D in accordance with one of a variety of known methods for forming LED's or lasers on gallium arsenide substrates. See, for example, Windhorn et al, "AlGaAs/GaAs Laser Diodes on Si", *Applied Physics Letters*, Vol. 47, p. 1031 (1985); Ettenburg, "Continuous Low Threshold AlGaAs/GaAs Laser", *Applied Physics Letters*, Vol. 27, p. 652 (1975), or the previously cited Choi et al articles. Waveguide 54 can be polymer, silicon oxide, or glass. Preferably it is a phosphosilicate glass waveguide such as described in Henry, "Recent Advances in Integrated Optics on Silicon", Proceedings of Eighth Annual European Fiber Optic Communications and Local Area Networks Conference, Jun. 27-29, 1990.

FIG. 6 schematically illustrates the use of the invention to provide a supplementary high-speed circuit to an integrated circuit in the substrate. Here, as above, the substrate 20 is preferably a monolithic silicon substrate containing one or more integrated circuits 50 and one or more limited area, low defect density gallium arsenide regions 24. The primary difference between this embodiment and that of FIG. 5 is that in FIG. 6 the regions 24 is sufficiently large to contain a small integrated circuit 60 rather than only a device. For example, a limited area region 24 having dimensions $50 \times 50 \times 50$ microns is sufficiently large to contain the GaAs MESFET Circuit described in Shichijo, et al, "Co-Integration of GaAs MESFET and Si CMOS Circuits", *IEEE Electron Device Letters*, Vol. 9, No. 9, September 1988. The silicon integrated circuit 50 can be CMOS inverter stages. The combination can form a ring oscillator. The advantage of using limited area regions 24 in accordance with the invention is lower defects in the gallium arsenide with resulting higher yield and improved performance.

FIG. 7 schematically illustrates the use of the invention to provide arrays of low defect density regions integrally formed on a high defect density substrate. Here substrate 20 is a monolithic crystalline substrate having a level of defect density sufficiently large to preclude high yield or to limit desired quality of devices formed on the substrate. For example, substrate 20 can be gallium arsenide having a defect density in excess of about $10^3$ cm$^{-2}$.

As a preliminary step, substrate 20 is etched, as by reactive ion etching, to form a sequence of pits 70 and mesas 71. Gallium arsenide is deposited as by MBE to form low defect regions 24A on the mesas 30, and low defect regions 24B can be simultaneously formed in the pits. By growing the gallium arsenide sufficiently thick as compared with its maximum lateral dimension, the regions 24A and 24B are provided with upper surfaces substantially free of defects. The resulting structure can be used to fabricate on the upper surfaces of regions 24A and 24B, arrays of devices such as photodetectors and lasers, having reduced defects and resulting higher yield and performance.

It is to be understood that the above-described embodiments are illustrative of only a few of the many possible specific embodiments which can represent applications of the principles of the invention. Numerous and varied other arrangements can be readily devised in accordance with these principles by those skilled in the art without departing from the spirit and scope of the invention.

I claim:

5,158,907

7

1. A method for making a semiconductor device having one or more limited area regions with low defect density semiconductor surfaces comprising the steps of:
   providing a monocrystalline semiconductor substrate;
   epitaxially growing on said semiconductor substrate one or more limited area regions of semiconductor material having a maximum lateral dimension L and a thickness t, the ratio t/L being in excess of $\sqrt{3}/3$ so that threading dislocations arising from the interface between said limited area regions and said substrate exit at lateral side surfaces of said limited area regions.

2. The method of claim 1 further comprising the step of etching one or more pit regions in said substrate; and
   wherein said limited area regions are grown in said pit regions.

3. The method of claim 1 further comprising the step of forming on said substrate one or more mesa regions on said substrate; and
   wherein said limited area regions are grown on said mesa regions.

4. The method of claim 1 further comprising the steps of a) providing said substrate with a layer of insulating material, and b) etching in said insulating layer one or more pit regions to said substrate; and
   wherein said limited area regions are grown in said pit regions.

5. The method of claim 1 further comprising the steps of a) providing said substrate with a layer of insulating material of thickness substantially equal to the thickness to which said limited area regions are to be grown, and b) etching in said insulating material one or more pit regions to said substrate; and

8

wherein said limited area regions are grown in said pit regions.

6. The method of claim 1 wherein said substrate is of a first crystalline material and said limited area regions are of a second crystalline material, said first and second materials having a lattice mismatch in excess of about 0.2%.

7. The method of claim 1 wherein said substrate comprises silicon and said limited area regions comprise gallium arsenide.

8. The method of claim 1 wherein said substrate has a density of dislocation defects in excess of $10^3$ per $cm^2$ and said limited area regions are comprised of the same semiconductor material as said substrate.

9. A method for making a semiconductor device having one or more limited area regions with low defect density semiconductor surfaces comprising the steps of:
   providing a monocrystalline silicon substrate;
   epitaxially growing on said silicon substrate one or more limited area regions of $Ge_x Si_{1-x}$ having respective areas in the range between 25 and 10,000 square microns and having a graded concentration of Germanium increasing to about 100%; and
   epitaxially growing on said $Ge_x Si_{1-x}$ regions respective limited area regions of gallium arsenide having a thickness sufficiently large as compared with the maximum lateral dimension that threading dislocations arising from the GaAs-Ge interface exit at lateral side surfaces.

10. The method of claim 9 wherein the concentration of germanium in said $Ge_x Si_{1-x}$ is graded at a rate in the range between 5% and 0.1% per one thousand angstroms.

* * * * *

# EXHIBIT B

# REDACTED

# EXHIBIT C

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2002 WL 1558531 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

**H**
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
TRUEPOSITION, INC. & KSI, INC., Plaintiffs/
Counterclaim Defendants,
v.
ALLEN TELECOM, INC. Defendant/ Counterclaim
Plaintiff.
No. CIV.A.01-823 GMS.

July 16, 2002.

Motion was filed to amend patent infringement
complaint to add claims of infringement regarding
four additional patents relating to the same subject
matter. The District Court, Sleet, J., held that
amendment was not precluded on grounds of bad
faith or prejudice to defendant.

Motion granted.

West Headnotes

[1] Patents 291 ⚖310.11

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
            291k309 Pleading
                291k310.11    k.    Amended    and
Supplemental Pleadings. Most Cited Cases
Motion to amend patent infringement complaint to
add claims of infringement regarding four additional
patents relating to the same subject matter was not in
bad faith, where it was in compliance with the
deadline imposed by the scheduling order, despite
contentions that plaintiff filed its initial complaint
with the knowledge that the asserted patents were
invalid and that it sought discovery of accused
products in connection with patents that were not
mentioned in the complaint. Fed.Rules Civ.Proc.
Rule 15(a), 28 U.S.C.A.

[2] Federal Civil Procedure 170A ⚖834

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(E) Amendments
            170Ak834 k. Injustice or Prejudice. Most
Cited Cases
The scope of the court's inquiry as to bad faith on

motion to amend is limited to whether the motion to
amend itself is being made in bad faith, not whether
the original complaint was filed in bad faith or
whether conduct outside the motion to amend
amounts to bad faith, and inquiry focuses on the
plaintiff's motives for not amending the complaint
earlier. Fed.Rules Civ.Proc. Rule 15(a), 28 U.S.C.A.

[3] Patents 291 ⚖310.11

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
            291k309 Pleading
                291k310.11    k.    Amended    and
Supplemental Pleadings. Most Cited Cases
Amendment of patent infringement complaint to add
claims of infringement regarding four additional
patents was not precluded on ground of prejudice to
defendant, despite contention that amendment would
increase the complexity of the action and
unnecessarily delay its conclusion to the prejudice of
defendant's business relationships, where discovery
was in its earliest stages, the patents which plaintiff
sought to add were substantially similar to the patents
contained in the original complaint, and it would be
economically beneficial to the parties to resolve all
the issues in a single proceeding, as well as being in
the interest of judicial economy. Fed.Rules Civ.Proc.
Rule 15(a), 28 U.S.C.A.


MEMORANDUM AND ORDER
SLEET, District J.

I. INTRODUCTION

*1 On December 11, 2001, the plaintiffs,
Trueposition, Inc. and KSI, Inc. (collectively
"Trueposition") filed a complaint against the
defendant, Allen Telecom, Inc. ("Allen"). In the
complaint, Trueposition alleges that Allen has
infringed three of its patents, namely U.S. Patent No.
4,728,959 ("the '959 patent"), U.S. Patent No.
6,108,555 ("the '555 patent"), and U.S. Patent No.
6,119,013 ("the '013 patent"). Each of these patents
discloses a technology for locating cellular phones.

The court held a scheduling conference on March 7,
2002. During the scheduling conference,
Trueposition asked the court to set a July 15, 2002

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1558531 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

deadline for filing motions to amend. Trueposition stated that they needed until that time in order to complete "adequate discovery to determine whether we've asserted all the patents that we should." (D.I. 20, March 7, 2002 Scheduling Conference Transcript at 3:17-4:20.) In its April 3, 2002 scheduling order, the court set a May 31, 2002 deadline for motions to amend pleadings. The case is still in early stages of discovery, with fact discovery related to liability scheduled to close on November 1, 2002. The other stages of discovery have not yet commenced.

Presently before the court is Trueposition's motion to amend the complaint, which was filed on May 31, 2002 in accordance with the deadline set by the court. Trueposition seeks to add claims of infringement regarding four additional Trueposition patents. The four newly asserted patents also disclose technology for locating cellular phones. Allen contends that the motion should be denied because Trueposition has acted in bad faith and Allen will be prejudiced by the amendment. The court finds that Trueposition has not acted in bad faith and Allen will not be prejudiced by the proposed amendment. Therefore, the court will grant Trueposition's motion to amend the complaint.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 15(a) provides that a party may amend its complaint "by leave of court ... and leave shall be freely given when justice so requires." FED. R. CIV. P. 15(a). Although the trial court has discretion to grant or deny leave to amend, leave should be freely granted in accordance with Rule 15(a) unless there is an apparent or declared reason for denial. See Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); see also In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir.1997). Sufficient reasons include undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, and futility of amendment. Foman, 371 U.S. at 182.

## III. DISCUSSION

Allen argues that leave to amend the complaint should be denied because Trueposition is acting in bad faith, and that granting leave to amend would be highly prejudicial to Allen.[FN1] The court will now address each of these assertions in turn.

FN1. Allen has not made any argument

suggesting that either undue delay or futility would support denial of the motion. Furthermore, the record reveals no basis for such contentions. Therefore, the court will not consider these factors.

### A. Bad Faith

[1][2] Allen argues that Trueposition has acted in bad faith for two reasons. First, Allen claims that Trueposition filed its initial complaint with the knowledge that the asserted patents were invalid. Second, Allen alleges that Trueposition sought discovery of accused products in connection with patents that were not mentioned in the complaint. Regardless of whether these allegations are true, they are not relevant to the court's determination of whether leave to amend should be granted.

*2 Allen has misconstrued the meaning of "bad faith," as it was contextualized in Foman. When considering a motion for leave to amend, the court should grant leave unless "the *motion* is being made in bad faith." U.S. ex rel. B & R, Inc. v. Donald Lake Const ., 19 F.Supp.2d 217, 220 (D.Del.1998) (emphasis added). The scope of the court's inquiry is therefore limited to whether the motion to amend *itself* is being made in bad faith, not whether the original complaint was filed in bad faith or whether conduct outside the motion to amend amounts to bad faith. See J.E. Mamiye & Sons, Inc. v. Fidelity Bank, 813 F.2d 610, 614 (3d Cir.1987) ("[T]he question ... of bad faith, requires that we focus on the plaintiff's motives for not amending their complaint earlier"). See also Foman, 371 U.S. at 182. (coupling "bad faith" together with "dilatory motive").

Allen has presented no evidence which would support the claim that Trueposition's motion to amend was made in bad faith or with dilatory motive. To the contrary, the record indicates that Trueposition filed its motion to amend in compliance with the May 31 deadline imposed by the court. Therefore, the court will not deny the motion to amend on the basis of bad faith.

### B. Prejudice

[3] Allen argues that the addition of four patents to this action will increase the complexity of this action and unnecessarily delay its conclusion to the prejudice of Allen's business relationships. These vague and mild assertions of prejudice do not amount to the level of prejudice necessary under current law.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1558531 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

To show undue prejudice, Allen must demonstrate that it will be "unfairly disadvantaged or deprived of the opportunity to present facts or evidence" unless leave to amend is denied. _Bechtel v. Robinson, 886 F.2d 644, 652 (3d Cir.1989)._

Since discovery is in its earliest stages, amendment of the complaint will not deprive Allen of the opportunity to present facts or evidence or otherwise prepare and present its case. In fact, since the patents which Trueposition seeks to add are substantially similar to the patents contained in the original complaint, it would be economically beneficial to the parties to resolve all the issues in a single proceeding. Allen has thus failed to demonstrate that it will be unduly prejudiced by Trueposition's proposed amendments.

Moreover, granting leave to amend will benefit the court. Where the additional patents are closely related to the already asserted patents and the patents involve similar technology, it is clearly in the interest of judicial economy to dispose of all of the claims between the parties in one proceeding. _See Jenn-Air Products Co. v. Penn Ventilator, Inc., 283 F.Supp. 591, 594 (E.D.Pa.1968)._ Since the accused products are the same, the technology is the same, and the parties remain the same, the facts and the issues will substantially overlap. Granting the motion to amend will therefore enable the court to address all of these related issues simultaneously. Conversely, if the motion to amend were denied, Trueposition could institute a second action against Allen for infringement of the additional patents. The court, therefore, finds that judicial economy weighs in favor of granting the motion to amend.

### IV. CONCLUSION

**\*3** The court concludes that Trueposition has not acted in bad faith in bringing this motion. The court further finds that since discovery is still in its earliest stages and the newly asserted patents relate to the same accused products and technology as the originally asserted patents, Allen will not be unduly prejudiced if Trueposition's motion to amend is granted.

For the foregoing reasons, IT IS HEREBY ORDERED that:
1. Trueposition's motion seeking leave to file an amended complaint (D.I.37) is GRANTED.

D.Del.,2002.
Trueposition, Inc. v. Allen Telecom, Inc.
Not Reported in F.Supp.2d, 2002 WL 1558531 (D.Del.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 652943 (D.Del.), 55 U.S.P.Q.2d 1124
(Cite as: Not Reported in F.Supp.2d)

Page 1

C

United States District Court, D. Delaware.
CENTERFORCE TECHNOLOGIES, INC., Plaintiff,
v.
AUSTIN LOGISTICS INC., Defendant.
No. CIV. A. 99-243 MMS.

March 10, 2000.

Patricia Smink Rogowski, Esquire, and Francis
DiGiovanni, Esquire, Connolly, Bove, Lodge & Hutz
LLP, Wilmington, Delaware; Of Counsel: William E.
Wallace III, Esquire, Gregory S. Lewis, Esquire,
Tyler R. Goodwyn, IV, Esquire, Margaret S. Izzo,
Esquire, and Melvin L. Barnes, Jr., Esquire, of
Morgan, Lewis & Bockius LLP, Washington, D.C.;
Attorneys for Plaintiff.
Richard D. Kirk, Esquire, and Gretchen A. Bender,
Esquire, of Morris, James, Hitchens & Williams LLP,
Wilmington, Delaware; Of Counsel: Robert Neuner,
Esquire, of Baker & Botts, L.L.P., New York, New
York, Patrick O. Keel, Esquire, and Robert W.
Holland, Esquire, Baker & Botts, L.L.P., Austin,
Texas; Attorneys for Defendant.

MEMORANDUM OPINION
SCHWARTZ, Senior District J.

I. Introduction

*1 CenterForce Technologies, Inc. ("CenterForce") is
the owner by assignment of three patents relating to
methods for optimizing telephone campaigns. Its U.S.
Patent No. 5,436,965 (the '965 patent), filed on
November 16, 1993 and entitled "Method and
System for Optimization of Telephone Contact
Campaigns," issued on July 25, 1995. CenterForce
filed a continuation-in-part application of the '965
patent application on June 7, 1995, which resulted in
the second patent, U.S. Patent No. 5,621,790 (the
'790 patent), issued on April 15, 1997. On April 14,
1997, CenterForce filed a continuation of the '790
patent application, which resulted in the issuance of
the third patent, U.S. Patent No. 5,889,799 (the '799
patent), on March 30, 1999.

CenterForce filed a complaint against Austin
Logistics Inc. ("ALI") on April 13, 1999, alleging
that ALI had infringed the '799 patent, that ALI

engaged in false patent marking, and that ALI made
false and misleading representations in violation of
the Lanham Act, 15 U.S.C. § 1051, et seq. Docket
Item ("D.I.") 1. ALI filed an answer and
counterclaim on May 24, denying CenterForce's
allegations and seeking a declaratory judgment that
the '799 patent is invalid, unenforceable, and not
infringed. D.I. 14. ALI subsequently amended its
counterclaim to assert a Lanham Act claim against
CenterForce. D.I. 46.

On October 26, 1999, CenterForce moved for leave
to file an amended complaint. D.I. 80. In the
amended complaint, CenterForce seeks to allege
infringement of the '965 patent, and to add a claim for
willful infringement of both the '799 and '965 patents.
CenterForce also seeks recovery of treble damages.
ALI opposes CenterForce's motion to amend. For the
reasons set forth below, the Court will grant
CenterForce's motion to amend the complaint.

II. Factual Background

The three CenterForce patents describe methods and
systems for enhancing telephone contact campaigns
by scheduling calls based on probabilities of right
party contact with the targeted individual in order to
enhance the rate of correct party contact and operator
productivity. CenterForce markets and sells its
telephone scheduling systems under the name
"Optimizer," to, for example, debt collection and
telemarketing firms.

ALI is also in the business of selling call optimization
systems. ALI markets its "CallTech" system,
previously known as "Stalker," in competition with
CenterForce's Optimizer system.

CenterForce's president and chief operating officer,
Robert F. Kelly, learned of the Stalker system as
early as November 1994 when he was employed by
EIS International. Kelly had received two documents,
a facsimile of a brochure cover or data sheet
describing Stalker and a two-page general product
overview. D.I. 91, at B-9-11. Early in 1995, Kelly
met with representatives of ALI to discuss ALI's
product development generally, but "no technical
specifics" were discussed. Id. at B-15.

In July 1995, representatives of CenterForce, then

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 652943 (D.Del.), 55 U.S.P.Q.2d 1124
(Cite as: Not Reported in F.Supp.2d)

known as Automated Systems and Programming, Inc. ("ASPI"), obtained a copy of a Stalker brochure at a trade show. *Id.* at B-23. By a letter dated July 28, 1995, CenterForce's attorney wrote to ALI stating that the Stalker system as described in the brochure was "very similar to ASPI's [CenterForce's] Campaign Optimizer product." *Id.* at B-25. The letter went on to assert that "important aspects of the Campaign Optimizer are protected by the ['965 patent]" and that CenterForce had another patent application pending. *Id.* The letter closed with a warning that "ASPI [CenterForce] intends to enforce its patent rights vigorously and will not license potential competitors such as ALI. ALI should ensure that its products do not incorporate ASPI's [CenterForce's] patented technology." *Id.*

\*2 ALI's attorney responded in a letter dated October 12, 1995 asserting that "the ALI system cannot be considered as conflicting with [the] 965 Patent." *Id.* at B-34. The letter stated in pertinent part:

Although ALI's scheduling system is proprietary and I can, therefore, not disclose to you specifically what ALI's system does, I can set forth for you generally what the ALI system does not do relative to your client's 965 Patent. First, the ALI process does not prioritize accounts into relative priorities according to contact priority. The ALI system also does not allocate accounts in descending order of contact probability. Also, the ALI system does not create demographic profiles representative of contact probability.

*Id.* Enclosed with the letter were several pages of additional descriptive information including flow charts. *Id.* at B-36-43.

On January 30, 1996, CenterForce's attorney responded to the October 12, 1995 letter, acknowledging receipt of the materials describing Stalker and stating:

These materials, like the publicly-available information about the Stalker product that we reviewed earlier, suggest that the Stalker infringes claims of ASPI's [CenterForce's] U.S. Patent No. 5,436,965. However, you decline to provide further detail on the operation of the product on the grounds that the information is proprietary, and we lack sufficient independent information about the product to form a definitive infringement conclusion. We must therefore rely on the representations in your October 12 letter that the product does not meet the claim limitations that you identified.

*Id.* at B-44. The letter concluded by stating that

CenterForce would "let this matter rest" until its next patent issued or "until [CenterForce] receive [d] additional information indicating that the '965 patent is infringed." *Id.*

On June 4, 1996, ALI's attorney wrote to CenterForce's attorney, expressing concern that certain CenterForce representatives had been representing in the marketplace that ALI's CallTech product infringed a CenterForce patent and demanding that such representations cease. CenterForce responded by letter dated June 25, 1996, stating that "in light of ALI's published material and your May 10 letter, and since ALI has refused to provide sufficient information to permit us to perform a definitive infringement analysis, [CenterForce] remains concerned that ALI is infringing one or more claims of [the '965] patent. Accordingly, [CenterForce] has expressed its concerns to others." *Id.* at B-45.

By letter dated July 7, 1997, CenterForce's attorney informed ALI that the '790 patent recently had issued. *Id.* at B-59. The letter asserted, "[m]any of the claims of the '790 patent are directed to features of CenterForce's software that were not specifically claimed in the '965 patent and which may be used in ALI's product. Other claims are directed to the same features as were claimed in the '965 patent and which CenterForce remains unsatisfied are not infringed by ALI's product." *Id.* In conclusion, CenterForce renewed its "demand that ALI explain why its CallTech product does not infringe CenterForce's patent rights." *Id.*

\*3 At least one of CenterForce's salesmen continued during 1998 to make representations to customers that CenterForce had "three broad based patents" covering the Optimizer and, therefore, it was "virtually impossible for ALI to be selling the same type of product." *Id.* at B-47, 50, 57.

On September 1, 1998, ALI received a patent for its CallTech system, U.S. Patent No. 5,802,161 (the '161 patent). The patent specification references the use of "scorecards" and "characteristics" in the specification and description of the preferred embodiment. *Id.* at B-68.

On April 15, 1999, CenterForce's president wrote ALI's president, announcing the issuance of the '799 patent on March 30, 1999, and advising ALI that CenterForce had filed this suit for alleged infringement of the '799 patent. *Id.* at B-82. In August 1999 the parties exchanged responses to

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 652943 (D.Del.), 55 U.S.P.Q.2d 1124
(Cite as: Not Reported in F.Supp.2d)

document requests and interrogatories, and in September and October 1999 the parties engaged in depositions.

On December 14-15, 1999, the court held a *Markman* [FN1] hearing regarding construction of disputed claim terms of the '799 patent.

FN1. *Markman v. Westview Instruments, Inc.,* 517 U.S. 370 (1996).

### III. Legal Standard

Rule 15(a) of the Federal Rules of Civil Procedure provides that a party may amend its pleadings by "leave of the court" and that leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a); *Foman v. Davis,* 371 U.S. 178, 182 (1962); *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1434 (3d Cir.1997) (citing *Glassman v. Computervision Corp.,* 90 F.3d 617, 622 (1st Cir.1996)). This Rule "embodies a liberal pleading policy of the federal rules." *Barkauskie v. Indian River School Dist.,* 951 F.Supp. 519, 527 (D.Del.1996). A policy of favoring decisions on the merits, rather than on the technicalities, underlies this Rule. *Foman,* 371 U.S. at 181-82. While a trial court has the discretion to grant or deny leave to amend, leave to amend should be freely granted, as the Rule requires, unless there is sufficient reason to deny leave. *See id.* at 182; *Burlington Coat Factory,* 114 F.3d at 1434. Sufficient reasons include undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, failure to cure deficiencies in former amendments, and futility of amendment. *See Foman,* 371 U.S. at 182; *Burlington Coat Factory,* 114 F.3d at 1434. The Third Circuit Court of Appeals has further elaborated on the exceptions to the policy of liberally granting leave to amend, stating that "[t]he passage of time, without more, does not require that a motion to amend a complaint be denied; however, at some point, the delay will become 'undue,' placing an unwarranted burden on the court, or will become 'prejudicial,' placing an unfair burden on the opposing party." *Adams v. Gould, Inc.,* 739 F.2d 858, 868 (3d Cir.1984), *cert. denied,* 469 U.S. 1122 (1985); *see also Proctor & Gamble Co. v. Nabisco Brands, Inc.,* 125 F.R.D. 405, 409 (D.Del.1987) ("a showing of undue prejudice or unfair disadvantage to the nonmovant is required before delay provides an adequate basis for denial" (citations omitted)). Thus, " 'prejudice to the non-moving party is the touchstone for the denial of an amendment." ' *Lorenz*

*v. CSX Corp.,* 1 F.3d 1406, 1414 (3d Cir.1993) (quoting *Cornell & Co. v. Occupational Safety & Health Review Comm'n,* 573 F.2d 820, 823 (3d Cir.1978)).

### IV. Discussion

\*4 The Court now turns to consideration of the factors relevant [FN2] to determining whether to grant the motion to amend.[FN3]

FN2. There is no indication, and ALI has made no argument, that CenterForce's proposed amendments would be futile or that, by this amendment, CenterForce seeks to cure deficiencies it failed to make in former amendments. Therefore, the Court will not further consider these factors.

FN3. As an initial matter, ALI urges that CenterForce's motion should be denied because it is not supported by any evidence, particularly affidavits of a CenterForce witness to support the assertions in the motion to amend about what CenterForce knew and when it knew it. In *Barkauskie,* 951 F.Supp. at 527-28, this Court found a letter from the plaintiff's treating psychiatrist supported her motion to amend her complaint. However, the Court knows of no authority that would require the filing of an affidavit to support a motion to amend. Moreover, as CenterForce points out, because the depositions which gave CenterForce comfort in filing the motion to amend were designated by ALI as "Attorneys Eyes Only," CenterForce's counsel could not show or discuss the contents of these depositions with CenterForce executives.

### A. Undue Delay

Delay in of itself will not serve as a basis for denying a motion to amend unless the defendant is prejudiced. *See Proctor & Gamble Co.,* 125 F.R.D. at 409; *Jenn-Air Products Co., Inc. v. Penn Ventilator, Inc.,* 283 F.Supp. 591, 594 (E.D.Pa.1968). However, "[b]ecause ... a showing of long delay may ameliorate the degree of prejudice which a nonmovant must establish in order to defeat the proposed amendment," the Court will address the parties contentions regarding when CenterForce was in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 4
Not Reported in F.Supp.2d, 2000 WL 652943 (D.Del.), 55 U.S.P.Q.2d 1124
(Cite as: Not Reported in F.Supp.2d)

possession of sufficient information upon which to base a claim of infringement of the '965 patent. *Proctor & Gamble Co., 125 F.R.D. at 410.*

CenterForce asserts that it did not unduly delay amending the complaint to include infringement of the '965 patent, but rather quickly sought to amend when it received sufficient evidence of infringement through discovery in this case. CenterForce contends that it had concerns as early as 1995 that ALI's Stalker system, the predecessor to CallTech, infringed CenterForce's '965 patent and conveyed those concerns to ALI. D.I. 91, at B-44 & -45. However, CenterForce asserts it did not file and could not have filed a claim against ALI for infringement of the '965 patent earlier because, based on publicly available information about the Stalker product, ALI's refusal to provide additional product information on the ground such information was proprietary, and ALI's representations regarding the differences between the two products, *id.* at B-34, CenterForce could not form a definitive conclusion as to whether the product infringed the '965 patent. *Id.* at B-44 & 45. CenterForce maintains that it obtained sufficient information to form a good faith belief that ALI's products infringed the '965 patent through discovery in this case relating to the '799 infringement claim. In particular, CenterForce contends that, among the 30,000 pages of documents produced by ALI in August 1999, four technical documents relating to CallTech evidenced a possibility that ALI's CallTech infringed the '965 patent. CenterForce asserts it was not until October 4-8, 1999, however, during the depositions of ALI's President, Alexander N. Svoronos, and Vice-President, Daniel N. Duncan, that it received sufficient information regarding the functionality of the CallTech product, which furthered its understanding of the documents produced in August, to enable it to determine that CallTech infringed the '965 patent. In particular, CenterForce contends that CallTech infringes independent claim 4 and dependent claims 5 and 7 of the '965 patent, which involve the creation and use of a "demographic profile" representative of right party contact. Also after these depositions, CenterForce updated its claim chart regarding the '799 patent to assert that claim 9, which also references "demographic profile," is also infringed.

**\*5** ALI counters that CenterForce unduly delayed in bringing its claim for infringement of the '965 patent because it had the necessary information to make the infringement determination prior to filing the original complaint. In particular, ALI contends that the information CenterForce claims to have learned in discovery was already known to CenterForce through the following materials: (1) brochures on the Stalker system given to Robert Kelly in 1994; (2) a brochure on CallTech obtained by CenterForce at a trade show in 1995; (3) the October 12, 1995 letter from ALI's counsel accompanied by a product description and flow charts; and (4) ALI's '161 patent. ALI maintains these materials indicated that its system used "scorecards" and "characteristics" to determine right party contact probabilities and that CenterForce should have been well aware that the scorecards could be determined based on characteristics that included demographic data representative of right party contact.

"The issue of undue delay is inherently ambiguous. Any consideration of it frequently necessitates an inquiry into the applicability of Rule 11 [of the Federal Rules of Civil Procedure] and the incidental issues of dilatory motive, unfair surprise or bad faith. It is difficult, even through the gift of hindsight, for the Court to determine precisely when counsel possessed sufficient information upon which to base an amendment." *Proctor & Gamble Co.*, 125 F.R.D. at 411. Rule 11 mandates that upon signing a pleading, an attorney is "certifying that to the best of the person's knowledge, information, and belief formed after an inquiry reasonable under the circumstances," the claims and allegations therein are well grounded in fact and warranted by law. Fed.R.Civ.P. 11(b). CenterForce contends that it was following the requirements of Rule 11 on advice of counsel by waiting for the discovery process to reveal whether or not there was sufficient basis to assert a claim that CallTech infringed the '965 patent.

In light of Rule 11's mandate, the Court cannot conclude that CenterForce unduly delayed asserting a claim for infringement of the '965 patent. Here, correspondence between attorneys for ALI and CenterForce, beginning as early as 1995, indicates a consistent position by CenterForce that it was concerned that ALI's product infringed the '965 patent, but that it did not have sufficient information to make a definitive infringement interpretation. ALI refused CenterForce's requests for additional information on its product, citing its proprietary nature. ALI also asserted that its product did not infringe the '965 patent, citing differences, including a representation in the October 12, 1995 letter that "the ALI system does not create demographic profiles representative of contact probability." B-34. Moreover, as far as the Court can determine, the brochures and other information available to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 652943 (D.Del.), 55 U.S.P.Q.2d 1124
(Cite as: Not Reported in F.Supp.2d)

CenterForce, including ALI's '161 patent, while indicating that the Stalker and CallTech systems used "scorecards" and "characteristics," do not explicitly reference use of demographic information in calculating contact probabilities. ALI argues that anyone with any sort of expertise in the credit collection business would understand that a credit scoring system, like ALI's product, necessary used demographic data. D.I. 134, Transcript 2/2/00, at 27-29. However, in light of the fact that ALI was clearly on notice of CenterForce's position that it did not have sufficient information to make a definitive infringement analysis, ALI's refusal to provide additional information, and ALI's explicit representation that its product did not create demographic profiles, the Court concludes CenterForce did not unduly delay in asserting the claim for infringement of the '965 patent.[FN4]

> FN4. ALI cites *DRR, L.L.C. v. Sears, Roebuck & Co.*, 171 F.R.D. 162 (D.Del.1997) to support its argument that CenterForce unduly delayed in asserting a claim for infringement of the '965 patent. The Court finds *DRR* to be distinguishable from the present case. In *DRR*, of primary importance to the court's finding of undue delay and undue prejudice was the fact that the plaintiff sought leave to amend the complaint to add a new legal theory after summary judgment had been granted, more than two and one-half years after the original complaint was filed. *Id.* at 167-68. In the present case, by contrast, fact discovery has yet to close and there have been no determinations on the merits. Moreover, in *DRR*, unlike the present case, the plaintiff offered no explanation for its failure to assert the new legal theory before summary judgment was entered against it. *Id.* at 167.

### B. Undue Prejudice

*6 CenterForce contends the proposed amendment would not be prejudicial to ALI because the '965 patent is the grandparent of the '799 patent and the claims of the two patents are substantially similar. CenterForce asserts the addition of the '965 patent would not introduce any new claim terms, that extensive discovery has been taken already on the '965 patent, and, therefore, that little additional discovery will be required. Finally, CenterForce maintains it would be preferable for all concerned to

dispose of the '965 patent infringement claims in one proceeding, rather than forcing CenterForce to file a separate lawsuit, given the substantial similarity between the patents, the claims involve the same infringing product, and the substantial overlap in discovery.

ALI maintains that permitting amendment of the complaint would unduly prejudice ALI because the additional claims and the additional defenses to such claims would necessitate additional discovery regarding the '965 patent and claim terms. ALI further asserts that it would have excellent grounds for defending the new claim on the basis of laches and equitable estoppel. Although ALI may have affirmative defenses to the '965 infringement claim based upon the doctrine of estoppel and laches, this can only be determined after adjudication on the merits including the required factual findings regarding the elements of these defenses. *See Jenn-Air Products Co., Inc.*, 283 F.Supp. at 594. In addition, ALI may need to conduct additional discovery related to these defenses, as well as the defense of advice of counsel to the willful infringement claim that CenterForce seeks to add.

" 'Prejudice' for the purpose of Rule 15(a) does not concern potential prejudice resulting from the nature of the claims sought to be added; it concerns only the prejudice resulting from the fact of adding new claims at a late date." *Barkauskie*, 951 F.Supp. at 528. While the Court agrees with ALI that some additional discovery will be needed, the Court does not believe this need for additional discovery creates "undue prejudice" within the meaning of *Foman*, 371 U.S. at 182. *See id.* As was the case in *Barkauskie*, a trial date has not been set in this case, and defendants will be able to conduct discovery with respect to the additional claims and defenses. *See id.* Moreover, prejudice to ALI is diminished because the claims relate to the same product, the patents are substantially similar, and significant discovery regarding the '965 patent has been conducted already in this litigation.

ALI also maintains that any delay of the case by extending scheduling order deadlines would unduly prejudice ALI because it would extend CenterForce's ability to use this litigation "as a club against ALI in the marketplace." D.I. 90, at 14. This argument is not persuasive. Were this Court to deny CenterForce's motion to amend the complaint, CenterForce would be entitled to file a separate suit for infringement of the '965 patent (and would then, presumably, have a very good argument for consolidation of that action

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 652943 (D.Del.), 55 U.S.P.Q.2d 1124
(Cite as: Not Reported in F.Supp.2d)

with this one). It would seem that, were the Court to deny the motion to amend and CenterForce were to file a separate suit, as it asserts it would, it would extend even longer CenterForce's ability to use infringement litigation "as a club in the marketplace against ALI." ALI counters that resolution of the '799 claim will essentially end the litigation for all practical purposes <u>FN5</u> At this point, however, the Court has no way of knowing whether this is correct. Therefore, because discovery has not yet closed, <u>the '965 patent</u> is closely related to <u>the '799 patent</u>, both claims involve the same product, the trial of this case has not been set, and, if CenterForce's instant motion is denied, CenterForce could, and represents it would, institute a separate action against ALI, the Court concludes ALI will not be unduly prejudiced by allowing the motion to amend.

> <u>FN5.</u> At the hearing on the motion to amend, ALI also put forth the following argument: ALI asserts that the claims of <u>the '799 patent</u> are drawn more broadly than those of <u>the '965 patent</u> and, therefore, if CenterForce were to prevail on its claim for infringement of <u>the '799 patent</u>, it would get the same relief as it would under <u>the '965 patent</u> because CenterForce is claiming the benefit of the earlier filing date. D.I. 134, at 41. However, if CenterForce were to prevail on a claim for infringement of <u>the '965 patent</u>, which issued in 1995, it would appear to be eligible for four additional years of damages than it would be were it to prevail only on <u>the '799 patent</u>, which issued in 1999. *See generally* 5 DONALD S. CHISUM, CHISUM ON PATENTS § 16.04[2]-[3] (1999) (liability and remedy for infringing acts only during term of patent, which begins when patent issues) and cases cited therein.

### C. Bad Faith or Dilatory Motive

*7  Finally, ALI makes two arguments that CenterForce has brought this motion in bad faith. First, ALI contends that CenterForce's conduct in the marketplace, in particular assertions by sales representatives that ALI's CallTech system infringes the '965 and <u>'799 patents</u>, demonstrates CenterForce's bad faith. Second, ALI asserts CenterForce is adding the claim for infringement of <u>the '965 patent</u> because it has come to realize that its case regarding <u>the '799 patent</u> is weak.

Regarding the representations of the CenterForce sales representative that ALI's system may infringe CenterForce's patents, the Court finds it hard to relate this action to any bad faith in bringing the motion to amend. ALI is essentially arguing their Lanham Act claim against CenterForce as their argument for bad faith, and the ultimate success of the parties' claims on the merits is not properly before the Court at this procedural juncture. *See Proctor & Gamble Co.*, 125 F.R.D. at 412. Moreover, in most instances, infringement litigation is a stronger "club" in the marketplace than a salesman's assertions that a competitor's products "may" violate CenterForce's patent rights. It follows that it would make sense for CenterForce to assert its patent infringement claims as soon as possible, rather than delay.

Second, ALI argues that CenterForce is now seeking to assert a claim for infringement of the grandparent '965 patent because it made some bad decisions during the course of the current lawsuit and that during the course of discovery, CenterForce has been educated as to the weakness of its case regarding <u>the '799 patent</u>. D.I. 90, at 15; D.I. 134, at 39, 43-44. The success or failure of CenterForce's original claims is an issue for trial and cannot be decided on a motion to amend. *See Proctor & Gamble Co.*, 125 F.R.D. at 412. Other than ALI's bald assertions, the Court has no indication at this stage of the proceedings that the original claims are unsupported. *See id.*

Finally, there is no evidence to indicate that motion to amend is simply a delaying tactic by CenterForce. CenterForce has argued that there is no need to change the current schedule, that very little, if any additional discovery would be necessitated by the additional claims. In sum, the Court cannot conclude there was bad faith or dilatory motive on the part of CenterForce.

### V. Conclusion

The Court concludes that CenterForce did not unduly delay in asserting a claim for infringement of <u>the '965 patent</u>, nor was the motion to amend brought in bad faith. In view of the fact that discovery has not yet closed, <u>the '965 patent</u> is closely related to <u>the '799 patent</u>, both claims involve the same product, and the trial of this case has not been set and ALI will have time to prepare its defenses to these new claims before the case is scheduled for trial, ALI will not be unduly prejudiced by granting the motion to amend. "Moreover, if plaintiff's motion were denied[,] ... a separate action against the defendant could be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 652943 (D.Del.), 55 U.S.P.Q.2d 1124
(Cite as: Not Reported in F.Supp.2d)

instituted[,] and, in the absence of creating undue complications at trial, it is clearly preferable to dispose of all the contentions between these parties in one proceeding." *Jenn-Air Products Co.*, 283 F.Supp. at 594. Therefore, an order will be issued granting CenterForce's motion to amend and addressing case management concerns.

D.Del.,2000.
CenterForce Technologies, Inc. v. Austin Logistics Inc.
Not Reported in F.Supp.2d, 2000 WL 652943 (D.Del.), 55 U.S.P.Q.2d 1124

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.