# EXHIBIT B

1          IN THE UNITED STATES DISTRICT COURT

2          IN AND FOR THE DISTRICT OF DELAWARE

3                      - - -

OSRAM SYLVANIA, INC.,

4                              :      CIVIL ACTION

          Plaintiff,           :

5                              :

          v.                   :

6                              :

DUREL CORPORATION,             :

7                              :      NO. 00-501 (GMS)

          Defendant.           :

8                      - - -

9                  Wilmington, Delaware
         Tuesday, August 15, 2000 at 2:06 p.m.

10                 CHAMBERS CONFERENCE

11                     - - -

12  BEFORE:        HONORABLE GREGORY M. SLEET, U.S.D.C.J.

13                     - - -

   APPEARANCES:

14

15       YOUNG CONAWAY STARGATT & TAYLOR, LLP
         BY:  JOSY W. INGERSOLL, ESQ.

16
                   and

17
         KIRKLAND & ELLIS

18       BY:  JOHN DESMARAIS, ESQ.
             (New York, New York)

19
                         Counsel for Plaintiff Osram

20                       Sylvania Inc.

21
         MORRIS, NICHOLS, ARSHT & TUNNELL

22       BY:  DONALD F. PARSONS, JR., ESQ. and
             KAREN JACOBS LOUDEN, ESQ.

23
                   and

24

25                       Brian P. Gaffigan
                         Official Court Reporter

1    APPEARANCES: (Continued)

2                    PRETTY SCHROEDER & POPLAWSKI, PC
         BY:   LAURENCE H. PRETTY, ESQ.
3                       (Los Angeles, California)

4                    Counsel for Defendant Durel Corporation

5                       - oOo -

6                    P R O C E E D I N G S

7              (Proceedings started at 2:06 p.m. with

8    introductions being made.)

9              THE COURT:  Okay.  We have a one patent action;

10   right?

11             MR. DESMARAIS:  That's right.

12             THE COURT:  '496 patent.

13             MR. DESMARAIS:  And it's a welcome relief.

14             THE COURT:  You just spoke a mouthful, counsel.

15             Why don't we just sort of cut straight to the

16   chase.  I'm looking for the page where, paragraph 12, we have

17   the proposed schedule, which I see the parties have agreed

18   upon.  And in the main, it's acceptable to the Court.  I

19   believe it's consistent with the Court's availability for

20   trial.

21             Ms. Preston, were you going to?

22             THE DEPUTY CLERK:  There is only one change for

23   the pretrial conference.  We'd have to change the date to

24   October 26th.

25             THE COURT:  Okay.

1          THE DEPUTY CLERK:  That's the only change.

2          THE COURT:  Right.  So the trial date is a good

3  trial date.

4          THE DEPUTY CLERK:  That's fine.

5          THE COURT:  The only other date that --

6          MR. DESMARAIS:  Your Honor, may I?

7          THE COURT:  Yes.

8          MR. DESMARAIS:  I am scheduled to do a mediation

9  here with the magistrate judge.

10          THE COURT:  On that date?

11          MR. DESMARAIS:  It's actually scheduled.  It's a

12  huge case and she scheduled three days, the 25th, 26th and

13  27th.

14          THE COURT:  All right.  We can move that.

15          THE DEPUTY CLERK:  The pretrial.

16          THE COURT:  Yes, we'll get another date.  While

17  Ms. Preston is checking the calendar for that, I am going to

18  move the proposed dispositive motion filing deadline to May

19  -- to the end of May, if May 31 is not -- I'm not sure what

20  day of the week that is.

21          MR. DESMARAIS:  This is May next year.

22          THE COURT:  Yes.  Gail, I'm going to move the

23  case dispositive deadline.

24          MR. DESMARAIS:  May 31 is a Thursday.

25          THE COURT:  It's a Thursday.  We'll move it to

1    May 31.

2                    THE DEPUTY CLERK:  Okay.

3                    THE COURT:  And the only other significant

4    issues that we need to account for in the schedule as far

5    as I can tell are related to Markman.  I have begun taking

6    the approach that each case is unique and has different

7    requirements apparently with regard to the scheduling and

8    positioning of Markman in the process, so I have moved away

9    from, not that my approach was ever rigid, but firm approach

10   one way or the other.  And for purposes of discussion, I'll

11   suggest, and counsel, please feed back to me, that Markman

12   might be positioned some time after the fact discovery

13   deadline but before the opening due date on opening expert

14   reports.

15                   MR. DESMARAIS:  That would be fine with the

16   plaintiff.

17                   MR. PRETTY:  Yes, I can work with that.

18                   THE COURT:  What I would then suggest is that

19   we make the opening expert reports due 30 days after the

20   Markman.

21                   MR. DESMARAIS:  I didn't hear.

22                   THE COURT:  After the ruling on Markman, which I

23   would endeavor to get out in 30 days of the hearing.  So we

24   need to account for a date for the hearing, Ms. Preston.

25                   THE DEPUTY CLERK:  Markman hearing?

1                    THE COURT:  Yes.  I would anticipate a half day

2    to a day.

3                    MR. DESMARAIS:  I don't know that it would take

4    a day.  It's a pretty simple patent.  A half day should be

5    fine.

6                    MR. PRETTY:  Yes.  I take it this isn't

7    preclusive of summary judgment motions before that time --

8                    THE COURT:  Oh, no.

9                    MR. PRETTY:  -- which may involve Markman

10   rulings.

11                   MR. DESMARAIS:  So I would say a half day.

12                   MR. PRETTY:  Yes.

13                   THE COURT:  You can file those summary judgment

14   motions.  I'm not sure I'm going to get to them before

15   addressing Markman.  I tend not to mix-up the issues usually

16   attendant or raised in summary judgment with Markman.  Right

17   now, I'm somewhat of a purist in approaching Markman and

18   keeping Markman issues to purely matters of claim interpret-

19   ation almost exclusively in consideration of intrinsic

20   evidence, not ruling out the possibility that extrinsic

21   evidence may be appropriate in a given case but not generally

22   predisposed to hearing it, not at this stage where I'm

23   prepared to combine issues, summary judgment and Markman

24   judgment issues absent some persuasive argument from the

25   parties.

1    MR. PRETTY:  I think actually I agree with Mr.

2 Desmarais.  It may be that we won't even have a Markman

3 hearing.

4    THE COURT:  And there is nothing that says you

5 have to have a Markman hearing, as far as I can tell; and

6 that's perfectly fine.

7    MR. DESMARAIS:  I think if the parties agree

8 there are no terms in dispute there.

9    THE COURT:  There is no need for one.

10    MR. DESMARAIS:  Right.  Or if we wanted to go

11 with the plain language.

12    MR. PRETTY:  We may well do that.

13    THE COURT:  In point of fact, even if there are

14 claims in dispute, Markman says you don't have to have a

15 hearing.

16    MR. PARSONS:  Right.

17    THE COURT:  So then is it your feeling right now

18 that we should go ahead and schedule a date for a Markman?

19    MR. DESMARAIS:  I think it would be helpful.

20    MR. PRETTY:  Just in case.

21    THE COURT:  Yes, why don't we do that.

22    THE DEPUTY CLERK:  May 18th.

23    THE COURT:  May 18th.

24    MR. DESMARAIS:  I misspoke on October.  I was

25 looking at October 2000.  I don't have anything for October

1    2001, so the 26th is good.

2           MR. PRETTY:  I was impressed.

3           MR. DESMARAIS:  Yes.

4           MS. INGERSOLL:  Really.

5           MR. DESMARAIS:  Just off by a year.

6           THE COURT:  Yes, because you were going to be the

7    first attorney that came in with that, having planned out

8    that far.  Unfortunately, we have to plan that far.

9           Otherwise, the dates proposed in paragraph 12,

10   has anything changed since this was prepared?

11          MR. DESMARAIS:  Not that I'm aware of.

12          MR. PRETTY:  No.

13          THE COURT:  Then what I would ask of plaintiff's

14   counsel is to set this down in the form of in a formal

15   proposed scheduling order.

16          MS. INGERSOLL:  Okay.

17          THE COURT:  And send it over to with a disk, 6.0

18   WordPerfect.

19          MR. DESMARAIS:  WordPerfect.

20          THE COURT:  And I will, after you of course

21   exchange drafts with your opponent, I will turn it around,

22   along with a form of order for the preparation of the

23   proposed final pretrial order --

24          MR. DESMARAIS:  Okay.

25          THE COURT:  -- that will accompany that.  As

1    your local counsel knows who have appeared before me before,

2    it's fairly detailed and small type but it's really worth

3    following.

4              MS. INGERSOLL:  Yes.

5              MR. DESMARAIS:  Okay.

6              MS. INGERSOLL:  If we decide not to have a

7    Markman, we'll come back with a stipulated order giving you

8    the expert deadlines because otherwise we won't have it.

9              THE COURT:  That's right.  Otherwise, we won't

10   have a date, nor expert reports, so if you would do that.

11             MR. PRETTY:  We probably won't know the Markman

12   issue until we have contention interrogatories outstanding,

13   then we'll see the answers, then we'll see whether we have a

14   Markman dispute that will show up.

15             MS. INGERSOLL:  Yes.

16             MR. PARSONS:  I think what we'll do is we'll have

17   a tentative date for the Markman hearing, and then we'll,

18   maybe we'll put, some 30 days from that, maybe 60 days from

19   that, we'll put the expert reports due unless the Court, you

20   know, unless we don't have the Markman ruling, which it will

21   be 30 days.

22             MR. DESMARAIS:  Yes.  If we're going to agree not

23   to have a Markman at the same time, agree when we have the

24   expert reports, we can do that.

25             MS. INGERSOLL:  What I was going to do if I'm

1   granted this was Markman hearing May 18th and then opening

2   expert report 30 days after the ruling on Markman.

3                   MR. DESMARAIS:  Yes, that's what the judge said.

4                   MS. INGERSOLL:  Right.

5                   MR. PARSONS:  That's fine.

6                   THE COURT:  I understand what you are saying.

7                   MS. INGERSOLL:  And then if we don't have the

8   Markman, we'll just do a stipulated order --

9                   MR. DESMARAIS:  At that time.

10                  MS. INGERSOLL:  -- at that point.

11                  MR. DESMARAIS:  Right.

12                  THE COURT:  I need impose one additional

13  requirement related to Markman, in the event that we are

14  going to have disputed terms, that they be identified in some

15  sort of claim chart and the meaning described by the parties

16  to those terms and submitted to the Court I guess a couple of

17  weeks before briefs are due.

18                  MR. DESMARAIS:  Okay.

19                  THE COURT:  Okay?  And I would like to have

20  briefs two weeks in advance of the hearing, if we're going to

21  have one.

22                  As far as briefing in a general sense and

23  certainly as related to case dispositive motions, you can

24  brief on the local rule, and if you need relief from the

25  provisions of that rule, please write to me and set forth

1  the reasons in the letter.

2  A brief word about discovery disputes. They

3  do crop up from time to time -- he said facetiously. And I

4  would appreciate you following a procedure that will be

5  outlined in the scheduling order but I will outline briefly

6  now that is a two page opening letter, single spaced, and

7  with any attachments that you feel would help me decide the

8  issue at hand, two page answer and a two page reply.

9  It is my strong recommendation, which this is

10  informal motions practice and I think lends itself to a

11  timing provided by the local rule, that you do it on a more

12  expedited basis, since I do handle them directly and get to

13  them, usually try to get to them sooner rather than later,

14  so we can keep the case moving and not get bogged down in

15  motions practice and opinion writing and the like in terms

16  of discovery disputes, unless it's a dispute that I don't

17  feel I can address on the submissions and on the argument

18  we will have on the teleconference which will follow the

19  submissions. If I don't feel that I can do justice to the

20  issue that way, then I will free you up to engage in motions

21  practice. Pretty simple. Okay?

22  MR. DESMARAIS: Sounds great.

23  THE COURT: The other matter that I have on my

24  agenda, before I get to it, why don't we talk about estimated

25  length of trial and any other issues that counsel might have.

1          MR. DESMARAIS:  Can I ask one question about the

2    schedule?

3          THE COURT:  Yes.

4          MR. DESMARAIS:  Did you want to set a time for

5    the pretrial conference and the Markman hearing?

6          THE DEPUTY CLERK:  Pretrial conference will be at

7    2:00 o'clock and the Markman hearing will be at 10:00.

8          MR. DESMARAIS:  Okay.

9          THE COURT:  Let's say a word about pretrial

10    conferences, and it sort of may help you think a little bit

11    about length of trial.  We, as I think do most federal

12    district judges, really do what we can to pretry as much

13    of the case as possible.  So that all rulings that can be

14    anticipated certainly by way of motion in limine and my

15    pretrial order requires that you fully brief all motions

16    in limine and submit them at the time of the filing of the

17    proposed order; but those objections that are able to be

18    anticipated and legal issues can be raised in that way or at

19    the beginning of each day or at the close of the day session,

20    we will do that so that we can eliminate the interruptions

21    for the jury.

22          MR. DESMARAIS:  Great.

23          THE COURT:  But we do a lot to try to cut down

24    the amount of time that is necessary to actually be in that

25    courtroom in front of the jury.

1           MR. DESMARAIS:  Great.

2           THE COURT:  Jury selection doesn't take a long

3  time at all in this court.  Two hours should do it.

4           MR. PARSONS:  Max.

5           MR. DESMARAIS:  Judge Farnan threw me a loop last

6  fall and had the lawyers do the jury selection.

7           MR. PARSONS:  Yes, we did that, too.

8           MR. DESMARAIS:  On 15 minutes notice.

9           THE COURT:  Is that right?

10          MR. PARSONS:  Right.

11          MS. INGERSOLL:  We went first, though.  We were

12  just, yes, he brought us back and thought, oh, right before

13  the panel came in and said I want to try something new this

14  morning.

15          MR. DESMARAIS:  You guys go out there.  I said,

16  judge, can I give me 10 minutes to get ready.

17          MR. PARSONS:  Right.

18          MR. DESMARAIS:  But it was fun, though.  It was

19  actually fun.

20          THE COURT:  No.  When I was a practitioner, I

21  much preferred to do it myself, but now I'm not any longer,

22  I've become an ogre.  No, I do allow at the side bar, during

23  the side bar follow-up questions to be posed by counsel.  And

24  usually I find that counsel don't have that many questions

25  that they want to ask.  Sometimes there is a time when it's

13

1   appropriate.  But given the opportunity to sit down over a

2   period of time and craft questions you are going to do that

3   and some of them will be great questions, some of them I

4   won't agree are great questions.  So I'm still of the mind to

5   do it myself in the main, but you will have an opportunity

6   during the voir dire when we bring up the individual person

7   to the side bar.

8            We were going to talk a little bit more about

9   length of trial.

10           MR. PARSONS:  Right, length of trial.

11           THE COURT:  Length of trial.

12           MR. PRETTY:  Yes.  I think as I understand it,

13   Mr. Desmarais thinks it will be a one week trial, we think it

14   will be a two week trial.  I think one of the factors will be

15   the foreign witnesses, that may there may be a number of

16   them, Japanese possibly, not conversant in English.  So if

17   you end up with translation time, it can slow a trial down a

18   lot.  So we have put two weeks to be on the safe side just in

19   case we run into translation difficulties.

20           THE COURT:  Well --

21           MR. DESMARAIS:  I would be surprised if there

22   were that many foreign witnesses.

23           THE COURT:  As you might imagine in this court,

24   we deal with foreign witnesses a lot and I would be loath to

25   schedule a one patent matter, absent some really exceptional

1    circumstance, and foreign witnesses is not one that comes to

2    mind, to my mind for a two week trial.  So I am going to

3    schedule it for five days of trial.  If we find that we've

4    run into a problem, we'll of course all be watching the clock

5    because I probably will put you on a timer, we will be able

6    to anticipate that problem and make some kind of allowance --

7              MR. PRETTY:  All right.

8              THE COURT:  -- in some way.

9              MR. PRETTY:  And we may be moving at some time,

10   by the way, to bifurcate the damages.

11             THE COURT:  Likely, that will not be a motion

12   well taken, but I certainly would not preclude you from

13   filing it.  It's not generally the practice in this

14   particular district and not this particular judge's

15   practice, absent some compelling circumstance, to bifurcate

16   those issues.  But I will not cut you off from making your

17   argument, and I will listen to it.

18             MR. PRETTY:  Okay.

19             THE COURT:  The only other issue that I have --

20   and we can do this either off the record -- is settlement.

21   I'd like to talk a little bit about that.  And if counsel are

22   more comfortable off the record, we can certainly do that.

23             MR. PRETTY:  I think off the record for

24   settlement.

25             MR. DESMARAIS:  That would be fine.

1          THE COURT:  All right.  We can go off, Brian.

2          (Discussion held off the record from 2:22 p.m.

3    until 2:25 p.m.)

4          THE COURT:  We should go back on the record.

5          Is there anything else we should talk about

6    today?

7          MR. PRETTY:  There is the motion Mr. Desmarais

8    brought up.

9          THE COURT:  I have not read the papers, quite

10   frankly.  I think there is a discovery dispute.

11         MR. DESMARAIS:  That's right.

12         MR. PRETTY:  Yes.

13         THE COURT:  I'm unfortunately just back a second

14   day from vacation.

15         MR. DESMARAIS:  Good for you.

16         THE COURT:  I have not yet --

17         MR. DESMARAIS:  We're happy to take it up by

18   telephone --

19         THE COURT:  We can do that.

20         MR. DESMARAIS:  -- when you are comfortable.

21         MR. PRETTY:  Yes.  The only problem I have is one

22   of timing.  This deposition was originally noticed for I

23   guess last Friday, and then the letter got I guess filed on

24   Monday.  I'm not quite sure of my dates.

25         MR. PARSONS:  It was more like Wednesday.

1    MR. PRETTY:  Wednesday, okay.  So now we

2  rescheduled the deposition for this coming Friday, and of

3  course for me to get from California to wander takes a day

4  of travel.

5    MR. DESMARAIS:  The case just started.  There is

6  no urgency to have the deposition in our view.  We have a

7  year to do discovery.

8    MR. PRETTY:  Until we get into the merits of the

9  motion, which I don't think the judge wants to raise right

10  now, I'm just trying to work out if the judge was going to

11  rule on this quite fast.  The issues are so simple, I wonder

12  if we could sort of argue it now and maybe get a decision

13  on.  Well, I can put it off a week.

14    THE COURT:  Do you have the submissions?

15    THE DEPUTY CLERK:  Yes.

16    THE COURT:  Let me see what you've got.

17    Are there any cases I need to read?

18    MR. DESMARAIS:  Well, I think the legal issues

19  we could probably each tell you about.  I have copies.

20    THE COURT:  Okay.  Ms. Preston?

21    MR. DESMARAIS:  I have cases but unfortunately I

22  highlighted.  If you don't mind looking at my highlighting,

23  I'm happy to show them to you.

24    THE COURT:  Why don't you just outline.  Whose

25  motion is it?

1          MR. DESMARAIS:  It's the defendant filed a

2   30(b)(6) deposition notice, we made a motion for protective

3   order not to go forward with the deposition and they

4   responded.  It's our motion but it's the defendant who is

5   seeking the discovery.

6          THE COURT:  I don't mind taking a few moments to

7   listen.

8          MR. DESMARAIS:  I can outline the dispute for you

9   in two minutes, and you can decide if you want to go forward.

10          THE COURT:  All right.

11          MR. DESMARAIS:  On the same day we got the

12   30(b)(6) deposition notice for essentially contentions

13   supporting the infringement allegations in the complaint,

14   we got interrogatories seeking contentions supporting

15   infringement allegations in the complaint, we got document

16   requests seeking the documents supporting the contentions

17   of the complaint, and we got requests to admit seeking

18   admissions relating to the contentions in the complaint.

19          It's our view that a contention 30(b)(6)

20   deposition doesn't make any sense in these kinds of cases.

21   I personally have never done them because really what a

22   deposition like that is asking for is me or one of the

23   workers from my law firm to be the witness, to testify what

24   did do you to prepare the complaint?  What did you look at?

25   What were all the things you did?  What were the bases for

1    that?  And, why did you do it?  That's the kind of stuff it's

2    looking for.  I'd have to testify myself or one of my

3    associates.

4            Ordinarily in these type of cases, the way I

5    have handled it in the past is through contention interrog-

6    atories where you serve an interrogatory that asks the

7    same question.  What are the basis for the infringement

8    allegations?  What products are you charging?  What claims?

9    You know, give us a claim chart, tell us what it's all

10   about.  They served interrogatories on the same day.  If you

11   look at the case law, it's clear the cases favor contention

12   interrogatories for the very reason I just articulated.

13           THE COURT:  Yes.

14           MR. DESMARAIS:  They don't want lawyers telling

15   why they did it.  The lawyers sit down, craft the answers and

16   the other side gets the discovery.

17           And the other thing that is odd is you certainly

18   don't, at least in all the cases I have looked at, you don't

19   get contention discovery the day the case starts.  Each side

20   does discovery and the cases, you know, almost all the

21   reported decisions that I have read say that when contention

22   discovery is available is towards the middle of discovery or

23   towards the end of discovery when the parties have formulated

24   ideas, when they've come up with a long list of what products

25   are going to be in the case, which claims are going to be in

1    the case, and then you put up, you answer the interrogatories

2    with the detailed allegations somewhere once discovery is

3    underway, and that's the way I have always done it.

4         We don't see how it's appropriate to go forward

5    with a 30(b)(6) deposition.  And in fact, there is no

6    witness.  It would have to be a witness from Kirkland & Ellis

7    which we put up, which is, I've never had to do that before.

8                   THE COURT:  Okay.

9                   MR. DESMARAIS:  So we just think it's not an

10   appropriate form of discovery.

11                  THE COURT:  Okay.

12                  MR. DESMARAIS:  We have the cases cited in our

13   letter.

14                  THE COURT:  Okay.  Mr. Pretty.

15                  MR. PRETTY:  The whole premise of Mr. Desmarais'

16   argument is that there is a contention deposition.  They're

17   not.  We asked contention interrogatories because we know

18   you can't get contentions by a deposition.  We found in the

19   previous litigation that because of the nature of the subject

20   matter, what you really need to find out early on in the case

21   is what type of testing equipment was used?  What type of

22   test results did you get?  And, what type of data did you

23   have as facts?  We asked entirely facts because until you

24   know, for example, whether you are going to use particular

25   types of equipment, you can't really start your discovery in

1    a focused way.  You need to know, for example, how do you

2    count particles?  Do you use a particle counter?  Do you use

3    this piece of equipment or that?

4            So our questions are very carefully crafted not

5    to be contention interrogatories.  If I can just hand them to

6    you, they're all asking what type of test equipment did you

7    use?  What test results did you get?  Because we knew that

8    contention interrogatories are improper or at least not

9    favored.

10            And we're not going to be asking about their

11   mental processes.  We're not going to be asking for lawyer

12   work product.  We just want a technician to come out who

13   did the average particle size, how did he do it?  And

14   interrogatories are really of no use for these kind of

15   questions because you have to ask, well, did you adjust the

16   gain this way when you were doing it?  What data did you

17   get?  Did you factor in the temperature at that time?

18   There is a whole bunch of stuff that you can only really

19   find out when you ask fact questions, you have follow-up

20   discovery.

21            And we're doing this now because we find that

22   when you know what the test methodology is, then you can

23   really focus the rest of your discovery very efficiently.

24   And it worked in the last lawsuit and I think it will work

25   here.  So we're not asking for contentions.  And they're

1    going to be at the deposition.  If they think we're asking

2    for a contention, they can certainly tell the witness not to

3    answer.  I'm not going to push the point.  I just want to

4    find out facts because I want to know.

5            They filed this complaint.  We have a problem in

6    this case that there are products made by my client Durel and

7    products which are from Toshiba.  They haven't even told us

8    which products are the ones that infringe.  We want to ask,

9    for example, well, what products did you analyze?  So we can

10   know whether it's our products or their production.  Then we

11   want to know, well, what type of analyzer did you test it

12   in?  This is all fact information.  None of it is contention

13   information.  And the cases that they've cited are all ones

14   that deal with contention interrogatories.  And we agree with

15   them.  The contention interrogatories, we've asked those and

16   we'll get the contentions through those.  But right now, we

17   want the facts to get our case started because they have sued

18   us and we want to defend ourselves.

19           MR. DESMARAIS:  If I might reply to that?

20           THE COURT:  Sure.

21           MR. DESMARAIS:  Looking at the deposition notice,

22   I didn't address the test results.  I'd like to do that now.

23   But just looking at a large portion of the deposition notice

24   relates to contentions.  If you look at it, it says give us

25   a witness who is knowledgeable about the allegation in the

1    paragraph in the complaint about Durel has infringed the

2    patent and is continuing to infringe under these sections

3    of the patent.  Who is knowledgeable about the second cate-

4    gories, how Durel has infringed the '496 patent by importing,

5    using.  And the third one, the same thing, paragraph 9 in

6    the complaint, that Durel had constructive notice and that

7    the infringement is willful.  Those are standard textbook

8    contentions.  There are all sorts of topics relating to

9    testing.  I omitted those in my opening remarks.

10           The testing that was done at the direction of

11   Kirkland & Ellis in consultation with the client prior to the

12   filing of the lawsuit is textbook attorney work product.  And

13   we have a case from this district, Phillips vs. Universal

14   Electronics where it says that that sort of testing and

15   analysis done and relied upon in the decision to file the

16   complaint, textbook work product not discoverable.

17           We also have a case from the Third Circuit which

18   is In Re: Ford Motor Company vs. -- and then there is

19   individual names vs. Ford Motor Company, which is reported at

20   110 F.3d 954.

21           THE COURT:  Is that cited in your submission?

22           MS. INGERSOLL:  It is.

23           MR. DESMARAIS:  Is it?

24           MS. JACOBS LOUDEN:  No, it's not.

25           MR. DESMARAIS:  It's In Re: Ford Motor Company.

1      THE COURT:  Why don't you give me that and I'll

2  copy this.

3      MR. DESMARAIS:  Yes.

4      THE COURT:  Okay.

5      MR. DESMARAIS:  Is Philips v Universal?

6      MS. INGERSOLL:  Yes, Philips is.

7      MR. DESMARAIS:  So Philips is and the other is

8  not.  They say the kinds of testing and analysis done in

9  consultation with the law firm and between the client to

10  decide how to formulate the allegations and to consult the

11  client is all work product, it's attorney-client work and

12  work product and they don't need it for the case.  What they

13  need for the product is what products we're going to charge

14  for infringement, what claims we're going to do, and what

15  tests we're going to rely on at trial.

16      It doesn't make any difference to their case,

17  maybe we did 10 different cases to decide whether to sue or

18  not, that's not relevant.  What is relevant is how we're

19  going to go forward with the trial and what we're going to

20  proffer during the case that is developed during discovery.

21  We're going to exchange contentions.  That is how all the

22  cases I've been involved in proceed.

23      THE COURT:  I'll give you an option to reply.

24      MR. PRETTY:  Yes.  On the first point, your

25  Honor, the part up front here before the lettered topics

1    merely parrots their complaint.  I'd asked for someone

2    knowledgeable, but the topics of the letter, topics A

3    through, whatever it is, E, those are the topics for the

4    deposition, and they are all tests.  There is not one

5    contention amongst them.

6              THE COURT:  But they're tests counsel contends

7    were done at the direction of counsel and, therefore, fall

8    within classic definition of work product.

9              MR. DESMARAIS:  If you look more closely, it's

10   tests that were relied on to show infringement.  Tests that

11   were relied on to determine whether -- you know, it's all

12   attorney-client privilege --

13             MR. PRETTY:  Well --

14             MR. DESMARAIS:  -- or attorney work product.

15             MR. PRETTY:  That is merely to identify that

16   we're talking about these tests.  We're not talking about

17   tests that have nothing to do with the lawsuit.  We're

18   talking about the test methodology.  We want to know what

19   type of analyzer did you use to find out average diameters.

20   A lot of analyzers can be used.  We want to know how you

21   did it.

22             THE COURT:  Let me interrupt, counsel, because

23   what I'm interested in knowing is having a direct response

24   to his contention that this is work product.  And do you

25   disagree?

1          MR. PRETTY:  Yes, I disagree with that, your

2    Honor.

3          THE COURT:  And what is the basis of that?

4          MR. PRETTY:  The case he relied on is this

5    Lock-Tite -- I'm sorry -- the Phillips case.  The Phillips

6    case which is out of this district is one where they were

7    seeking documents that embodied the counsel's work product.

8    And the judge says no, you can't have the documents, they

9    embody the work product, but the underlying facts, the judge

10   went on to say -- and it was Judge --

11         MS. INGERSOLL:  McKelvie.

12         MR. PRETTY:   Judge McKelvie says that plaintiff

13   may not rule on, rely on Rule 26(b)(3) or claims of work

14   product as a basis for refusing to respond to discovery

15   requests seeking the disclosure of nonprivileged facts.

16         All we want is the facts.  We don't want any

17   contentions.  We don't want their mental theories.  We just

18   want to know what type of machine did you use?  How did you

19   set it?  What were the test data?  And I'm not going to push

20   it.  If, at the deposition, Mr. Desmarais says you can't ask

21   that particular question and it's not one relating to these

22   types of facts, we'll just go on to something else.

23         MR. DESMARAIS:  But, respectfully, counsel is

24   misreading the case when he talks about nonprivileged facts.

25   The facts he is seeking in this case are the privileged facts

1   which tests the law firm in consultation with what the client

2   chose to run, which tests were decided to be relied on to go

3   forward with the allegation.  Those are privileged facts or

4   work product facts.

5           What facts wouldn't be privileged would be, for

6   instance, if this case was about documents, if, within the

7   document, it said, you know, on a particular day, Durel

8   launched a product.  You know, that is a nonprivileged fact.

9   If it happens to be contained in the work product memo, that

10  probably needs to be disclosed.  But the essence of the work

11  product and the privilege is what we have advised the client

12  to do, how to work the test, what tests are used, and how to

13  rely on those.  That's the essence of the work product.

14          THE COURT:  I have never had a request or seen

15  one in my young career where counsel, one side or the other,

16  has sought information that was used in the due diligence

17  essentially leading up to the filing of the complaint.  So

18  sort of circling back to counsel's earlier suggestion that

19  during the course of discovery, you will have certainly

20  the opportunity to discover that information which you need

21  to support your contentions, whatever they are, regarding

22  infringement, noninfringement, validity, willfulness, what-

23  ever they may be.  But why is this particular information

24  that is that which was done at the direction of counsel,

25  whether it be a tweak or a twit or whatever by a engineer or

1    a scientist, why are you entitled to that information?

2          MR. PRETTY:  Well, one thing, your Honor, goes

3    very importantly to our claim for attorney fees at the

4    end.  Because, for example, one of the key factors in this

5    case they're alleging is size of particles.  Well, we think

6    that if they analyzed the Durel particles, they should know

7    they're too big for the patent claim.  We want to get the

8    discovery now so we can say later on down the case, if we

9    win, that, look, you brought this lawsuit at a time when you

10   knew that the Durel particles were too big.  If I relegated,

11   if I can't ever get the discovery on what did you bring the

12   lawsuit on, I'm being deprived of discovery that I need to

13   show that this lawsuit was brought without a proper basis.

14         THE COURT:  Is that to say that you would never

15   have opportunity to get that discovery?

16         MR. PRETTY:  It sounds kind of like it from what

17   he is saying.

18         THE COURT:  Let's hear --

19         MR. DESMARAIS:  No.  As the case goes forward,

20   if we can't prove that his particles are the right size,

21   that's the time when he complains that the action is

22   frivolous.  He doesn't need to know how we went about put-

23   ting the complaint together.  What he needs, he needs to

24   ultimately win this case.  And if he wins his case and proves

25   to the Court that the case was frivolous, and that we just

1    can't meet our allegations, at that point he moves for

2    attorney fees.  It doesn't make any difference.  He couldn't

3    need the work product from my consultations with my client

4    to make that proof.

5              If you look at any of these attorney fees or

6    frivolous case actions or Rule 11 actions, it's all based on

7    whether the merits of the case was frivolous at the time he

8    litigated.  Did he file a motion for summary judgment?  Did

9    he get dismissed?  In your opinion, did you say the action

10   was frivolous?  That is all based on what comes out in

11   discovery, not what comes out in due diligence, to use your

12   Honor's phrase.

13             THE COURT:  Counsel.  Mr. Parsons.

14             MR. PARSONS:  Well, I mean there is recent

15   Federal Circuit law within the last, certainly within the

16   last six months, maybe within the last three months, as to

17   the type of investigation that is required to meet a party's

18   obligations for filing a complaint for patent infringement.

19             THE COURT:  But my concern at this point, Mr.

20   Parsons, my concern is a timing one.  And I don't see that

21   this issue cannot be raised again later on at a time that it

22   might be more appropriate after some discovery has actually

23   transpired, because being quite candid, counsel, are you

24   interested in knowing whether you are able to move for

25   attorney fees at an appropriate time?

1      MR. PRETTY:  That's right.

2      THE COURT:  It strikes me -- I'm sorry to use

3  this cliche -- it's a little bit cart before the horse in a

4  way.

5      MR. PRETTY:  Well, the other thing is at some

6  point, we are going to have to depose the guy who ran the

7  average particle size counter.

8      THE COURT:  Okay.

9      MR. PRETTY:  Now, I don't want to be told that

10  the same arguments are going to come up then, oh, you can

11  never depose the guy who ran the average particle size

12  counter because that is a very crucial part of the case.

13      THE COURT:  Well, I don't know how could they

14  interpose that argument or objection.

15      MR. PRETTY:  Well, the argument apparently is

16  they select the type of counter to be used.  That is part

17  of their work product.  I don't see why that argument won't

18  apply equally well three months from now when I want to

19  get to the guy.  I mean either I'm entitled to take his

20  deposition on how he ran the counter or I'm not.

21      THE COURT:  Well, this is someone that I would

22  presume would be offered as an expert.

23      MR. DESMARAIS:  Exactly.

24      MR. PRETTY:  This is a technician.  This machine

25  is typically run by a technician.

1    MR. DESMARAIS:  The person that would be deposed

2    by the other side would be the expert when we go forward

3    with putting our contention, and that comes through expert

4    discovery, and that expert will say how my client feels the

5    machine should be run.  You are exactly right.

6    THE COURT:  Counsel, I'm going to grant the

7    protective order and deny -- grant the motion without

8    prejudice to your renewing this issue at a later time, based

9    on what I'm hearing right now.  I'm certainly willing to stay

10   my hand and take a further look at these cases but just based

11   on what I'm hearing, you did indicate you thought this matter

12   from a timing point is somewhat critical.  I feel comfortable

13   in saying that my ruling today does not inure to your ever-

14   lasting prejudice to renew the issue, and I don't think any-

15   thing that I'm intending to imply by my ruling is intended

16   to suggest, because I'm not articulating exactly the basis,

17   quite frankly, that you should be precluded in or estopped

18   from making the same arguments or additional arguments at a

19   later time.  And the same would go for you as well.

20   MR. DESMARAIS:  Thank you, your Honor.

21   MS. INGERSOLL:  Thank you, your Honor.

22   MR. PRETTY:  Your Honor, I would like to ask one

23   thing.

24   THE COURT:  Sure.

25   MR. PRETTY:  You haven't had a chance to read all

1    the cases.

2                    THE COURT:  Granted.

3                    MR. PRETTY:  And I wondered if you could just

4    look at the Lock-Tite case because that is a 7th Circuit case

5    out of this district, but it did deal with the fact --

6                    THE COURT:  Is that --

7                    MR. PRETTY:  I don't --

8                    MR. DESMARAIS:  It's referenced in your papers.

9                    MR. PRETTY:  This was going on to the importance

10   of tests.  I underlined in red the two parts.

11                   THE COURT:  Okay.

12                   MR. PRETTY:  You're in a chemical case where

13   they point out how important it is you get to depose and

14   take -- well, sorry -- to take discovery on the test equip-

15   ment used.  And then on the earlier part that I underlined in

16   red, they pointed out --

17                   THE COURT:  Well, I think there is no disagree-

18   ment that you are entitled to take discovery on the test

19   equipment used.

20                   MR. DESMARAIS:  Exactly.

21                   THE COURT:  It's for what purpose I think is

22   really -- well, go ahead.

23                   MR. PRETTY:  I think he said I'm not even

24   entitled to take the deposition of a technician, who is a

25   crucial person to take.  He said I can only take the expert.

1    That is ridiculous.

2          MR. DESMARAIS:  It's our position that at no

3    time, unless we're down the line deciding whether attorney

4    fees are relevant or not, at no time during the case is it

5    discoverable or even needed in these cases what the client

6    and the lawyers did to confirm to them theirselves that the

7    allegations were sufficient to file the complaint.  What he

8    is entitled to and what happens in these cases is eventually

9    we have to give each other contentions.  I'm going to prove

10   at trial that your products are the right size because this

11   guy did a test, this is how he did it, and that means you

12   infringed.

13         He is going to depose all those people that we're

14   going to pony up to support our contentions, the contentions

15   we're going to go forward to trial on.  Those are a different

16   set of contentions.  That's my attorney work product with

17   my client deciding whether to bring the case at all in the

18   beginning.  The question is can we support the contentions

19   through the case?  That's a two different testing here.

20         THE COURT:  That's the sort of the rub here.

21         MR. PRETTY:  No, he is making a distinction

22   between the experts and the technicians.  The last case,

23   we found the way the equipment is set up on these things,

24   you have to get to the guy who twiddles the knobs, the blue

25   collar person who is actually operating the equipment because

1    the experts will interpret the data one way, but you want to

2    know was he turning the gain up to 5.7 to get this result

3    before it was given to the expert?

4              MR. DESMARAIS:  I'm not taking issue with that.

5    You can have, at the relevant time in expert discovery, you

6    can have the technician and anyone who did anything to the

7    tests when we're going forward with the contentions in the

8    case.  I'm not saying you can't have that.  You can have full

9    discovery on all that.

10             MR. PARSONS:  Well, I don't think it needs to

11   wait.  In our view, it doesn't need to wait until expert

12   discovery to find out how tests are run.

13             THE COURT:  Can't that be done during fact

14   discovery?

15             MR. PRETTY:  Yes.

16             MR. DESMARAIS:  When we exchange contentions.

17             MR. PRETTY:  No, I want it before then.  I want

18   it early on in the case.  Believe me, this technology, I've

19   been litigating it for five years.  How the tests are run is

20   crucial.  Now I want to know how those tests are run early

21   in the case.  I can't wait until the end of the case.  If I

22   don't do it this month, can do it next month perhaps, your

23   Honor?

24             MR. DESMARAIS:  Your Honor, what I'm

25   understanding here, I assume he is going to get his own

1    expert and run the tests.  He gets an expert that has his

2    people run the tests.  He decides how to set it up so it

3    shows one size.  My experts and technicians do the test and

4    decide it shows whatever size.  That's the fact issue for

5    trial.  What size these particles are is the fact issue for

6    trial.

7                THE COURT:  No, I understand the distinction.

8                MR. PRETTY:  But I want the harmful facts that

9    came out when you tried it with your technician and found

10   the particles are too big, if that is the case, because then

11   I want to have that as evidence at trial.  Right now, you're

12   saying I can only rely on my evidence, I can't look for

13   admissions or any bad conduct on your side.

14               THE COURT:  That has relevance to more than just

15   the narrow issue you focused on which was attorney fees.

16               MR. PRETTY:  Yes, I agree with that, your Honor.

17               THE COURT:  Okay.  And I think counsel is saying

18   he doesn't object to giving you access to that information;

19   is that correct?

20               MR. DESMARAIS:  I'm not 100 percent sure.  I

21   don't have objection to him talking to the technicians.

22               THE COURT:  See, this is one of the reasons this

23   Court so enjoys when counsel are able to sit down and really

24   flesh these things out among yourselves.  Since we joined the

25   issue, we might as well try to see what we can do to resolve

1    it now.  I think there is basis for an agreement here.

2                MR. DESMARAIS:  I do, too.  I have no objection

3    to him deposing the technicians and the test operators and us

4    producing all the discovery on the tests -- the tests being

5    the tests that we're going to use to support our contentions

6    going forward with the case in discovery and to trial, what

7    are we going to prove at trial?  We're going to exchange.  He

8    asked an interrogatory already, which claim are you going to

9    assert?  Which products are you going to claim infringe?  And

10   what are the underlying basis for that?  We're going to work

11   on the response to that interrogatory.  It's going to say we

12   rely on this test, these people and this expert.  And if you

13   want the technicians, we'll give you the technicians, and you

14   can depose them all.

15               I'm drawing a distinction between that set of

16   analyses I'm going to go to trial on, I'm drawing a dis-

17   tinction between that and whatever analyses we did with

18   the client and the law firm to determine whether there was

19   infringement and to bring a lawsuit.

20               THE COURT:  Yes, I don't think he is after the

21   work product.

22               MR. PRETTY:  No, I'm not after his work product.

23               MR. DESMARAIS:  Then we don't have a problem.

24               THE COURT:  Then the issue that is left, it seems

25   to me, on the table is one of timing.

1          MR. PRETTY:  That's exactly right, your Honor.

2          MR. DESMARAIS:  Right.

3          MR. PRETTY:  We want it as soon as possible.

4          THE COURT:  So what can we do?

5          MR. DESMARAIS:  The case just started.

6          THE COURT:  Ms. Ingersoll.

7          MS. INGERSOLL:  I was just curious when the

8  interrogatories have come in?  And these are the

9  interrogatories we're talking about that we will respond to

10  in 30 days, I'm assuming --

11          MR. DESMARAIS:  Right.

12          MS. INGERSOLL:  -- at that point.

13          MR. DESMARAIS:  Well, I'm not sure.  We

14  haven't even started discovery yet.  We have to discover

15  what products they have.  They have to discover what our

16  positions are.  I mean this is something the case just

17  started.  Ordinarily, contentions are at least midway

18  through discovery.

19          THE COURT:  Go ahead, counsel.

20          MR. PRETTY:  You can see I'm not going to get

21  any meaningful answers on what test equipment was done or

22  anything until they've stalled me through interrogatory

23  answers.  I've had to move to compel.  I'm entitled to this

24  information now.

25          THE COURT:  No, no.  I'm trying to determine the

 1  authority for that.

 2              MR. PRETTY:  Okay.  Here is the authority.

 3              THE COURT:  No, no.  But you submitted written

 4  questions, interrogatories.

 5              MR. PRETTY:  Right.

 6              THE COURT:  And you've noticed the deposition.

 7              MR. PRETTY:  Right.

 8              THE COURT:  I don't know if the notice is

 9  premature or not.

10              MR. PRETTY:  Okay.

11              THE COURT:  Conceivably it is under the rules.

12  I'd have to go back and take a quick look at the rules.  But

13  it seems to me that as a practical matter, not trying to

14  be over legalistic here, that counsel does not object to

15  responding in a timely fashion to provide you the very

16  information that you requested.  So based on the words I just

17  heard exchanged, I don't think that you are going to need to

18  file a motion to compel that which you seek.

19              Now, we can talk this out right now so we can

20  determine whether you are going to need to file a motion to

21  compel, because I don't want to leave this having invested

22  now 22 minutes and leave this to the point where you do have

23  to file a motion to compel, because I think that should not

24  transpire.

25              MR. DESMARAIS:  Right.  I believe he is entitled

1  to contention responses, and I would like to serve contention

2  interrogatories on him and I expect him to answer. The only

3  question is how detailed the answers are at this point. I

4  mean discovery has started today. We haven't even exchanged

5  documents. We haven't had additional disclosures yet.

6        THE COURT: Whether we call them contentions

7  interrogatories, I don't want to get bogged down on that.

8  The better analyzed cases in my view have moved away from

9  that and have recognized there is always, always the

10  opportunity to supplement to seek relief from the Court

11  to amend where because the early response to a so-called

12  contention interrogatory position has changed in light of new

13  evidence or whatever. So I'm not hung up on that label.

14  Nor do I think it's appropriate to put you to the burden of,

15  plaintiff's counsel or plaintiff, to the burden of making a

16  response that it is not prepared to make within the rules.

17        Essentially, the complaint I hear coming from

18  this side of the table is that, judge, we haven't had a

19  chance to really respond to this. And there is still time

20  left within the rules to give us an opportunity to respond

21  in a timely way as opposed to you ordering us to do it

22  today. And, is that really what you want?

23        MR. PRETTY: Well, they did file a complaint.

24  Under Rule 11, they must have had some facts that made it. I

25  just want to know what the facts are that base the complaint.

1        THE COURT:  That's my concern, that this is

2   really a Rule 11 issue.  And Rule 11 is always in play,

3   counsel, but I am not going to allow you, with all due

4   respect, to back-door that issue in this way.  So -- Yes,

5   Mr. Parsons?

6        MR. PARSONS:  No, I appreciate that; and I think

7   I understand what the Court is saying there.  And I think

8   what we're probably going to have to do is let the responses

9   come in, and I'm not sure we're not going to have a motion to

10  compel sort of situation.

11       THE COURT:  You might.

12       MR. PARSONS:  But we may have to just let the

13  responses come in, pursue the fact discovery, non-Rule 11

14  type fact discovery that we think we're entitled to.  If

15  there is an issue, we'll have to be back to the Court on it.

16       THE COURT:  And I rather think so.  So my ruling

17  today certainly in no way prejudices you from renewing this

18  issue.  What is the specific relief that you request in your

19  paperwork?

20       MR. DESMARAIS:  Not to go forward with the

21  30(b)(6) contention deposition.

22       THE COURT:  Okay.  I'm going to order that that

23  notice be quashed.  And, you can renew it at a later time.

24       MR. DESMARAIS:  Thank you, your Honor.

25       THE COURT:  All right.  Is there anything else?

40

1              MR. DESMARAIS:  Not from the plaintiff.

2              MS. INGERSOLL:  Did we get a date as to when you

3    want the draft?

4              THE DEPUTY CLERK:  Pretrial order.

5              THE COURT:  Well, the pretrial order and the Rule

6    16.

7              THE DEPUTY CLERK:  The pretrial order date will

8    be October 10th, 2001.

9              THE COURT:  Okay.

10             THE DEPUTY CLERK:  Submit the proposed scheduling

11   order by August 30th.

12             THE COURT:  August 30th close of business.

13             Anything else, counsel?

14             MR. PARSONS:  No, that's fine.

15             THE COURT:  I would encourage you to rejoin this

16   issue later on, and I suspect you will be able to resolve it

17   to your satisfaction, but I'm here if you are not.

18             (Conference ends at 2:56 p.m.)

19

20

21

22

23

24

25