# EXHIBIT A

SHEET 1

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                        - - -

 4   AMBERWAVE SYSTEMS CORPORATION,  :  CIVIL ACTION
                                     :
 5              Plaintiff,           :
                                     :
 6   v.                              :
                                     :
 7   INTEL CORPORATION,              :
                                     :
 8              Defendant.           :  NO. 05-301 (KAJ)

 9                        - - -

10                   Wilmington, Delaware
                   Thursday, March 23, 2006 at 2:00 p.m.
11                   TELEPHONE CONFERENCE

12                        - - -

13   BEFORE:     HONORABLE KENT A. JORDAN, U.S.D.C.J.

14                        - - -
     APPEARANCES:
15

16           MORRIS NICHOLS ARSHT & TUNNELL
             BY:  JACK B. BLUMENFELD, ESQ.
17
                 and
18
             IRELL & MANELLA, LLP
19           BY:  DAVID I. GINDLER, ESQ., and
                  JASON G. SHEASBY, ESQ.
20               (Los Angeles, California)

21                   Counsel for AmberWave Systems
                     Corporation
22

23

24
                         Brian P. Gaffigan
25                       Registered Merit Reporter
```

SHEET 2

**2**

1  APPEARANCES:  (Continued)

2

3      YOUNG CONAWAY STARGATT & TAYLOR
       BY:  JOHN W. SHAW, ESQ.

4          and

5      SIMPSON THACHER & BARTLETT, LLP
       BY:  GEORGE M. NEWCOMBE, ESQ., and

6      PATRICK E. KING, ESQ.
       (Palo Alto, California)

7

8          Counsel for Intel Corporation

9

10

11

12

13

14              - oOo -

15          P R O C E E D I N G S

16      (REPORTER'S NOTE:  The following telephone

17  conference was held in chambers, beginning at 2:00 p.m.)

18      THE COURT:  Hi, this is Judge Jordan.  Who do I

19  have on the line?

20      MR. BLUMENFELD:  Your Honor, it's Jack

21  Blumenfeld for AmberWave, the plaintiff now, along with

22  David Gindler and Jason Sheasby from Irell.

23      THE COURT:  All right.

24      MR. SHAW:  Good afternoon, Your Honor.  It's

25  John Shaw for Intel; and with me on the phone are George

**3**

1  Newcombe and Patrick King from Simpson Thacher.

2      THE COURT:  All right.  We've got Protective

3  Order Redux today, a subject we were talking over last

4  November.  And I've read the letters that you sent in to me

5  for today's call.  Let me just give you what I think are

6  the issues in play here and we'll go through them one by

7  one.

8      MR. SHEASBY:  Your Honor, if I may interrupt?

9      THE COURT:  Sure.

10      MR. SHEASBY:  There has been a partial

11  resolution to the dispute between the parties.  This is

12  Jason Sheasby for AmberWave.

13      THE COURT:  I'm glad you interrupted.  Tell me

14  what it is.

15      MR. SHEASBY:  There are two issues on the table.

16  One is the scope of the prosecution bar and one is how an

17  attorney substitute for prosecution bar can participate

18  in the reexamination.  The reexamination issue has been

19  resolved.  Intel and AmberWave have stipulate the neither

20  party is going to file reexamination on the patents-in-suit

21  and based on that, we are prepared to agree to Intel's more

22  stringent standard for participation and reexamination.

23      MR. NEWCOMBE:  No, no, no.  Excuse me.  This is

24  George Newcombe.  It's my understanding, judge, I agree with

25  Ms. Sheasby up to the point where those portions of the

**4**

1  protective order dealing with reexam just go out of the

2  window.  They're not in the protective order at all.  Once

3  we take this off the table, it was my understanding that

4  this whole portion of the protective order goes out and we

5  are just left with the prosecution bar and how wide that

6  would be; but by stipping to neither party will put patents

7  in suit into reexam, that we would eliminate the entire

8  carve out.

9      THE COURT:  It sounds like you guys are not as

10  fully together as you thought on that.

11      MR. SHEASBY:  That appears to be the case.

12      THE COURT:  Well, I'll tell you what.  We won't

13  take that up today.  Hopefully, we won't have to take it up

14  on another occasion.

15      MR. GINDLER:  This is David Gindler for

16  AmberWave.  I think that issue is something we will be able

17  to resolve, and I think it need not be addressed further

18  today.

19      THE COURT:  All right.  Then let's talk about

20  the scope of the bar.  Who wants to take the lead?

21      MR. NEWCOMBE:  Your Honor, can I go first?  This

22  is George Newcombe for Intel.

23      THE COURT:  Fine.

24      MR. NEWCOMBE:  The problem and why we're

25  concerned about this issue is that we literally are talking

**5**

1  about the crown jewels of the Intel once we start turning

2  over all the internal designs and processes by which we make

3  our microprocessors to them.  The issue is as follows:  We

4  maintain that the bar should apply to all counsel of record,

5  period.  AmberWave believes it should only be counsel of

6  record who has reviewed the AEO material.  And the reason

7  we think that is inadequate is multiple fold, but the most

8  practical thing is that if you're on the team, if you are

9  on the litigation team, issues of infringement of claim

10  construction, of validity are all of necessity going to be

11  and should be driven by counsel's analysis of our most

12  sensitive materials.  I don't know how, whether or not

13  someone has actually looked at those documents but as part

14  of the team they're going to be exposed to that analysis.

15      If those people can then turn around and, as we

16  have found out that AmberWave has on the '890 application,

17  while we're negotiating this, put in additional amendments,

18  and that is one that may be in suit, and when we ask them in

19  a letter to say has anybody contacted, been in communication

20  with prosecution counsel over those amendments, the only

21  response back was no one who had reviewed AEO material has

22  been in contact.  And that doesn't make us very comfortable

23  because I don't think it's possible to separate out the

24  analysis of the case, working on the case by virtue of who

25  has looked at AEO material and who is working on the case

SHEET 3

**6**

1   and therefore subjected to the kinds of deliberations and
2   analysis that will be driven — of necessity, could and
3   should be driven in the litigation by those materials.
4       And so we're very, very concerned by trying to
5   make this distinction over who has actually reviewed and not
6   reviewed the materials, and we believe that the bar should
7   be as to counsel of record, period. And if you look at
8   Brown Bag, where the balancing test is really over balancing
9   their ability to litigate the case which is completely
10  unaffected, they can litigate this case because we're saying
11  everybody on their team can have access to this and work as
12  they will to defend or prosecute the case.
13      And as to other patent prosecution work, that is
14  something which AmberWave has its own separate prosecution
15  counsel. They can go ahead and do anything they want but
16  there is no impact on the ability of Amberwave's litigation
17  counsel to litigate the case while still preventing them
18  from participating broadly, any of them, in patent
19  prosecution.
20      THE COURT: Why don't you speak to me for just a
21  moment, Mr. Newcombe, about the position they've taken and
22  which you haven't mentioned that there is some sort of
23  detrimental reliance that has been going on here. That they
24  were quiet for ten months and now they have people involved
25  and that's a problem.

**7**

1       MR. NEWCOMBE: I think that is actually a
2   misstatement of the record as follows, and I'll run through
3   the chronology with you.
4       Starting on November 23rd, which is right after
5   our previous conference, every draft of the protective
6   order that we sent them, back to November, had the language
7   applying the prosecution bar to all counsel of record.
8   AmberWave's draft they sent back to us on December 12th
9   actually contained our language on that.
10      The first time that the limitation on review
11  that was put in, now they say only the people who have
12  reviewed ABO material, was actually on February 5th. And
13  in response to that, we, in fact, said now we're getting
14  concerned by this caveat of just "reviewed." We expanded
15  the scope of the prosecution bar to be, to include "all
16  patent prosecutions, that field of semiconductor devices.
17      Then we learned that the '890 application was
18  in fact amended. We sent a letter saying, Have you
19  communicated with prosecution counsel? And the only
20  response we got back is only nobody who had reviewed our
21  AEO materials had communicated. So I think the chronology
22  does not support the claim that we have tried to sandbag
23  them here and there has been detrimental reliance. This
24  has been a position we staked out pretty clearly starting
25  November 23rd and going forward.

**8**

1       THE COURT: All right. Mr. Gindler, are you
2   going to be speaking own behalf of Mr. AmberWave?
3       MR. GINDLER: No, Mr. Sheasby will.
4       THE COURT: All right. Mr. Sheasby, go ahead,
5   sir. The ball is yours.
6       MR. SHEASBY: Sure. So I think it's important
7   exactly to clarify exactly what AmberWave's position is. If
8   litigation counsel is not subject to the prosecution bar,
9   they can't do the following: They can't review Intel
10  produced documents that are designated ABO, attorneys' eyes
11  only technical information. They can't review internally
12  produced memoranda at our firm, for example, that has within
13  it Intel attorneys' eyes only technical information. And
14  they can't discuss with people who are subject to the
15  prosecution bar Intel attorneys' eyes only technical
16  information.
17      THE COURT: I think I've got a pretty good
18  handle on your position. I need you to speak to the
19  specific position that your opponents have which is whether
20  it's being expressly discussed or not, if somebody who has
21  reviewed attorneys' eyes only information is sitting down
22  with somebody who is on the litigation team but whom you
23  have chosen to say, okay, no, you're not on the attorneys'
24  eyes only review list, and they are working together to
25  craft claim construction position and litigation positions,

**9**

1   when that person goes off to prosecute patents, they will
2   inevitably have acquired an understanding or a view that is
3   informed by the technical information that the other person
4   has reviewed.
5       That's, I take it to be, the heart of the
6   argument that is being pressed on me by your opponents and
7   that is the argument I need you to directly address.
8       MR. SHEASBY: Sure. There is no doubt people
9   who are not subject to the prosecution bar are going to be
10  able to play a limited role in this case. They're not going
11  to be able to discuss infringement theories with us. We
12  recognize that.
13      THE COURT: How does the other side know that,
14  though?
15      MR. SHEASBY: The other side knows it because
16  we are under protective order and we would be in Contempt of
17  this Court if I discussed attorneys' eyes only technical
18  information with a member of this team who was not under the
19  protective order.
20      THE COURT: I'm sorry. I might be talking past,
21  we may be talking past each other. I guess what I'm asking
22  is when you say we can't discuss infringement positions,
23  which is what I thought I heard you say a second ago, I
24  thought you had a position — and maybe I'm wrong. I should
25  maybe be quiet and hear more about what your position is,

SHEET 4

**10**

1  but I thought your position was people who had access to
2  attorneys' eyes only information and people who didn't could
3  in fact discuss infringement positions, could in fact
4  discuss claim construction issues, that that was going to
5  be a wide range and wide open discussion even if the person
6  who had attorneys' eyes only information wasn't permitted
7  to say, oh, I saw this document from Intel that revealed
8  such-and-such and such-and-such. But short of doing that
9  step, which they weren't permitted to do, they were allowed
10  to talk about what they thought the right positions were
11  going to be.
12      MR. SHEASBY: Well, I think it's somewhere in
13  the middle, which is to say attorneys with access to the
14  information would need to self-censor themselves and
15  obviously not be able to disclose AEO technical information.
16      I will point out that the protective order
17  that they agreed to allows attorneys who have access to
18  attorneys' eyes only technical information to advise their
19  clients on those issues as well. And so the point is that
20  certainly we would, there would be strategic discussions
21  potentially about this is the position we're taking on a
22  matter of validity let's say that we would have with people
23  who are not subject to the prosecution bar. But that
24  discussion really has, doesn't implicate technical
25  information at all. And so there would be no reason not

**11**

1  to be able to have that discussion.
2      THE COURT: They're not contesting that piece;
3  right? I mean when you say everybody agrees that there can
4  be some high level strategic discussion even with clients,
5  people who are not subject to the attorneys' eyes only
6  provision, that if I have understood right, that is some
7  high level strategic discussion. Everybody agrees with
8  that; correct?
9      MR. NEWCOMBE: Your Honor, I don't know what
10  that means. It's not in the protective order. I don't
11  know what language that he is referring to so our position
12  is pretty clear that there shouldn't be -- that litigation
13  counsel should be separate and apart from prosecution
14  counsel here, period.
15      MR. SHEASBY: Your Honor, if I may interrupt. I
16  think if you look at the case law on this subject, you will
17  see there is a common touchstone, even the cases that Intel
18  cites in its own papers, and what those cases say is that
19  attorneys on a litigation team have a choice. They can
20  choose to view confidential information and be subject to
21  the prosecution bar, but they can choose not to view that
22  information and recognize that it's the role they're going
23  to be able to play in that litigation is limited.
24      I'm not aware of any case I don't think Intel
25  has cited any case that has said, per se, if you are on the

**12**

1  litigation team, you are subject to a prosecution bar. And
2  I think that there is a basic reason for that, and it's one
3  of fairness, which is that AmberWave has put together a
4  litigation team and that litigation team includes members
5  who potentially are going to be subject to the prosecution
6  bar and have agreed to be or able to be and includes members
7  and members of our firm who are not able to agree to that.
8  And now 10 months into this litigation and four-and-a-half
9  months after our previous hearing before this Court, they're
10  telling us everyone in your litigation team is subject to a
11  prosecution bar.
12      THE COURT: Well, Mr. Sheasby, you heard Mr.
13  Newcombe tell me they've been telling you since last fall.
14      MR. SHEASBY: Your Honor, I do not agree with
15  that. In the protective order that the parties agreed to in
16  almost every -- on November 9th, the parties agreed to a
17  protective order and there are two outstanding issues:
18  participation of reexamination and challenge to experts.
19  Everything else was agreed to. That form of protective
20  order, on November 8th, did not contain a per se bar such as
21  applied to all litigation counsel, regardless of whether
22  they received information.
23      For Mr. Newcombe, who did not even negotiate
24  the protective order, to suggest this issue was brought up
25  before November 8th or November 22nd is simply not accurate.

**13**

1  I had a phone conversation with Intel counsel this Sunday,
2  and it was this Sunday for the first time that Intel counsel
3  said to me, yes, we want it to apply to all litigation
4  counsel.
5      THE COURT: I find this fascinating when I can
6  have people telling me as to historical facts diametrically
7  opposed things. That nothing was said about this until last
8  weekend on the one side and the other side saying we've been
9  saying it for the last five months. It's amazing.
10      MR. KING: Your Honor, if I may interject here.
11  This is Patrick King for Intel on behalf of Intel who did
12  negotiate with Mr. Sheasby the protective order. And Mr.
13  Newcombe is well aware what the protective orders we've
14  been exchanging say because he has copies of. He has looked
15  through all of them and what he says is accurate.
16      The first time the idea of this being confined
17  to only two attorneys who reviewed the materials was
18  raised by Mr. Sheasby recently when he brought that to my
19  attention. It alarmed me and I discussed it internally
20  with my team, including Mr. Newcombe and it brought into
21  focus the danger of the position they were taking.
22      THE COURT: All right.
23      MR. SHEASBY: Your Honor, I hate to interrupt
24  here. I'd like to address one other issue which bothers me.
25      THE COURT: Is this Mr. Sheasby?

SHEET 5

**14**

1    MR. SHEASBY: This is Mr. Sheasby.
2    THE COURT: Okay. Go ahead, sir.
3    MR. SHEASBY: That's Mr. Newcombe's
4  characterization of the recent activity in the '890
5  application. I just want to clarify something to make it
6  very clear, which is that no Irell attorney who had access
7  to Intel's attorneys' eyes only confidential information
8  participated in the amendment of claims in that application.
9  It's not just those who reviewed Intel's documents, it's
10  those who had any access to the information, full stop.
11    MR. NEWCOMBE: Your Honor, it's George Newcombe.
12  What bothers me here is this self-censored
13  concept that somehow lawyers are going to segregate in their
14  head.
15    THE COURT: All right. You know, I don't need
16  the further argument.
17    MR. NEWCOMBE: Thank you.
18    THE COURT: The parties' positions have been
19  effectively laid out in your submissions and statements here
20  on the teleconference have been of assistance. Let me tell
21  you what I'm going to do first and then I'll tell you why
22  I'm doing it.
23    I'm sorry you couldn't come to a resolution of
24  this, but I'm coming down on the side of Intel in this. And
25  the reason is I don't agree that there is a fair or an

**16**

1  to me, that was pretty straightforward. I said no.
2    Now, here is a circumstance where in advance
3  people don't really know what going to happen perhaps but
4  inevitably, you know, I just think Intel has the better side
5  of this argument. If you are fully informed by the
6  technical information of your opponent and you are sitting
7  down talking about how to frame up an infringement position,
8  a claim construction position, something like that, how are
9  you in your mind going to say, well, I can't say that
10  sentence to my partner or I can't utter this idea to them
11  because it's informed by technical information that I have
12  had access to. I just don't think you can slice it that
13  carefully or that fine. It won't work. And in some way, it
14  gives a benefit to prosecuting counsel that ought not be
15  there. It just shouldn't.
16    It's an artificial world we have to step into
17  when we're dealing in a case like this where one side gets
18  into the other side's information in a way that no sensible
19  businessperson would ever permit but for the fact we have a
20  dispute and so we have to allow that. So we put people in
21  the bubble and they've got to stay in the bubble. So I'm
22  not comfortable saying, okay, I trust you. Not because I
23  don't trust you in the sense that I think anybody would be
24  dishonest but I don't think anybody should be trusted to try
25  to separate out in their own brain what they can and can't

**15**

1  appropriate way to draw the line AmberWave wants to draw,
2  even people acting in the best of faith in self-censorship.
3    Now, it may well be that this is the first time
4  this has ever been done, but I've got to say I think it may
5  be the first time that anybody has tried to put the position
6  in quite the fashion it's been put in this case. In the
7  past when I have seen this, and I have seen it on a regular
8  basis, the context has been in-house lawyers who want to
9  be working with outside counsel and have an access to
10  everything and that is where the bar has frequently and
11  regularly come up.
12    I've not had occasion to see a case where
13  somebody with the outside counsel wanted to parse it as
14  finely as AmberWave does and says, well, we want some people
15  in outside counsels' firm to have access and some people on
16  outside counsels' firm not to have access and those on the
17  outside that are doing it to have them still be able to
18  prosecute.
19    In the CEA case, it's true that I had a
20  situation something like that where they had specifically a
21  specific set of people. And you folks have cited this case
22  back to me. I've gone back and looked at it again. That
23  was a circumstance where there was a set of people and they
24  wanted them to have access to attorneys' eyes only
25  information and still be able to prosecute patents. And

**17**

1  say to their own partners and associates in the context of
2  litigation. They ought to be able to have free and open
3  discussion. As they're doing that, some of this information
4  may inevitably leak out.
5    So I'm going to go ahead and say if you guys
6  can't work it out, I'm working it out for you this way.
7  Intel gets it the way it wants it. If somebody is going
8  to work on this litigation, this litigation which is
9  informed by the attorneys' eyes only material, they're not
10  prosecuting patents. If they're not going to be working on
11  this case, then they can do whatever they want with respect
12  to this field. But if they've got access to this Intel
13  stuff, they can't be working in this field.
14    Now, I regret that people seem to have a
15  different view on who knew what when about these positions
16  and I can't sort that out right now. I don't know who
17  has got the better of that. But that's how we're going to
18  handle it.
19    Now, you folks have already resolved the other
20  piece of it that you put before me. I've resolved this
21  piece of it. You ought to be able to get a protective order
22  in place and actually get it to me for signature now, I
23  hope.
24    MR. GINDLER: Your Honor, this is David Gindler
25  for AmberWave. I wanted to raise just one issue. And the

SHEET 6

18

1    issue is the following: During the course of this case,
2    Intel has identified many, many pieces of prior art to us as
3    being potentially relevant to the patents-in-suit and maybe
4    others. So we have possession of this information. We get
5    informed from time to time that a new patent is going to
6    issue by the Patent Office.
7         I think that AmberWave has an obligation, if it
8    has possession of prior art that could be relevant, to make
9    sure that prior art is submitted to the Patent Office.
10   Well, that is prior art that is being given to us by Intel
11   in the course of the litigation. And we want to make sure
12   that our client, the assignee of the patent rights, complies
13   with all of its obligations in the Patent Office to insure
14   that any prior art that could conceivably relevant and
15   important to an examiner gets submitted.
16        So my concern right now is just one very narrow
17   one, which is that we're getting lots of prior art cited to
18   us. I'm going to guess we're going to get a lot more prior
19   art cited to us. And we may look at that, we may be told by
20   our client, hey, the patent X is going to issue. We have a
21   notice of allowance it's going to issue in five months.
22        We take a look at the claims. We take a look at
23   the prior art that we have in our possession and we say,
24   holy smokes. We have some things here that we think that,
25   on balance, it would be a better thing if we gave that to

19

1    the Patent Office. And I think we want to be in a position
2    to be able to tell the prosecution counsel we have been
3    communications of the following pieces of prior art. We
4    got them in the context of other patents but you've sent us
5    the allowed claims of this patent and we think 25 pieces of
6    this prior art conceivably might be considered relevant by
7    the examiner. And we want to be able to put that into the
8    hands of our prosecution counsel to make sure that AmberWave
9    complies to the letter with its obligations to the Patent
10   Office.
11        THE COURT: Mr. Newcombe.
12        MR. NEWCOMBE: Your Honor, this is the first
13   time this concern has been raised, so we're reacting to it
14   on the fly.
15        I don't like the concept of there being contact
16   between the two camps. And maybe we need to flesh this out
17   between us a bit to find out exactly what they mean and what
18   is involved. Literally, this is the first time, at least to
19   my knowledge, this concept, this particular concept has been
20   raised.
21        MR. SHEASBY: Your Honor, this is Jason Sheasby.
22   I can just speak for — I think there is two sets of
23   partners and two sets of associates on the call and I think
24   the associates need to maybe connect better with their
25   partners. But Pat King and I, in the form of protective

20

1    order you have, have a carve out in place so that
2    AmberWave counsel would be able to submit information
3    for the information disclosure statement.
4         THE COURT: All right.
5         MR. NEWCOMBE: So in other words, Jason, you're
6    saying this problem has been resolved?
7         MR. SHEASBY: This problem has been resolved.
8         MR. NEWCOMBE: Then I will stop talking.
9         THE COURT: Well, you know what? Now, it might
10   have just gotten unresolved by surfacing it here. I hope
11   not. You ought to go back and have your discussions. I
12   don't want anything that I have said on this call in
13   relation to prosecuting patents to prevent you from having
14   sensible compromises in relation to an issue like the one
15   that has just been related to me.
16        MR. NEWCOMBE: Your Honor, this is George
17   Newcombe. I think this gets back to my understanding
18   which was the stipulation that we presented to Your Honor
19   addressed the entire issue of the communication with respect
20   to prior art because that carve out was supposed to
21   completely go. And we'll continue this discussion but I
22   think that is the basis of maybe some of the confusion here.
23        THE COURT: Well, you guys see if you can work
24   it out. Let me say that if you can't work it out, I thought
25   you were on sort of the right track before, both of you,

21

1    with the compromise you've been working toward, even
2    though you weren't able to come to "yes" about how many
3    communications you could have. But if you can't work that
4    out because there is an issue like his that one side thinks
5    still has to have at least a bit of a door open on, you
6    ought to go back and take a look at the progress you had
7    already made and not throw all that out the window.
8         All right. Well, I'm sorry to hear that we're
9    not quite on the same page where we thought we were and yet
10   I'm not able to help you resolve it because there is not a
11   point on it at this stage. So you guys take the piece that
12   we have got resolved and the piece that you haven't and see
13   if you can't come up with a compromise that addresses
14   everybody's concern adequately and get me something in
15   writing. If you can't, let's get on the phone promptly and
16   get this done so we've got a protective order and moving
17   forward. All right?
18        MR. NEWCOMBE: Yes, Your Honor.
19        THE COURT: All right. Thanks for your time.
20        (Unidentified speaker): Your Honor?
21        (Telephone conference ends at 2:30 p.m.)
22
23
24
25

**'**

**'890** [3] - 5:16, 7:17, 14:4

**0.**

**05-301** [1] - 1:8

**1**

**10** [1] - 12:8
**12th** [1] - 7:8

**2**

**2005** [1] - 1:10
**22nd** [1] - 12:25
**23** [1] - 1:10
**23rd** [2] - 7:4, 7:25
**25** [1] - 19:5
**2:00** [2] - 1:10, 2:17
**2:30** [1] - 21:21

**5**

**5th** [1] - 7:12

**8**

**8th** [2] - 12:20, 12:25

**9**

**9th** [1] - 12:16

**A**

**ability** [2] - 6:9, 6:16
**able** [17] - 4:16, 9:10, 9:11, 10:15, 11:1, 11:23, 12:6, 12:7, 15:17, 15:25, 17:2, 17:21, 19:2, 19:7, 20:2, 21:2, 21:10
**access** [12] - 6:11, 10:1, 10:13, 10:17, 14:6, 14:10, 15:9, 15:15, 15:16, 15:24, 16:12, 17:12
**accurate** [2] - 12:25, 13:15
**acquired** [1] - 9:2
**acting** [1] - 15:2
**Action** [1] - 1:4
**activity** [1] - 14:4
**additional** [1] - 5:17
**address** [2] - 9:7, 13:24

**addressed** [2] - 4:17, 20:19
**addresses** [1] - 21:13
**adequately** [1] - 21:14
**advance** [1] - 16:2
**advise** [1] - 10:18
**Aeo** [7] - 5:5, 5:21, 5:25, 7:12, 7:21, 8:10, 10:15
**afternoon** [1] - 2:24
**ago** [1] - 9:23
**agree** [5] - 3:21, 3:24, 12:7, 12:14, 14:25
**agreed** [5] - 10:17, 12:6, 12:15, 12:16, 12:19
**agrees** [2] - 11:3, 11:7
**ahead** [4] - 6:15, 8:4, 14:2, 17:5
**alarmed** [1] - 13:19
**allow** [1] - 16:20
**allowance** [1] - 18:21
**allowed** [2] - 10:9, 19:5
**allows** [1] - 10:17
**almost** [1] - 12:16
**Alto** [1] - 2:6
**amazing** [1] - 13:9
**Amberwave** [17] - 1:4, 1:21, 2:21, 3:12, 3:19, 4:16, 5:5, 5:16, 6:14, 8:2, 12:3, 15:1, 15:14, 17:25, 18:7, 19:8, 20:2
**Amberwave's** [3] - 6:16, 7:8, 8:7
**amended** [1] - 7:18
**amendment** [1] - 14:8
**amendments** [2] - 5:17, 5:20
**analysis** [4] - 5:11, 5:14, 5:24, 6:2
**and-a-half** [1] - 12:8
**Angeles** [1] - 1:20
**apart** [1] - 11:13
**Appearances** [2] - 1:14, 2:1
**application** [4] - 5:16, 7:17, 14:5, 14:8
**applied** [1] - 12:21
**apply** [2] - 5:4, 13:3
**applying** [1] - 7:7
**appropriate** [1] - 15:1
**argument** [4] - 9:6, 9:7, 14:16, 16:5
**Arshi** [1] - 1:16
**art** [11] - 18:2, 18:8, 18:9, 18:10, 18:14, 18:17, 18:19, 18:23, 19:3, 19:6, 20:20

**artificial** [1] - 16:16
**assignee** [1] - 18:12
**assistance** [1] - 14:20
**associates** [3] - 17:1, 19:23, 19:24
**attention** [1] - 13:19
**attorney** [2] - 3:17, 14:6
**attorneys** [6] - 10:13, 10:17, 11:19, 13:17
**attorneys'** [13] - 8:10, 8:13, 8:15, 8:21, 8:23, 9:17, 10:2, 10:6, 10:18, 11:5, 14:7, 15:24, 17:9
**aware** [2] - 11:24, 13:13

**B**

**Bag** [1] - 6:8
**balance** [1] - 18:25
**balancing** [2] - 6:8
**ball** [1] - 8:5
**bar** [18] - 3:16, 3:17, 4:5, 4:20, 5:4, 6:6, 7:7, 7:15, 8:8, 8:15, 9:9, 10:23, 11:21, 12:1, 12:6, 12:11, 12:20, 15:10
**Bartlett** [1] - 2:5
**based** [1] - 3:21
**basic** [1] - 12:2
**basis** [2] - 15:8, 20:22
**beginning** [1] - 2:17
**behalf** [2] - 8:2, 13:11
**believes** [1] - 5:5
**benefit** [1] - 16:14
**best** [1] - 15:2
**better** [4] - 16:4, 17:17, 18:25, 19:24
**between** [3] - 3:11, 19:16, 19:17
**bit** [2] - 19:17, 21:5
**Blumenfeld** [3] - 1:16, 2:20, 2:21
**bothers** [2] - 13:24, 14:12
**brain** [1] - 16:25
**Brian** [1] - 1:24
**broadly** [1] - 6:18
**brought** [3] - 12:24, 13:18, 13:20
**Brown** [1] - 6:8
**bubble** [2] - 16:21
**businessperson** [1] - 16:19

**C**

**California** [2] - 1:20, 2:8
**camps** [1] - 19:16
**carefully** [1] - 16:13
**carve** [3] - 4:8, 20:1, 20:20
**case** [19] - 4:11, 5:24, 5:25, 6:9, 6:10, 6:12, 6:17, 9:10, 11:16, 11:24, 11:25, 15:6, 15:12, 15:19, 15:21, 16:17, 17:11, 18:1
**cases** [2] - 11:17, 11:18
**caveat** [1] - 7:14
**Cea** [1] - 15:19
**censor** [1] - 10:14
**censored** [1] - 14:12
**censorship** [1] - 15:2
**certainly** [1] - 10:20
**challenge** [1] - 12:18
**chambers** [1] - 2:17
**characterization** [1] - 14:4
**choice** [1] - 11:19
**choose** [2] - 11:20, 11:21
**chosen** [1] - 8:23
**chronology** [2] - 7:3, 7:21
**circumstance** [2] - 15:23, 16:2
**cited** [4] - 11:25, 15:21, 18:17, 18:19
**cites** [1] - 11:18
**Civil** [1] - 1:4
**claim** [6] - 5:9, 7:22, 8:25, 10:4, 16:8
**claims** [4] - 14:8, 18:22, 19:5
**clarify** [2] - 8:7, 14:5
**clear** [2] - 11:12, 14:6
**clearly** [1] - 7:24
**client** [2] - 18:12, 18:20
**clients** [2] - 10:19, 11:4
**comfortable** [2] - 5:22, 16:22
**coming** [1] - 14:24
**common** [1] - 11:17
**communicated** [2] - 7:19, 7:21
**communication** [2] - 5:19, 20:19
**communications** [1] - 21:3
**completely** [2] - 6:9,

20:21
**complies** [2] - 18:12, 19:9
**compromise** [2] - 21:1, 21:13
**compromises** [1] - 20:14
**Conaway** [1] - 2:2
**concelvably** [2] - 18:14, 19:6
**concept** [4] - 14:13, 19:15, 19:19
**concern** [3] - 18:16, 19:13, 21:14
**concerned** [3] - 4:25, 6:4, 7:14
**Conference** [1] - 1:11
**conference** [3] - 2:17, 7:5, 21:21
**confidential** [2] - 11:20, 14:7
**confined** [1] - 13:16
**confusion** [1] - 20:22
**connect** [1] - 19:24
**considered** [1] - 19:6
**construction** [4] - 5:10, 8:25, 10:4, 16:8
**contact** [2] - 5:22, 19:15
**contacted** [1] - 5:19
**contain** [1] - 12:20
**contained** [1] - 7:18
**Contempt** [1] - 9:16
**contesting** [1] - 11:2
**context** [3] - 15:8, 17:1, 19:4
**continue** [1] - 20:21
**Continued** [1] - 2:1
**conversation** [1] - 13:1
**copies** [1] - 13:14
**Corporation** [4] - 1:4, 1:7, 1:21, 2:7
**correct** [1] - 11:8
**counsel** [21] - 5:4, 5:5, 5:20, 6:7, 6:15, 6:17, 7:7, 7:19, 8:8, 11:13, 11:14, 12:21, 13:1, 13:2, 13:4, 15:9, 15:13, 16:14, 19:2, 19:8, 20:2
**Counsel** [2] - 1:21, 2:7
**counsel's** [1] - 5:11
**counsels'** [2] - 15:15, 15:16
**course** [2] - 18:1, 18:11
**Court** [31] - 1:1, 2:18, 2:23, 3:2, 3:9, 3:13,

4:9, 4:12, 4:19, 4:23,
6:20, 8:1, 8:4, 8:17,
9:13, 9:17, 9:20,
11:2, 12:9, 12:12,
13:5, 13:22, 13:25,
14:2, 14:15, 14:18,
19:11, 20:4, 20:9,
20:23, 21:19
craft [1] - 8:25
crown [1] - 5:1

**D**

danger [1] - 13:21
David [4] - 1:19, 2:22,
4:15, 17:24
dealing [2] - 4:1,
16:17
December [1] - 7:8
defend [1] - 6:12
Defendant [1] - 1:8
Delaware [2] - 1:2,
1:10
deliberations [1] - 8:1
designated [1] - 8:10
designs [1] - 5:2
detrimental [2] - 6:23,
7:23
devices [1] - 7:16
diametrically [1] -
13:6
different [1] - 17:15
directly [1] - 9:7
disclose [1] - 10:15
disclosure [1] - 20:3
discuss [5] - 8:14,
9:11, 9:22, 10:3,
10:4
discussed [3] - 8:20,
9:17, 13:19
discussion [7] - 10:5,
10:24, 11:1, 11:4,
11:7, 17:3, 20:21
discussions [2] -
10:20, 20:11
dishonest [1] - 16:24
dispute [2] - 3:11,
16:20
distinction [1] - 6:5
District [2] - 1:1, 1:2
document [1] - 10:7
documents [3] - 5:13,
8:10, 14:9
done [2] - 15:4, 21:16
door [1] - 21:5
doubt [1] - 9:8
down [3] - 8:21, 14:24,
16:7
draft [2] - 7:5, 7:8
draw [2] - 15:1

driven [3] - 5:11, 6:2,
6:3
During [1] - 18:1

**E**

effectively [1] - 14:19
eliminate [1] - 4:7
ends [1] - 21:21
entire [2] - 4:7, 20:19
Esq [6] - 1:16, 1:19,
1:19, 2:3, 2:5, 2:6
exactly [3] - 8:7, 18:17
examiner [2] - 18:15,
19:7
example [1] - 8:12
exchanging [1] -
13:14
Excuse [1] - 3:23
expanded [1] - 7:14
experts [1] - 12:18
exposed [1] - 5:14
expressly [1] - 8:20
eyes [13] - 8:10, 8:13,
8:15, 8:21, 8:24,
9:17, 10:2, 10:6,
10:18, 11:5, 14:7,
15:24, 17:9

**F**

fact [5] - 7:13, 7:18,
10:3, 16:19
facts [1] - 13:6
fair [1] - 14:25
fairness [1] - 12:3
faith [1] - 15:2
fall [1] - 12:13
fascinating [1] - 13:5
fashion [1] - 15:6
February [1] - 7:12
field [3] - 7:16, 17:12,
17:13
file [1] - 3:20
fine [1] - 15:14
Fine [1] - 4:23
finely [1] - 15:14
firm [4] - 8:12, 12:7,
15:15, 15:16
first [9] - 4:21, 7:10,
13:2, 13:16, 14:21,
15:3, 15:5, 19:12,
19:18
five [2] - 13:9, 18:21
flesh [1] - 19:16
fly [1] - 19:14
focus [1] - 13:21
fold [1] - 5:7
folks [2] - 15:21, 17:19

following [4] - 2:16,
8:9, 18:1, 19:3
follows [2] - 5:3, 7:2
form [2] - 12:19, 19:25
forward [2] - 7:25,
21:17
four [1] - 12:8
frame [1] - 16:7
free [1] - 17:2
frequently [1] - 15:10
full [1] - 14:10
fully [2] - 4:10, 16:5

**G**

Gaffigan [1] - 1:24
George [5] - 2:5, 2:25,
3:24, 4:22, 14:11,
20:16
Gindler [5] - 1:19,
2:22, 4:15, 8:1, 8:3,
17:24
given [1] - 18:10
glad [1] - 3:13
guess [2] - 9:21, 18:18
guys [4] - 4:9, 17:5,
20:23, 21:11

**H**

half [1] - 12:8
handle [2] - 8:18,
17:18
hands [1] - 19:8
hate [1] - 13:23
head [1] - 14:14
hear [2] - 9:25, 21:8
heard [2] - 9:23, 12:12
hearing [1] - 12:9
heart [1] - 9:5
held [1] - 2:17
help [1] - 21:10
Hi [1] - 2:18
high [2] - 11:4, 11:7
historical [1] - 13:6
holy [1] - 18:24
Honor [17] - 2:20,
2:24, 3:8, 4:21, 11:9,
11:15, 12:14, 13:10,
13:23, 14:11, 17:24,
19:12, 19:21, 20:16,
20:18, 21:14, 21:20
Honorable [1] - 1:13
hope [2] - 17:23,
20:10
Hopefully [1] - 4:13
house [1] - 15:8

**I**

idea [2] - 13:16, 16:10
identified [1] - 18:2
impact [1] - 6:16
implicate [1] - 10:24
important [2] - 8:6,
18:15
in-house [1] - 15:8
inadequate [1] - 5:7
include [1] - 7:15
includes [2] - 12:4,
12:6
including [1] - 13:20
inevitably [3] - 9:2,
16:4, 17:4
information [29] -
8:11, 8:13, 8:16,
8:21, 9:3, 9:18, 10:2,
10:6, 10:14, 10:15,
10:18, 10:25, 11:20,
11:22, 12:22, 14:7,
14:10, 15:25, 16:6,
16:11, 16:18, 17:3,
18:4, 20:2, 20:3
informed [3] - 9:3,
16:5, 16:11, 17:9,
18:5, 19:3
infringement [5] - 5:9,
9:11, 9:22, 10:3,
16:7
insure [1] - 18:13
Intel [23] - 1:7, 2:7,
2:25, 3:19, 4:22, 5:1,
8:9, 8:13, 8:15, 10:7,
11:17, 11:24, 13:1,
13:2, 13:11, 14:24,
16:4, 17:7, 17:12,
18:2, 18:10, 19:3
Intel's [3] - 3:21, 14:7,
14:9
interject [1] - 13:10
internal [1] - 5:2
internally [2] - 8:11,
13:19
interrupt [2] - 3:8,
11:15, 13:23
interrupted [1] - 3:13
involved [2] - 6:24,
19:18
Ireli [3] - 1:18, 2:22,
14:5
issue [14] - 3:18, 4:16,
4:25, 5:3, 12:24,
13:24, 17:25, 18:1,
18:6, 18:20, 18:21,
20:14, 20:19, 21:4
issues [5] - 3:6, 3:15,
5:9, 10:4, 10:19,
12:17

**J**

Jack [2] - 1:16, 2:20
Jason [5] - 1:19, 2:22,
3:12, 19:21, 20:5
jewels [1] - 5:1
John [2] - 2:3, 2:25
Jordan [2] - 1:13, 2:18
judge [1] - 3:24
Judge [1] - 2:18

**K**

Kaj [1] - 1:8
Kent [1] - 1:13
kinds [1] - 6:1
King [5] - 2:6, 3:1,
13:10, 13:11, 19:25
knowledge [1] - 19:19
knows [1] - 9:15

**L**

laid [1] - 14:19
language [3] - 7:6,
7:9, 11:11
last [4] - 3:3, 12:13,
13:7, 13:9
law [1] - 11:16
lawyers [2] - 14:13,
15:8
lead [1] - 4:20
leak [1] - 17:4
learned [1] - 7:17
least [2] - 19:18, 21:5
left [1] - 4:5
letter [3] - 5:19, 7:18,
19:9
letters [1] - 3:4
level [2] - 11:4, 11:7
limitation [1] - 7:10
limited [2] - 9:10,
11:23
line [2] - 2:19, 15:1
list [1] - 8:24
literally [1] - 4:25
Literally [1] - 19:18
litigate [3] - 6:9, 6:10,
6:17
litigation [20] - 5:9,
6:3, 6:16, 8:8, 8:22,
8:25, 11:12, 11:19,
11:23, 12:1, 12:4,
12:8, 12:10, 12:21,
13:3, 17:2, 17:8,
18:11
Lipp [2] - 1:18, 2:5
look [5] - 6:7, 11:16,
18:19, 18:22, 21:6

looked [4] - 5:13, 5:25, 13:14, 15:22
Los [1] - 1:20

**M**

maintain [1] - 5:4
Manella [1] - 1:18
March [1] - 1:10
material [5] - 5:6, 5:21, 5:25, 7:12, 17:9
materials [5] - 5:12, 6:3, 6:6, 7:21, 13:17
matter [1] - 10:22
mean [2] - 11:3, 19:17
means [1] - 11:10
member [1] - 9:18
members [3] - 12:4, 12:6, 12:7
memoranda [1] - 8:12
mentioned [1] - 6:22
Merit [1] - 1:25
microprocessors [1] - 5:3
middle [1] - 10:13
might [5] - 9:20, 19:6, 20:9
mind [1] - 16:9
misstatement [1] - 7:2
moment [1] - 6:21
months [5] - 6:24, 12:8, 12:9, 13:9, 18:21
Morris [1] - 1:16
most [2] - 5:7, 5:11
moving [1] - 21:16
multiple [1] - 5:7

**N**

narrow [1] - 18:16
necessity [2] - 5:10, 6:2
need [7] - 4:17, 8:18, 9:7, 10:14, 14:15, 19:16, 19:24
negotiate [2] - 12:23, 13:12
negotiating [1] - 5:17
new [1] - 18:5
Newcombe [24] - 2:5, 3:1, 3:23, 3:24, 4:21, 4:22, 4:24, 6:21, 7:1, 11:9, 12:13, 12:23, 13:13, 13:20, 14:11, 14:17, 19:11, 19:12, 20:5, 20:8, 20:16, 20:17, 21:18

Newcombe's [1] - 14:3
Nichols [1] - 1:16
nobody [1] - 7:20
Note [1] - 2:16
nothing [1] - 13:7
notice [1] - 18:21
November [6] - 3:4, 7:4, 7:5, 7:25, 12:16, 12:20, 12:25

**O**

obligation [1] - 18:7
obligations [2] - 18:13, 19:9
obviously [1] - 10:15
occasion [2] - 4:14, 15:12
Office [6] - 18:6, 18:9, 18:13, 19:1, 19:10
Once [1] - 4:2
once [1] - 5:1
one [14] - 3:6, 3:7, 3:16, 5:18, 5:21, 12:2, 13:8, 13:24, 16:17, 17:25, 18:16, 18:17, 20:14, 21:4
One [1] - 3:16
ooo [1] - 2:14
open [3] - 10:5, 17:2, 21:5
opponent [1] - 16:6
opponents [2] - 8:19, 9:6
opposed [1] - 13:7
order [16] - 4:1, 4:2, 4:4, 7:6, 9:16, 9:19, 10:16, 11:10, 12:15, 12:17, 12:20, 12:24, 13:12, 17:21, 20:1, 21:16
Order [1] - 3:3
orders [1] - 13:13
ought [5] - 16:14, 17:2, 17:21, 20:11, 21:6
outside [5] - 15:9, 15:13, 15:15, 15:16, 15:17
outstanding [1] - 12:17
own [5] - 6:14, 8:2, 11:18, 16:25, 17:1

**P**

page [1] - 21:9
Palo [1] - 2:6
papers [1] - 11:18

parse [1] - 15:13
part [1] - 5:13
partial [1] - 3:10
participate [1] - 3:17
participated [1] - 14:8
participating [1] - 6:18
participation [2] - 3:22, 12:18
particular [1] - 19:19
parties [3] - 3:11, 12:15, 12:16
parties' [1] - 14:18
partner [1] - 16:10
partners [4] - 17:1, 19:23, 19:25
party [2] - 3:20, 4:6
past [5] - 9:20, 9:21, 15:7
Pat [1] - 19:25
patent [7] - 6:13, 6:18, 7:16, 18:5, 18:12, 18:20, 19:5
Patent [8] - 18:6, 18:9, 18:13, 19:1, 19:9
patents [8] - 3:20, 4:6, 9:1, 15:25, 17:10, 18:3, 19:4, 20:13
patents-in-suit [2] - 3:20, 18:3
Patrick [5] - 2:6, 3:1, 13:11
people [16] - 5:15, 6:24, 7:11, 8:14, 9:6, 10:1, 10:2, 10:22, 11:5, 13:6, 15:2, 15:14, 15:15, 15:21, 15:23, 16:3, 16:20, 17:14
per [2] - 11:25, 12:20
perhaps [1] - 16:3
period [3] - 5:5, 6:7, 11:14
permit [1] - 16:19
permitted [2] - 10:5, 10:9
person [3] - 9:1, 9:3, 10:5
phone [3] - 2:25, 13:1, 21:15
piece [3] - 11:2, 17:20, 17:21, 21:11, 21:12
pieces [3] - 18:2, 19:3, 19:5
place [3] - 17:22, 20:1
Plaintiff [1] - 1:5
plaintiff [1] - 2:21
play [3] - 3:6, 9:10, 11:23
Pm [3] - 1:10, 2:17,

21:21
point [4] - 3:25, 10:16, 10:19, 21:11
portion [1] - 4:4
portions [1] - 3:25
position [16] - 6:21, 7:24, 8:7, 8:18, 8:19, 8:25, 9:24, 9:25, 10:1, 10:21, 11:11, 13:21, 15:5, 16:7, 16:8, 19:1
positions [8] - 8:25, 9:22, 10:3, 10:10, 14:18, 17:15
possession [3] - 18:4, 18:8, 18:23
possible [1] - 5:23
potentially [3] - 10:21, 12:5, 18:3
practical [1] - 5:8
prepared [1] - 3:21
presented [1] - 20:18
pressed [1] - 9:6
pretty [4] - 7:24, 8:17, 11:12, 16:1
prevent [1] - 20:13
preventing [1] - 6:17
previous [2] - 7:5, 12:9
problem [4] - 4:24, 6:25, 20:6, 20:7
processes [1] - 5:2
produced [2] - 8:10, 8:12
progress [1] - 21:6
promptly [1] - 21:15
prosecute [4] - 6:12, 9:1, 15:18, 15:25
prosecuting [3] - 16:14, 17:10, 20:13
prosecution [21] - 3:16, 3:17, 4:5, 5:20, 6:13, 6:14, 6:19, 7:7, 7:15, 7:19, 8:8, 8:15, 9:9, 10:23, 11:13, 11:21, 12:1, 12:5, 12:11, 19:2, 19:8
prosecutions [1] - 7:16
Protective [1] - 3:2
protective [17] - 4:1, 4:2, 4:4, 7:5, 9:16, 9:19, 10:16, 11:10, 12:15, 12:17, 12:19, 12:24, 13:12, 13:13, 17:21, 19:25, 21:16
provision [1] - 11:6
put [6] - 4:6, 5:17, 7:11, 12:3, 15:5, 15:6, 16:20, 17:20,

19:7

**Q**

quiet [2] - 6:24, 9:25
quite [2] - 15:6, 21:9

**R**

raise [1] - 17:25
raised [3] - 13:18, 19:13, 19:20
range [1] - 10:5
reacting [1] - 19:13
read [1] - 3:4
really [3] - 6:8, 10:24, 16:3
reason [4] - 5:6, 10:25, 12:2, 14:25
received [1] - 12:22
recent [1] - 14:4
recently [1] - 13:18
recognize [2] - 9:12, 11:22
record [5] - 5:4, 5:6, 6:7, 7:2, 7:7
Redux [1] - 3:3
reexam [2] - 4:1, 4:7
reexamination [5] - 3:18, 3:20, 3:22, 12:18
referring [1] - 11:11
regardless [1] - 12:21
Registered [1] - 1:25
regret [1] - 17:14
regular [1] - 15:7
regularly [1] - 15:11
related [1] - 20:15
relation [2] - 20:13, 20:14
relevant [4] - 18:3, 18:6, 18:14, 19:6
reliance [2] - 6:23, 7:23
Reporter [1] - 1:25
Reporters [1] - 2:16
resolution [2] - 3:11, 14:23
resolve [2] - 4:17, 21:10
resolved [5] - 3:19, 17:19, 17:20, 20:6, 20:7, 21:12
respect [2] - 17:11, 20:19
response [3] - 5:21, 7:13, 7:20
revealed [1] - 10:7
review [4] - 7:10, 8:9,

8:11, 8:24
reviewed [11] - 5:6, 5:21, 6:5, 6:6, 7:12, 7:14, 7:20, 8:21, 9:4, 13:17, 14:9
rights [1] - 18:12
role [2] - 9:10, 11:22
run [1] - 7:2

## S

sandbag [1] - 7:22
saw [1] - 10:7
scope [3] - 3:16, 4:20, 7:15
se [2] - 11:25, 12:20
second [1] - 9:23
see [4] - 11:17, 15:12, 20:23, 21:12
seem [1] - 17:14
segregate [1] - 14:13
self [3] - 10:14, 14:12, 15:2
self-censor [1] - 10:14
self-censored [1] - 14:12
self-censorship [1] - 15:2
semiconductor [1] - 7:16
sense [1] - 16:23
sensible [2] - 16:18, 20:14
sensitive [1] - 5:12
sent [5] - 3:4, 7:6, 7:8, 7:18, 19:4
sentence [1] - 16:10
separate [4] - 5:23, 6:14, 11:13, 16:25
set [2] - 15:21, 15:23
sets [2] - 19:22, 19:23
Shaw [3] - 2:3, 2:24, 2:25
Sheasby [27] - 1:19, 2:22, 3:8, 3:10, 3:12, 3:15, 3:25, 4:11, 8:3, 8:4, 8:6, 9:8, 9:15, 10:12, 11:15, 12:12, 12:14, 13:12, 13:18, 13:23, 13:25, 14:1, 14:3, 19:21, 20:7
short [1] - 10:8
side [8] - 9:13, 9:15, 13:8, 14:24, 16:4, 16:17, 21:4
side's [1] - 16:18
signature [1] - 17:22
simply [1] - 12:25
Simpson [2] - 2:5, 3:1
sitting [2] - 8:21, 16:6

situation [1] - 15:20
slice [1] - 16:12
smokes [1] - 18:24
someone [1] - 5:13
somewhere [1] - 10:12
sorry [3] - 9:20, 14:23, 21:8
sort [3] - 6:22, 17:16, 20:25
sounds [1] - 4:9
speaker [1] - 21:20
speaking [1] - 8:2
specific [2] - 8:19, 15:21
specifically [1] - 15:20
stage [1] - 21:11
staked [1] - 7:24
standard [1] - 3:22
Stargatt [1] - 2:2
start [1] - 5:1
Starting [1] - 7:4
starting [1] - 7:24
statement [1] - 20:3
statements [1] - 14:19
States [1] - 1:1
stay [1] - 16:21
step [2] - 10:9, 16:16
still [4] - 6:17, 15:17, 15:25, 21:5
stipping [1] - 4:6
stipulate [1] - 3:19
stipulation [1] - 20:18
stop [2] - 14:10, 20:8
straightforward [1] - 16:1
strategic [3] - 10:20, 11:4, 11:7
stringent [1] - 3:22
stuff [1] - 17:13
subject [11] - 3:3, 8:8, 8:14, 9:9, 10:23, 11:5, 11:16, 11:20, 12:1, 12:5, 12:10
subjected [1] - 6:1
submissions [1] - 14:19
submit [1] - 20:2
submitted [2] - 18:9, 18:15
substitute [1] - 3:17
such-and-such [2] - 10:8
suggest [1] - 12:24
suit [4] - 3:20, 4:7, 5:18, 18:3
Sunday [2] - 13:1, 13:2
support [1] - 7:22
supposed [1] - 20:20

surfacing [1] - 20:10
Systems [2] - 1:4, 1:21

## T

table [2] - 3:15, 4:3
Taylor [1] - 2:2
team [12] - 5:8, 6:9, 5:14, 6:11, 8:22, 9:18, 11:19, 12:1, 12:4, 12:10, 13:20
technical [10] - 8:11, 8:13, 8:15, 9:3, 9:17, 10:15, 10:18, 10:24, 16:6, 16:11
teleconference [1] - 14:20
telephone [1] - 2:16
Telephone [2] - 1:11, 21:21
ten [1] - 6:24
test [1] - 6:8
Thacher [2] - 2:5, 3:1
themselves [1] - 10:14
theories [1] - 9:11
therefore [1] - 6:1
they've [4] - 6:21, 12:13, 16:21, 17:12
thinks [1] - 21:4
throw [1] - 21:7
Thursday [1] - 1:10
today [3] - 3:3, 4:13, 4:18
today's [1] - 3:5
together [3] - 4:10, 8:24, 12:3
touchstone [1] - 11:17
toward [1] - 21:1
track [1] - 20:25
tried [2] - 7:22, 15:5
true [1] - 15:19
trust [2] - 16:22, 16:23
trusted [1] - 16:24
try [1] - 16:24
trying [1] - 6:4
Tunnell [1] - 1:16
turn [1] - 5:15
turning [1] - 5:1
two [5] - 3:15, 12:17, 13:17, 19:16, 19:22, 19:23

## U

unaffected [1] - 6:10
under [2] - 9:16, 9:18
understood [1] - 11:6
Unidentified [1] - 21:20

United [1] - 1:1
unresolved [1] - 20:10
up [7] - 3:25, 4:13, 12:24, 15:11, 16:7, 21:13
Usdc [1] - 1:13
utter [1] - 16:10

## V

validity [2] - 5:10, 10:22
view [4] - 9:2, 11:20, 11:21, 17:15
virtue [1] - 5:24

## W

wants [3] - 4:20, 15:1, 17:7
weekend [1] - 13:8
whole [1] - 4:4
wide [3] - 4:5, 10:5
Wilmington [1] - 1:10
window [2] - 4:2, 21:7
words [1] - 20:5
world [1] - 16:16
writing [1] - 21:15

## Y

Young [1] - 2:2

# EXHIBIT B

1

```
1                IN THE UNITED STATES DISTRICT COURT

2               IN AND FOR THE DISTRICT OF DELAWARE

3                            - - -

4    INTEL CORPORATION,          :   CIVIL ACTION
                                 :
5              Plaintiff and     :
               Counter-defendant, :
6                                :
     v.                          :
7                                :
     AMBERWAVE SYSTEMS CORPORATION, :
8                                :
               Defendant and     :
9              Counter-claimant.  :   NO. 05-301 (KAJ)

10                           - - -

11                    Wilmington, Delaware
               Tuesday, November 8, 2005 at 3:30 p.m.
12                    TELEPHONE CONFERENCE

13                           - - -

14   BEFORE:      HONORABLE KENT A. JORDAN, U.S.D.C.J.

15                           - - -

     APPEARANCES:
16

17            YOUNG CONAWAY STARGATT & TAYLOR
              BY:  JOSY W. INGERSOLL, ESQ., and
18                 JOHN W. SHAW, ESQ.

19                 and

20            SIMPSON THACHER & BARTLETT, LLP
              BY:  GEORGE M. NEWCOMBE, ESQ., and
21                 PATRICK E. KING, ESQ.
                   (Palo Alto, California)
22
                        Counsel for Intel Corporation
23

24
                             Brian P. Gaffigan
25                           Registered Merit Reporter
```

2

1    APPEARANCES:   (Continued)

2

3            MORRIS NICHOLS ARSHT & TUNNELL
         BY:   JACK B. BLUMENFELD, ESQ.

4                and

5            IRELL & MANELLA, LLP
         BY:   DAVID I. GINDLER, ESQ., and

6                JASON G. SHEASBY, ESQ.
                 (Los Angeles, California)

7

8                    Counsel for AmberWave Systems
                     Corporation

9

10

11

12

13                        - oOo -

14                P R O C E E D I N G S

15            (REPORTER'S NOTE:  The following telephone

16    conference was held in chambers, beginning at 3:30 p.m.)

17            THE COURT:  Hi, this is Judge Jordan.  Who do I

18    have on the line?

19            MS. INGERSOLL:  For Intel, Your Honor, it's

20    Josy Ingersoll and John Shaw at Young Conaway; and George

21    Newcombe at Simpson Thacher.  I think he is in Palo Alto.

22            MR. NEWCOMBE:  That's correct.

23            MR. BLUMENFELD:  Good afternoon, Your Honor.

24    Jack Blumenfeld for AmberWave; along with David Gindler

25    and Jason Sheasby at Irell & Manella in Los Angeles.

1           THE COURT:  All right.  I have your letters

2    regarding this dispute over the protective order and I've

3    read them.  So while I recognize that one might make the

4    argument as AmberWave does that the burden of a "more

5    restrictive" protective order falls on Intel, my questions

6    are more for you in the first instance, folks at AmberWave.

7           So, Mr. Blumenfeld or Mr. Gindler, who is going

8    to be speaking to this?

9           MR. BLUMENFELD:  Mr. Gindler is.

10          MR. GINDLER:  I think actually Mr. Sheasby will

11   be addressing this.

12          THE COURT:  Mr. Sheasby?  All right.

13          I am certainly familiar with plenty of

14   institutions of higher learning who are aggressive in

15   pursuing patents and in enforcing them and so the fact

16   there is a charitable institution or a higher education

17   institution that is doing that, how does that make it any

18   less of a concern for Intel?  Why should they say I don't

19   care whether my rights get lost to a for-profit corporation

20   or to a university?  Help me with the logic there.

21          MR. SHEASBY:  Yes, Your Honor.  That limitation

22   actually came out of discussion with Intel during the

23   protective order in which they were concerned that we would

24   retain an expert, an engineer working at one of her

25   competitors, say, for example, AMD.

4

1          I think if you take a step back and understand

2    the case law on this subject, it makes our position a little

3    clearer.  Intel doesn't cite a single case that has ever

4    applied a prosecution bar to expert witnesses.  In fact,

5    the major case that it relies on is an opinion written by

6    Your Honor in the CEA case, and in that case there was a

7    prosecution bar applied to trial counsel who was prosecuting

8    patents for competitors.  And if you look at the protective

9    order that was entered in that case, you will see that for

10   expert witnesses there was no prosecution bar.

11          THE COURT:  Well, I'm prepared to say there may

12   not have been a prosecution bar because there wasn't an

13   issue.  So I'm trying to get at, when you say they haven't

14   cited any cases to support it, do you have any cases that

15   say expert witnesses aren't an issue as opposed to attorneys

16   if they're pursuing patents?

17          MR. SHEASBY:  Well, I think there are two lines

18   of cases that relevant.  And the first line stems out of

19   U.S. Steel which is a Federal Circuit opinion.  And what

20   that case says is that decisions about limits on access

21   to documents need to be made on a person by person basis

22   based on the relationship and activities of the parties.

23   Now, it may in fact be the case that there are certain types

24   of expert witnesses for which the access to confidential

25   information presents just an unacceptable risk of

1    inadvertent disclosure.  And we've actually built in a

2    structure for that.  That structure is when we want to use

3    an expert witness, we have to disclose that to AmberWave

4    and disclose their qualification and their professional

5    experience, and AmberWave is given the opportunity to

6    object.  And if we can't resolve those objections, it goes

7    before the Court.

8         And so there may well be situations in which

9    certain expert witnesses are going to be inappropriate for

10   this case because of the concerns that Intel cites in those

11   letters, and we're prepared to deal with that on an expert

12   witness by expert witness basis.  But what we don't think

13   is appropriate and what we haven't found any case law

14   support for is across the board per se ban saying if you

15   are an expert witness, you have to have a prosecution bar

16   in place.

17        THE COURT:  Well, now maybe I misunderstood.  I

18   didn't understand them to be saying that any expert witness

19   has to have a prosecution bar.  Well, let me take that back.

20   I understood this to be directed at people falling into

21   this category of are you working in this field?  I mean

22   they're not worried about people who aren't working in the

23   field, right?  Well, maybe I should ask them that question.

24        MR. NEWCOMBE:  Yes, Your Honor.  That's correct.

25   There is a limitation to the field which is semiconductor

1    fabrication and design.

2              MR. SHEASBY:  And, Your Honor, the only expert

3    witness this case is about probably speaking semiconductor

4    fabrication and design and so that the rules follow the

5    exception.  All of our expert witnesses would be working in

6    the field of semiconductor fabrication and design.  If they

7    weren't, they would be inappropriate expert witnesses.  So

8    despite that limitation, what it really drops down to is if

9    we have an expert witness, they are automatically subject to

10   those prosecution bar for Intel's litigation.  What we're

11   asking for is not to say that there may not be situations

12   in which a bar would be appropriate or exclusion of expert

13   witness would be appropriate, but --

14             THE COURT:  Well, I'll tell you what.  Why

15   don't we shorten this up.  Here is how we'll do it.  We

16   won't have the bar in there at the front end, but I will put

17   you on notice right now that if you try to put somebody

18   forward who they can make any credible statement to me to

19   at all as being involved in this field, I'm going to apply

20   it.  When you say there is no case, maybe that is because

21   nobody has come forward before and said, hey, we want to

22   use somebody who is prosecuting patents in this field as a

23   researcher at a university and we still want to use them

24   and we have a right to.  Because that doesn't seem to me

25   to be a tenable position.  It doesn't make any difference

1    whether they're at a university or they're at a for profit

2    organization.  The point is you're asking for and are going

3    to get highly sensitive, highly confidential by definition

4    technical documents that bear on current research from

5    Intel, and they don't have to and shouldn't have to unveil

6    that to somebody who is looking to get patent prosecution in

7    the very same field.

8           Now, maybe you guys have cast the field too

9    broadly.  I'm not speaking to that at all.  I'm just giving

10   you a general statement that if you think you can find

11   somebody who doesn't meet the concern that they've got but

12   that would somehow be blocked by this up front statement,

13   I'll give you the benefit of the doubt, AmberWave, but just

14   be on notice I hear Intel's concern loud and clear and we

15   won't spend a lot of time on a later phone call.  If they

16   say, "hey, this is just the kind of person we're looking at"

17   and I believe them, that's the end of the discussion.  All

18   right?

19           MR. SHEASBY:  We understand, Your Honor.  And

20   I think we're going to have to go back and talk to Intel

21   perhaps about the scope of the subject matter bar that they

22   put in place.

23           MR. NEWCOMBE:  Your Honor, this is George

24   Newcombe.  I would also add that the paragraph seven was

25   drafted with the expectation of the bar being an up front.

1  If the procedure is going to be as Your Honor laid it out,

2  then we would probably have to expand that to include their

3  current areas of research so we can know and assess the

4  danger.

5            THE COURT:  Absolutely.  I agree with that

6  completely.  The point is not to prevent Intel from knowing

7  who is doing what.  If you want to do this, what I hear you

8  saying, AmberWave, is "we want to do it on a case by case

9  basis."  If you guys want to do it on a case by case basis,

10 then the people you are proposing had better be prepared to

11 certify all the research areas they're into so that Intel

12 can make a sensible decision about whether it's got an

13 objection or not.

14           MR. SHEASBY:  No, and I will have to go back

15 and speak with our client, but we can't imagine that would

16 be a problem.  We're certainly not looking to hide the ball

17 in this context.  We just have a situation in which the

18 realities of being an academic researcher are that you have

19 obligations to seek patents on your research.

20           THE COURT:  Right.  And that's in fact why I

21 think Intel's position is not as unfounded as you are

22 suggesting.  Because these are people who are obligated and

23 who will be seeking patent protection.  So to say to Intel

24 "now show us your stuff because we want to show it to

25 somebody who is going to be pursuing patents," that is

1    problematic.

2              All right.  Let's turn to the issue that you've

3    got with respect to the reexamination.  I think I understand

4    the parties' respective positions on this, but why don't you

5    let me restate it real quickly and somebody can straighten

6    me out if I'm wrong.

7              AmberWave's take on this is "hey, we may want to

8    seek reexamination.  If we do, all our lawyers are going to

9    be up the learning curve.  Therefore, we want them to be

10   able to participate."

11             Intel's position is "hey, it doesn't make any

12   difference whether it's before the fact or after the fact

13   since reexamination can end up in a different contour of the

14   claims.  You can't be allowed to have our information in

15   your head while you are pursuing a reexamination."

16             Have I got your side of it right, Mr. Sheasby?

17             MR. SHEASBY:  A slight modification, Your Honor.

18   Here is what we don't think we have a right to do.  We have

19   no right to, litigation counsel has no right to participate

20   in drafting amendments and reexamination.  And just as a

21   side note, because it's a reexamination, all claim amend-

22   ments must be narrowing so we could never get broader claims

23   in reexamination.

24             The second modification is that AmberWave is

25   not suggesting that if we seek reexamination, the litigation

1    counsel has a right to participate.  We understand that

2    that is a decision that if we make, we have to live with

3    that decision with the burdens that it places on us.  What

4    we're concerned with is in a situation where a third party

5    or Intel were to seek reexamination of one of our patents,

6    AmberWave wanted prosecution counsel and litigation counsel

7    to be able to discuss the prior art that is at issue in

8    that reexamination to make sure there is consistency

9    across the borders.  So when there is a problem we cause,

10   we don't believe we get any relief; but if it's not a

11   problem that we've caused, we think the narrow relief we're

12   asking for which is no participation in claim drafting,

13   simply being able to discuss with prosecution counsel the

14   positions they're going to be taking regarding the patent

15   in both the litigation, the reexamination is narrow and

16   reasonable.

17              THE COURT:  Okay.  Mr. Newcombe.

18              MR. NEWCOMBE:  Thank you, Your Honor.  I think

19   you captured the essence of our argument in your summary.

20   And I point out that saying it narrows doesn't help at all

21   because you can, by being aware of all the bar specific

22   internal confidential information, you can use the

23   reexamination process to alter the scope of your claims in

24   a manner to artfully avoid prior art yet still establish

25   infringement.  So that danger of using and misusing that

1    information is very real whether you are broadening or

2    narrow.

3              Second, there is only two things you can do in a

4    reexamination to avoid the patents being invalid, and that

5    is one to change the scope of the claim in a manner which

6    avoided the prior art or to argue a claim modification of

7    scope to the Patent Office does the same thing.  Both of

8    those processes involve, if someone has in their head all

9    of the secret sauce, all of the highly confidential

10   information.  I don't know how they separate that out.  And

11   that's the danger that we think requires trial counsel not

12   to be involved not only in drafting claim language per se

13   but in formulating responses to all its actions which have

14   the effect of achieving that result.

15             THE COURT:  Okay.  Mr. Sheasby, do you want to

16   say anything in response?

17             MR. SHEASBY:  Yes.  You know, Your Honor, I

18   think whether it's a reexamination or another litigation or

19   this litigation before the Court, the litigation counsel

20   are going to have knowledge about Intel's products that are

21   going to allow them to "take positions on the scope of the

22   claims" so whether that occurs in a reexamination on the

23   litigation doesn't strike me as not a meaningful distinct-

24   ion.  The idea we're not going to be able to participate in

25   claim drafting seems to me to be a significant protection

1    for Intel.  In fact, I should say that Intel's position

2    in their letter brief is a shock to AmberWave because in

3    previous discussions we've had with Intel's counsel, they

4    had actually agreed in principle to allow us to participate

5    in reexamination for the narrow purpose of consistency and

6    positions, not for drafting claims.

7              THE COURT:  Well, explain to me what you mean

8    when you say "consistency and positions but not for drafting

9    claims."

10             MR. SHEASBY:  Sure.

11             THE COURT:  In your view of this, let's say

12   you're the guy and you've spent months working on this case

13   and spent who knows how many tens of, maybe hundreds of

14   hours immersed in highly confidential documents.  And one

15   of your colleagues comes to you who is now roped into a

16   reexamination, not by AmberWave's choice but somebody

17   else's.

18             MR. SHEASBY:  Intel's choice.

19             THE COURT:  Go ahead.  We'll make those guys the

20   bad guys.  They've got the temerity to challenge your patent

21   at the PTO, start a reexamination and now your colleagues

22   sits down with you.  How do you envision this discussion

23   taking place?  When they say, "well, the challenge is to

24   this specific claim.  We think if we do this or we do that

25   with the claim, we can get past the reexamination."  In your

1    mind, would that be "drafting claims" or would that just be

2    advising on strategy and prior art?

3                MR. SHEASBY:   That would be drafting claims,

4    Your Honor.   If I had a discussion with prosecution counsel

5    about how claim should be amended, that clearly would be

6    within the scope of drafting claims.   The conversation that

7    I do think appropriate is "the piece of prior art was cited

8    against us.   We know this is a piece of prior art that's in

9    play in the litigation.   What position are you guys taking

10   on this piece of prior art?   What is your view of what it

11   discloses and what it doesn't disclose because we want to

12   make sure that we don't say, we don't take inconsistent

13   positions in the prosecution."

14               THE COURT:   So what you are saying is you want

15   to be able to talk about, you want to be able to confer

16   confining any discussion to a statement about the meaning

17   of prior art.   Have I understood that right?

18               MR. SHEASBY:   Yes, the discussion about the

19   prior art.   Yes, that's correct, Your Honor.

20               THE COURT:   All right.   Now, Mr. Newcombe, I

21   want you to help me out.   How would a discussion of that

22   sort be problematic?   How would knowledge of your client's

23   technical information be violated if somebody said, "hey,

24   what are the parties' competing positions in front of the

25   District of Delaware with respect to the Gadzooks reference

1    or whatever?"  How does that that implicate your technical

2    information?

3                    MR. NEWCOMBE:  Your Honor, if the limitation --

4    keep in mind what we're talking about here is participation

5    in response to Office Actions.  Okay?  That is what we say

6    they can't do.  That's what I think in the hypothetical Your

7    Honor laid out was, what we envisioned the conversations

8    would be wherein how do we play this before the Patent

9    Office?  What can we do to avoid this reference?  And that's

10   why we have it limited to responses to Office Actions.

11                   If they were to say, "look, obviously they

12   have to have separate prosecution counsel," that is a given

13   because that person is going to have to be involved in

14   detailed analysis claims and what not.  But if they were

15   simply to say "here is our analysis of the prior art that

16   we've come up against in the case," and give it to them,

17   all right?  So let's say "here is your prior analysis.  Take

18   it.  You guys do what you need to do to make sure this is

19   not used inconsistently."  Fine, then there is no back and

20   forth.

21                   But what I'm concerned about, you get into a

22   very slippery slope once you start talking, discussing it,

23   getting into conversations about it.  I don't know how that

24   doesn't slide into what you are going to use it as before

25   the PTO.  I have no problem with them telling them how they

1    use it, how they analyze it, giving them the work products

2    so they can say "here is all the prior art we've come up

3    with and how we view it," but then how that interplays

4    with the reexamination proceeding they should not be

5    involved in.

6              THE COURT:  Well, you know, I think you folks

7    ought to discuss how to.  And it's going to get wordy but

8    you ought to take a crack at working on that piece of

9    common ground.  I am exquisitely sensitive to both parties

10   in this litigation have their legitimate needs to take care

11   that their research and development work not be misused.

12             And so once again, as a general statement, I

13   am more sympathetic to the Intel side than the AmberWave

14   side here.  I just think one of the consequences of being

15   involved in litigation is you are going to run into costs

16   and expense, and if that means you are going to end up

17   with some duplication costs and expense to avoid revealing

18   somebody's highly technical information, maybe that is just

19   one of the fallouts of modern day litigation, unfortunate

20   but real.

21             However, I think there is a legitimate scope of

22   common ground here for you folks to work out, a basis for

23   some limited sharing of information.  And we've just heard

24   it discussed.  So I put that back on you folks to talk about

25   how a discussion or a statement of prior art position could

1   be legitimately shared, avoiding discussion of the sort that

2   we've all agreed would be inappropriate and providing some

3   sensible safeguards so that it doesn't devolve into that

4   discussion once you are giving a prior art position.  If you

5   think that is too complicated and you can't work it out,

6   I'll understand, but I think you ought to be looking there

7   in the first instance.

8            So, do you think you can work something out in

9   that regard, Mr. Sheasby?

10           MR. SHEASBY:  I think so, Your Honor.  I think

11  you should give us the opportunity to do so.

12           THE COURT:  All right.  Mr. Newcombe, I'll ask

13  you to work on that in good faith.  I hope my statement that

14  I've got some sympathy for Intel's position doesn't harden

15  you up to any reasonable discussion that Mr. Sheasby and

16  company might want to have with you.

17           MR. NEWCOMBE:  It won't, Your Honor.  I think

18  we all in the course of this have recognized the area where

19  there is the problem and we'll work towards achieving

20  something that will be efficient in using knowledge that

21  legitimately can be used from litigation counsel but not

22  crossing the line into an area that could devolve into what

23  we all agree is improper.

24           THE COURT:  Okay.  All right.  Well, there is

25  the rulings on the issues you put before me.  Is there

1   anything else we ought to be talking about while we're

2   all on the line together here?  Counsel for AmberWave?

3                   MR. SHEASBY:  Not from us.

4                   THE COURT:  Okay.  Intel, from you folks?

5                   MR. NEWCOMBE:  No, Your Honor.

6                   THE COURT:  All right.  Thanks for your time.

7   Good-bye.

8                   (The attorneys respond, "Thank you, Your

9   Honor.")

10                  (Telephone conference ends at 3:55 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT C

Proposed Stipulation Regarding Reexamination Proceedings                    Page 1 of 1

## Bussey, Jason

| | |
|---|---|
| **From:** | Gindler, David [DGindler@irell.com] |
| **Sent:** | Wednesday, March 22, 2006 8:41 AM |
| **To:** | King, Patrick |
| **Cc:** | Sheasby, Jason; Vanderlaan, Chris |
| **Subject:** | Proposed Stipulation Regarding Reexamination Proceedings |

**Attachments:** 1440707_1.DOC

<<1440707_1.DOC>>

Pat,

Following up on your conversations with Jason regarding reexamination, attached is a proposed stipulation. Let me have any comments at your earliest convenience.

David I. Gindler, Esq.
Irell & Manella LLP
1800 Avenue of the Stars
Suite 900
Los Angeles, California 90067
dgindler@irell.com
(310) 203-7106  Direct Dial
(310) 556-5206  Direct Fax
(323) 377-7826  Mobile

"NBEMF <irell.com>" made the following annotations.
----------------------------------------------------------------------

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system. Thank you.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMBERWAVE SYSTEMS CORPORATION, | ) | Civil Action No. 05-301-KAJ |
| | ) | |
| Plaintiff, | ) | Consolidated |
| | ) | |
| v. | ) | |
| | ) | |
| INTEL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## **STIPULATION**

IT IS HEREBY STIPULATED AND AGREED by and between AmberWave and Intel as follows:

1.     Neither party has filed or caused to be filed, directly or indirectly, a reexamination request pursuant to 35 U.S.C. § 302 or 35 U.S.C. § 311 (a "Reexamination Request") on United States Patent Nos. 6,831,292, 6,881,632, 6,946,371, any patent that issues from United States Application No. 10/774,890, any patent that may later be added to the above-referenced action, or any patent now existing or that subsequently issues that claims priority to any application to which any one of the foregoing patents claims priority (the "Subject Patents"), or a foreign equivalent of any such proceeding in a foreign jurisdiction.

2.     Neither party is aware of any third party that has filed, is considering filing, or intends to file a Reexamination Request on the Subject Patents, or a foreign equivalent of any such proceeding in a foreign jurisdiction.

3.     Neither party will file or cause to be filed, directly or indirectly, a Reexamination Request on the Subject Patents, or a foreign equivalent of any such proceeding in a foreign jurisdiction.

2

4. Neither party will discuss with, request, or assist, a third party, directly or indirectly, in filing a Reexamination Request on the Subject Patents, or a foreign equivalent of any such proceeding in a foreign jurisdiction.

Dated: March __, 2006                    Respectfully submitted,

OF COUNSEL                               By: _____
Morgan Chu                                    Jack B. Blumenfeld (#1014)
IRELL & MANELLA LLP                           Leslie A. Polizoti (#4299)
1800 Avenue of the Stars, Suite 900           MORRIS, NICHOLS, ARSHT &
Los Angeles, California 90067                 TUNNELL LLP
                                              1201 N. Market Street
                                              P.O. Box 1347
                                              Wilmington, Delaware 19899

                                              Attorneys for AmberWave Systems
                                              Corporation


OF COUNSEL                               By: _____
George M. Newcombe                            Josy W. Ingersoll (No. 1088)
SIMPSON THACHER & BARTLETT LLP                 John W. Shaw (No. 3362)
3330 Hillview Avenue                          YOUNG CONAWAY STARGATT &
Palo Alto, California 94304                   TAYLOR, LLP
                                              The Brandywine Building, 17th Floor
                                              1000 West Street
                                              Wilmington, Delaware 19801

                                              Attorneys for Intel Corporation



SO ORDERED: _____
                    Hon. Kent A. Jordan



Dated: _____, 2006



2